1   Steven Mack, Esq.
    Nevada State Bar # 4000
2   **GIBBS GIDEN LOCHER TURNER
    SENET & WITTBRODT LLP**
3   1140 N. Town Center Drive, Suite 300
    Las Vegas, Nevada 89144-0596
4   (702) 836-9800

5   Attorneys for Plaintiffs
    DARLENE CARTER and DAVID
6   BIANCO

7           **IN THE UNITED STATES DISTRICT COURT**

8                    **DISTRICT OF NEVADA**

9   DARLENE CARTER, an individual; and          Case No.:    2:19-cv-01779-APG-BNW
    DAVID BIANCO, an individual,
10
                    Plaintiff,                   **PLAINTIFFS DARLENE CARTER
11     v.                                        AND DAVID BIANCO'S RESPONSE
                                                 TO DEFENDANT'S MOTION FOR
12  LIBERTY MUTUAL INSURANCE, a foreign          SUMMARY JUDGMENT**
    entity; DOES I-X; ROE CORPORATIONS I-
13  X, inclusive,

14                  Defendants.

15          Plaintiffs, DARLENE CARTER, an individual and DAVID BIANCO, an individual

16  ("Plaintiffs"), hereby files the following RESPONSE TO DEFENDANT'S MOTION FOR

17  SUMMARY JUDGMENT, for the reasons set forth herein.

18          This Response is based upon the attached memorandum of points and authorities, the

19  pleadings on file herein, expert testimony, testimony of the parties and any oral arguments at the

20  time of hearing.

21  I.      **JURY INSTRUCTIONS ON EACH CLAIM**

22          This case arises in this court from Diversity Jurisdiction, and as a result, the underlying

23  causes of action are based upon substantive Nevada Law.[1]  This is a Jury trial, and for each of the

24  causes of action and claims in the complaint the relevant Jury instructions exist, at a minimum:[2]

25

26  [1] Liberty removed this matter pursuant to 29 U.S.C. § 1332. As a result, this matter is before this
    Court on the basis of diversity jurisdiction, and this Court must look to Nevada's substantive law
27  for the causes of action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed.
    1188 (1938).
28  [2] See, Exhibit "1" These are not exclusive or exhaustive, but relevant for the purposes of this
    Response.

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

II.   **EXPERT REPORTS AND TESTIMONY**

Plaintiffs have retained an insurance expert, Joanna Moore, for purposes of determining the whether the Defendant has breached the duty of care to Plaintiffs as an insurance provider, and whether the actions taken (or failed to have been taken) by the Defendant were reasonable or unreasonable, and whether the Defendant was responsible for the damages caused by the third-party contractors.  The total extent of the expert's opinion is incorporated herein by reference.3

Ms. Moore's deposition was also taken, and it was her opinion that the Liberty failed miserably in their handling of the claims, obligations and treatment of the Plaintiffs.  Further, it is Ms. Moore's opinion that Innovation Group was not only the agent of Liberty, but acted as the conduit and manager of the repairs on behalf of Liberty, connecting the contractors directly to Liberty including responsibility and management for their work.   Ms. Moore's opinion is based upon the totality of the depositions and facts of this case.

The Defendant failed to retain a single expert on the issue of Insurance bad faith, duty of care, responsibility to insured or any related matter.  No expert on behalf of Defendant can state that the facts, as they are, do not support the claims in the complaint.

Plaintiff also retained a construction expert, Lane Swainston, to determine not only the extent of the damages the Plaintiffs have suffered, but also to determine what actions should have been taken as to the repairs to the property and in what order to minimize further damage, what the contractors and the Defendant failed to do in regard to the property and how that ultimately affected the Plaintiffs.  The total extent of the expert's opinion is incorporated herein by reference.4  Mr. Swainston's testimony also states that he believes that Liberty failed miserably in the handling of the claims and management of the repairs to Plaintiff's home.  Mr. Swainston also finds that Innovation Group and Liberty acted together along with the contractors that were appointed by Innovation Group on behalf of Liberty.  Further, Ms. Moore finds that Mr. Swainston's findings support her findings of bad faith and failure to

///

---

3 See Expert Joanna Moore's written opinion, attached hereto as Exhibit "2".
4 See expert Lane Swainston's Report, attached hereto as Exhibit "3".

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

The Defendant's only expert was retained and testified as to the room by room repairs as estimated by the Defendant at the outset of the claims and not to any extent of the damages actually incurred by the Plaintiffs.  The contractors never even began repairs to the inside of the home, as the entire focus of both of Liberty's contractors was the patio cover, which was not only left unfinished, but was improperly reconstructed.

## III.   STATEMENT OF FACTS

While the Plaintiffs appreciate the argument makes attempting to state that certain facts are "undisputed", could not be further from the truth and wholly disputes the Liberty's "Statement of Undisputed Facts".

### A.   Innovation Group, The Contractors and Their Relationship With Liberty

Innovation Group was an agent and partner of Liberty.  The attached web page from the Liberty website is evidence of the relationship that existed between Innovation Group and Liberty.  And while the Plaintiffs may not have relied upon the website page, the Plaintiffs clearly and unequivocally relied upon Liberty to direct them, to which they did so to Innovation, who appointed the contractors.  Innovation never gave the Plaintiffs any choices for contractor, it was Liberty and Innovations specific direction to each of the contractors that were appointed.  And although the Plaintiffs signed contracts with the contractors, they did so at the direction of Liberty.  The Plaintiffs had no independent knowledge or contact with each of the contractors prior to Liberty's appointment.

When the Plaintiff's made their claim, they were referred to Innovation Group by Liberty for the claim handling and repair.  Innovation Group assigned Dallas White contractors initially to begin the job of repairing the Plaintiffs' home.  The assignment or choice of the contractor, Dallas White, was not made by the Plaintiffs, it was made by Innovation Group as directed by Liberty.  When Dallas White failed miserably, the Plaintiffs went back to Liberty, who then, in a conference call with Innovation Group, removed Dallas White as the contractor, replacing them with Belfor restoration.

Once again, Belfor was not a choice by Plaintiffs, but was assigned by Liberty through Innovation Group.  The Plaintiffs did not hire the contractors because they chose them

2502261.1

independently of Liberty, but rather signed the "Work Authorization" agreements with each of the contractors based upon Liberty's direction.  The exact and only reason that the contractors were on the job for the Plaintiffs was due to Liberty's direction as they were not given choices on contractors – they were specifically assigned.  The Plaintiffs relied upon Liberty and their agent Innovation to appoint the proper expert contractors to repair their home.[5]

Innovation Group was an arm or partner of Liberty.  Evidence of the partnership of Liberty and Innovation Group are found on the Liberty Website[6] as well as through the admissions of Liberty and Innovation Group that a contract existed between the parties for just such referrals. Liberty now claims that the Plaintiffs somehow randomly and directly entered into agreements with Dallas White and Belfor and are, therefore, responsible for the poor or non-existent workmanship, when in fact Liberty had numerous and inconsistent claim handlers who clearly relied upon Innovation Group as their agent to direct, oversee and manage the repairs. Innovation Group worked at the direction of Liberty and the contractors worked at the direction of Innovation Group.  Plaintiffs' experts' opinions clearly and unequivocally link Liberty with Innovation and their contractors, Dallas White and Belfor.

Ms. Moore states in her opinion, that Liberty failed to conduct a reasonable, thorough and timely investigation of the claims and failed to properly vet their recommended contractors, clearly linking the contractors with Liberty.   Ms. Moore clearly states that Dallas White and Belfor were agents of Liberty.[7]

Pursuant to Ms. Moore, "Liberty Mutual failed to ensure timely, regular status updates were provided to the policyholders and failed to inform them as to the status of claim/repairs as required by Nevada Code Title 57 insurance Chapter 686A.310.  It looks as if Liberty Mutual had numerous and inconsistent claim handlers involved in the course of this claim but relied on Innovation Group as their agent to oversee and manage the home repairs and Liberty Mutual took

---

[5] See DallasWhite and Belfor "Work Authorizations" attached hereto as Exhibit "4", wherein both agreements state that payments were to come directly from Liberty.  As far as Plaintiffs were concerned, these were authorizations to work and they had to sign them, but payments were supposed to come directly from Liberty to the contractors.

[6] See, Website capture, attached hereto as Exhibit "5".

[7] See Joanna Moore's Supplemental Expert Report, Exhibit "2" Page 6.

Gibbs Giden Locher Turner Senet & Wittbrodt LLP

1    a "hands off" approach to assisting the insureds in their time of need.  Unfortunately, it appears

2    Liberty Mutual's staff did not provide regular on-site assistance to their customers nor did they

3    support these insureds who were caught in the middle between Liberty Mutual and their

4    recommended contractors…"8

5           Further, in Ms. Moore's deposition, the Defendant's attorney attempts to testify as to what

6    the relationship of Liberty, Innovation and the contractors were, but is corrected by Ms. Moore:9

7           · Q.· ·And so from what we've talk about and from what's in your report, certainly as
       of July 6, 2020, seems to be that a summary of your opinions is that because the trades that
8      you believe or understand were recommended or referred by, directly or indirectly, Liberty
       did not do a good job, and that Liberty, then, did not adequately fix that failure on that part,
9      that that is what underlies these other areas where you've determined that Liberty either did
       not satisfy its duties or were -- was not reasonable.  Do you agree with that?
10          · A.· ·Well, I think it goes way beyond that.
           · Q.· ·Before we go beyond that, so you do not agree with that?
11          · A.· ·No. I -- I agree that your statement that Liberty Mutual referred these repair
       trades through what I would designate their third-party agent, Innovation Group, to assist
12     the insureds, and I think we talked about this the last time that we met for my first deposition,
       that they basically -- Liberty Mutual just turned this over to Innovation Group, and the
13     policyholders were stuck in the middle, basically, in my view of what happened, and that
       Liberty Mutual just abandoned them to try to figure it out with Innovation Group. There
14     were -- there were times that I know that there were some joint phone calls, but Liberty
       Mutual didn't assist the policyholders, in my view, in their time of need, and it continued to
15     go from bad to worse, getting Mr. Bianco and Ms. Carter more and more frustrated, more
       and more upset, more and more desperate to try to have Liberty Mutual help them, and that's
16     what did not happen in this claim, and here we are today because of it.
           · Q.· ·And so your opinions that there were failures to satisfy duties and failures to
17     comply and unreasonableness by Liberty Mutual, that's because of the failure of Liberty
       Mutual to provide the help in these issues with the repair trades; is that true?
18          · A.· ·That's definitely one part of it, because the insureds relied on Liberty Mutual
       and Liberty Mutual's assistance to get their home back in order and back to where it was
19     before the original storm, and that did not happen.

20

21

22   See, further:10

           · Q.· ·So it's those three things, then, that are the source of your opinions of where
23     Liberty did not satisfy its obligations?
           · A.· ·Yes.· In addition to that, I mean, I would also say, which I did in my
24     subsequent report, that, you know, there was no, that I saw, proper vetting by Liberty Mutual
       of the contractors, and they basically just turned this over to their agent or partner or
25     whatever you want to call them, Innovation Group, and just, you know, let them take over
       the contractor referral.· They did nothing internally to vet the ·contractors that I saw.

26

27   ──────────────
     8 Id.
28   9 See, Deposition of Joanna Moore, Volume II, Exhibit "6", Page 29:12-25, 30:1-25, 31:1.
     10 Id. at Page 89:21-25, 90:1-25, 91:1-4

2502261.1

·Q.· ·And that vetting issue, your concern that that's an inadequacy by Liberty is based upon your conclusion that Liberty created an expectation by the plaintiffs that Liberty would be in charge of making sure repairs were completed properly and to plaintiffs' satisfaction; is that right?

·A.· ·Well, and it's -- it's based on the fact that if Liberty is going to say on their website, you know, that we'll provide the service for you, and the contractors, you know, aren't properly vetted, the insured is going to rely on what Liberty Mutual has told them. But in addition to that, I think I also commented, which I don't want to lose my train of thought, that I didn't see any referral or assistance that Liberty Mutual could and should have provided since this was, you know, a water/storm claim for any emergency services to come and assess the situation at the time of the first report, and my experience is that normally an insurance company would at

least have a conversation with their policyholders about that and decide if the policyholders need emergency services.  Many policyholders, you know, are naïve and they don't know about that, but I didn't see that happening in this situation either.

And yet again:[11]

·Q.· ·And are you offering an opinion that Liberty Mutual should be -- or Liberty should be responsible for damage due to poor workmanship by Dallas White?

·A.· ·Well, I think based on my experience -- and, again, I think that's going to be an issue for the judge to determine and the jury to determine, but based on my own experience, from the documentation that I reviewed, it appears to me that Liberty Mutual took on the role, through Innovation, of overseeing the repairs, and that those contractors, through Innovation, became, you know, agents acting on behalf of Liberty Mutual. Again, that's not for me to determine because I'm not a lawyer, so a judge is going to be deciding that, a jury is going to be deciding that.· And if Liberty Mutual takes a look at the circumstances and says, you know, Hey, we -- we led these customers to have certain expectations, we didn't measure up, let's make it right, you know, that's an internal decision.· I mean, I don't know which way it's going to go.

·Q.· ·It sounds to me that based upon your assessment, that you believe Liberty assumed that obligation to, I guess, make sure that repairs occurred, that you believe Liberty should be responsible for damage from poor workmanship by DallasWhite.· Do I understand that right?

·A.· ·Well, you know, if -- I believe that they should be responsible for taking care of their customers, and because of their assumption of, you know, overseeing the referral network and all of that, if things were mishandled, mistakes were made, then I believe Liberty Mutual should just, you know, step up and say, Yeah, we made a mistake, let's make it right, no matter whose fault it was, Liberty Mutual's or their referral network or...

·Q.· ·And I think I hear what you're saying.· I asked you -- I said responsible, and I think I need to ask a different question. Do you think that Liberty Mutual is at fault for damages from poor workmanship by Dallas White?

·A.· ·I think that's a question the jury is going to have to answer.

·Q.· ·Okay.· Similar question.· Do you think that Liberty Mutual is at fault for damages from poor workmanship

by BELFOR?

·A.· ·Once again, I think that's a question the jury will answer.

---

[11] Id. at Page 135:2-25, 136:1-20

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

Plaintiffs' other expert, Lane Swainston, opined the following:[12]

"The homeowners acted in good faith to secure a contract with the contractors they advised to use by Liberty Mutual."

In the deposition of Plaintiff, Mr. Bianco he stated:[13]

> Q.· ·You say you were referred to DallasWhite, who made that reference?
> A.· ·Liberty Mutual.
> Q.· ·Who at Liberty Mutual?
> A.· ·It was one of the internal persons that was assigned to the case.
> Q.· ·What was that person's name?
> A.· ·I don't recall the name.· I can go back to my notes because my wife, like I said, was the one who made the phone call.
> Q.· ·It sounds like if there was a referral from someone at Liberty Mutual to DallasWhite that was not a communication you had, correct?
> A.· ·No, they were referred to me.· **I didn't have a choice on the matter.**
>  (emphasis added).

And further:[14]

> Q.· ·What happened after DallasWhite was dismissed?
> A.· ·They actually refer a different contractor so that's when Belfor came into place.
> **Q.· ·Who referred Belfor?**
> **A.· ·It was Liberty Mutual.**
> **Q.· ·Who at Liberty Mutual had made that reference?**
> **A.· ·Wanda Chambers, I believe.**
> (emphasis added)

And yet again:[15]

> Q.· ·After that point you never saw DallasWhite at your house again; is that right?
> A.· ·Correct.· What happened is I think I contacted the insurance company and I was very upset about the fact, you know, what was going on with all the water because we had the rain and I took the videos.· I believe I contacted the insurance company. I believe I told them these people have no idea what they are doing.· I mean, why is my roof leaking again after they supposedly fixed it. Now, the money you have paid me to get everything fixed is getting wet again, we have new plywood, we have new trusses going from the patio and everything is getting wet again.· It shouldn't be like that so what is the purpose of replacing everything if the roof has something corrected -- if they were not properly corrected why is it still leaking.· That's when I think I contacted the insurance company, and we decided to part ways or they decided to fire them.
> **Q.· ·Who did you speak with at the insurance company about that?**
> **A.· ·I believe it was Wanda Chambers.· It was a three way call.· It was Wanda**

[12] See, Expert Report of Lane Swainston, Exhibit "3", Page 6
[13] See Deposition of Mr. Bianco Exhibit "7", Page 79:1-15
[14] Id. at Page 112:15-23
[15] Id at Page 104:14-25, 105:1-18

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

**Chambers and Innovation Property and Innovation Property is supposed to be overseeing the jo[b].**

Q.· ·It was a phone call between you Wanda Chambers and Innovation Property at some point after you saw the leaks and the DallasWhite roof on your patio cover?

A.· ·Correct.

 (emphasis added)

Ms. Carter was asked her understanding of Innovation and responded that Liberty told the Plaintiffs to deal with Innovation, then Innovation assigned the contractors, specifically:[16]

· Q.· ·What was your understanding in terms of what Innovation was supposed to do?

· A.· ·Liberty Mutual recommended and said go with -- go with Innovation Properties. They teamed up together and they said we have some contractors for you so we can get this job done quickly.· So that's how we set that up.

· Q.· ·So it sounds like someone from Liberty recommended Innovation is your recollection; is that right?

· A.· ·Oh, yes, they did.

· Q.· ·Who was that?

· A.· ·Billy Gold was my first contact with Liberty, but then I believe it was Wanda Chambers because he said he was going to forward the information on to her, so it would be Wanda Chambers.· That's how I remember.

· Q.· ·So is it something where you remember Wanda Chambers specifically recommended Innovation or is that just what you probably think happened based upon what you recall of the sequence?

…

· Q.· ·So was the sequence as you remember it that Wanda Chambers made a recommendation for Innovation?

· A.· ·Yes.

· Q.· ·And then Innovation made a recommendation for Dallas White?

· A.· ·Yes.

Clearly, the Plaintiffs relied wholly on Liberty to direct them as to what contractors to use.

Further, when problems came up, the Plaintiffs contacted Liberty to try and iron them out.

Further Ms. Carter has always believed and understood that it was Liberty that was

repairing her home.  She stated further in her deposition:[17]

·Q.· · What do you intend to do with that money at this point?

·**A.· · I need to have stuff repaired.  And at this point I expect Liberty Mutual to repair my home with another contractor, of course, that's liable.**

·**Q.· · When you say another contractor that's liable, do you mean another contractor who will do the job appropriately?**

·**A.· · Yes.**

 (emphasis added)

---

[16] See Deposition of Darlene Carter, Exhibit "8", Page 91:16-25, Page 92:1-25, Page 93:1-5.

[17] See deposition of Darlene Carter, volume II, Exhibit "8" Page 71:7-15

2502261.1

Stephanie Farmer, the PMK of Innovation Group, affirmed that Innovation Group had a contract with Liberty Insurance to provide contractors to their insured:[18]

> Q. So -- so I guess my question was, is it fair to say that the insurance company's contract with Innovative to provide contractors to insureds?
> A. We work with them on a contractual basis.
> Q. Okay. The insurance companies. Correct?
> A. Correct.
> Q. Okay. And you represent -- or you did represent Liberty Insurance. Is that correct?
> …
> **A. We -- we are contractually -- I wouldn't say represent -- we have a contractual obligation to provide such service.**
> **Q. With Liberty?**
> **A. Correct.**
> (emphasis added)

And further and succinctly:[19]

> Q. Okay. In your best estimation, what are you providing to the insurance company?
> A. We're providing a contractor for their insured.
> Q. Okay. So it's your recommendation for the contractor for the insured then?
> A. Correct.

And more so:[20]

> Q. Okay. And is that -- so how was that resolved? Was that because Belfor was now appointed to come and be the contractor?
> A. Correct.
> Q. Okay. And did you choose Belfor and provide that to my clients?
> A. I asked Belfor if they would assist the insured.
> **Q. Okay. And so then Belfor was directed to my clients. Correct?**
> **A. Yes.**
> **Q. In other words, my clients didn't come to you and tell you that they wanted Belfor. Correct?**
> **A. Correct.**
> **Q. And they didn't come to you and tell you that they wanted DallasWhite. Correct?**
> **A. Correct.**
> …
> Q. Sure. So the reason that -- then the -- let me restate that. The contractors, both DallasWhite and -- shoot, I'm sorry, I just lost that screen I was looking for. DallasWhite and Belfor were referred by you. My clients didn't tell you that's who they wanted. Correct?
> …

---

[18] See, deposition of Stephanie Farmer, Exhibit "9" Page 13:10-25, 14:1-3
[19] Id. Page 17:13-19
[20] Id. Page 34:14-25, Page 25:1-25, Page 36:1-17

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

A. The contractor was referred by Innovation.

…

**Q. Okay. But that's -- the reason that you're even involved is based upon your contract with Liberty. Correct?**

**A. Correct.** (emphasis added)

Finally, August Nardoni, the PMK for Liberty states that Liberty would have referred the Plaintiffs to Innovation Group for the purposes of appointing a contractor, although he doesn't seem to understand the exact relationship or compensation to Innovation Group, and attempts to deflect the questions, even though he was supposed to be PMK:[21]

Q. Okay. Does the insurance company have contracts -- well, at this time, did they have a contract with a company called Innovations?

A. Right now?

Q. At the time.

A. So, I believe Innovations, at the time, was a program that was used to assist insureds in access to a contractor, if they didn't have any contractors in mind.

Q. Okay. Do you know how the contractors came about in these claims?

…

THE WITNESS: I'm not sure, but it may have been a referral for Innovations to provide a referral to the homeowner regarding the contractor.

BY MR. MACK:

Q. And Innovations was paid by Liberty, correct?

…

Q. Right. But do you know if Liberty Mutual generally had a contract with Innovations at the time?

…

THE WITNESS: No, not that I know of.

BY MR. MACK:

Q. Okay. Do you know how Innovations would have been referred to my clients?

A. I believe that Liberty Mutual claims adjuster would have referred them to Innovations.

Q. Okay. And then Innovations' job is to obtain a contractor for the insured?

A. I believe that Innovations makes a referral to the insured regarding contractors in the area.

Further, Mr. Nardoni has no knowledge in this specific case how the referrals occurred or who referred them, and simply makes assumptions, leaving more questions than answers:[22]

Q. Do you know if that's what occurred in this case?

A. I don't know what exactly occurred in this case regarding initial referral, whether -- I'm assuming the homeowner would have requested a referral for a contractor.

Q. But you don't have any knowledge of how that occurred; there's no notes in the file or anything like that?

---

[21] See deposition of August Nardoni, Exhibit "10", Page 18:3-25, Page 19:1-20

[22] Id. Page 21:7-17

Gibbs Giden Locher Turner Senet & Wittbrodt llp

2502261.1

A. I don't remember seeing a note as we speak right now.

It is clear that Liberty was dealing directly with the Contractors, including Belfor, prior to starting work, when they were drafting the plans for the building department to obtain the permits that DallasWhite failed to obtain prior to doing work for the patio work (that had to be rebuilt by Belfor after the shoddy work of Liberty's prior contractor, DallasWhite):[23]

Q. Okay. All right. This is an email from September of 2017. In this particular case, it looks like you're having direct conversations with Belfor to work with the drawings from the engineer and approve it so repairs could be made. Is that correct?

A. I'm sorry; you kind of cut out.

Q. Sure. I mean, obviously this email appears -- and correct me if I'm wrong -- to let my client know that you're working with Belfor. Correct?

A. Correct. Belfor had sent drawings from the engineer, so I sent a copy to the homeowner. And Belfor was supposed to be working on a repair estimate. That's what they had informed me they would do, and these are the engineer's plan.

Q. These are the plans that were sent?

A. Yeah, so these were the drawings from the engineer.

…

Q. Have you seen this email from David to Matt?

…

A. Yeah, I think I did look at this one.

Q. And here, Wanda Chambers is communicating directly with Belfor. Do you see that?

A. Yes.

Q. And in fact, she does that almost through the entire process. Are you aware of that?

A. Yeah.

Q. And Darin is telling her -- do you see this -- in July of 2017 to get the architect to draw up plans as built-out-to-code patio cover. Also attached is the proposal for the roof as the roof replacement as the roof suffered damage from 80-mile-per-hour winds experienced in Las Vegas in March. Do you see that?

A. Yes.

And a letter from the Plaintiffs to Liberty complaining about the contractors that Liberty appointed to the job, wherein Liberty fired them, has never been disputed or responded to by Liberty, stating that the factual allegations in the letter were inaccurate:[24]

Q. So here is this letter. And you see where my client is complaining because the original claim was from the first contractor, DALLASWHITE, who never did the job. Liberty Mutual fired them, said we would start over. Three-way call between Wanda Chambers and Stephanie Farmer saying they took full responsibility, they would handle everything. And then they, Liberty Mutual, hired Belfor for a new contractor. Do you see that?

---

[23] Id at Page 79:1-19, 75:4-21
[24] Id at page 77:1-25, Page 78:1-6, See also, footnote 43 herein.

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

A. Yes.

Q. Do you have any reason to dispute what's in this email to Matt?

…

THE WITNESS: I have no idea. I wasn't privy to the conversation.

BY MR. MACK:

Q. Okay. Are you aware of Matt ever saying, no, that didn't occur?

…

A. Regarding Wanda Chambers and Stephanie Farmer stating that they took full responsibility?

Q. Right.

A. I don't know that I asked them about it. I don't know that I ever saw this email other than reviewing for this process.

Q. Okay. And for the additional damage to the roof being mentioned at this point, right?

…

THE WITNESS: This was an email between, it looks like, David and Matthew.

And even though that email existed in the system of Liberty, and Mr. Nardoni admitted that an email existed between Matt Degelormo and the Plaintiffs, Mr. Degelormo denied any such communication:[25]

Q. Was there -- did you have an understanding that Dallas White was not performing the repairs and they did not properly pull permits on this project and that type of thing? Did you hear about that?

A. I remember hearing about that. And I remember that they, Mrs. Carter and Mr. Bianco, were not happy with the work that they did.

Q. Okay. And did you hear about a telephone conversation that they had with Wanda Chambers and with Innovation when they were on the phone all together to try and find out what they were going to do with Dallas White, and then ultimately reassigned the case -- the repairs were reassigned to BELFOR?

…

A. I do not. I don't know anything about that.

However, Mr. Degelormo admitted that they used Innovation to refer contractors to insureds, *and that Innovation was the only company they worked with to do so.*  Further, that Innovation communicated with Liberty multiple times in this case:[26]

Q. Innovation Properties. Thank you. And can you tell me what Innovation Properties is?

A. So that's a third-party contractor network.

Q. Okay. And can you tell me what they do for Liberty or they did for Liberty?

…

A. So we worked with them to try and find contractors for the insureds so they

---

[25] Deposition of Matt Degelormo, Exhibit "11" Page 40:13-25, 41:1-4

[26] Id at Page 30:19-25, 31:1-25, 32:1-25, 33:1-13

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

could then hire those contractors to complete the repairs to their home.

Q. Okay. And do you know how Liberty -- what the relationship between Liberty and Innovation Properties was?

A. Just that we worked with them. They kept track of contractors for any area where there was a need, and we would make the referrals over to them to reach out to the insured and offer the insured a contractor.

Q. Okay. And were you told -- were you told in Liberty, or at least at that time, to use Innovation's services; in other words, you didn't have a separate list of contractors you were told to refer to the insured over to Innovative [verbatim]and Innovative would take care of it, correct?

...

A. We don't have a separate list of contractors. So we would refer over to them, and that's how we would be assisting the insured with finding a contractor.

Q. Okay. And did you have any other company than Innovation Properties that you used at that time?

A. No, we did not.

Q. Okay. Did you have direct communications with Innovation through this entire process?

…

A. Yes. We were able to communicate directly with Innovation.

Q. Was that an ongoing communication during the entire process or was it just a one-time communication? I mean, what was the typical --

…

Q. -- typical way that you dealt with these people?

…

A. It would depend on the claim file. We could communicate with them once, we could communicate with them, you know, other times. It would depend on the need.

Q. Okay. And what about in this particular case?

…

A.  I honestly don't remember how many times I communicated with them.

B.

Ms. Wanda Chambers, the primary adjuster for the Plaintiffs, apparently has no

independent recollection of any of the events she was involved with:[27]

Q Do you remember this at all?

A I mean I'm looking at this information. I mean my name is there. I mean I don't remember it, but if it's there, yeah.

Q You don't remember any of this discussion whatsoever?

A No.

Q Do you recall in this particular matter an issue where the contractor had failed to permit the reconstruction that they were performing on the property?

A No, I don't recall.

Q You don't remember DallasWhite not properly getting permits for the reconstruction?

A I don't recall that.

Q Do you recall that one of the reasons that the Carters were unhappy with

---

[27] See, deposition of Wanda Chambers, Exhibit "12", Page 44:24-25, 45:1-19

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

DallasWhite was because they failed to properly construct the reconstruction?
A I mean I don't recall it, no. The conversation, yeah, no.

And further, although entries in Liberty's contact program indicates that Ms. Chambers dealt directly with DallasWhite, Ms. Chambers seems to have no independent recollection of any of the case:28

Q What is CTR?
A Contractor.
Q And Marques Brown would be your contact at DallasWhite?
A No, I can't say that is my contact, no. I don't recall having a specific contact or any contact actually.
Q Would you say that in this particular entry it appears that you made contact with Marques Brown?
A No, I can't say that I made contact with him based on that note. As I stated, it appears that there was information that was probably sent based on this entry here, but whether or not contact was made, I don't know that.

And again, Ms. Chambers claims to have no independent recollection, but that her notes clearly show that she was dealing with DallasWhite directly, and she conferenced in DallasWhite when the Plaintiffs were having issues.  In fact, the Plaintiffs turned to Liberty because the contractors retained for the job were from Liberty's referral:29

Q Can you explain what it says in that entry, please?
A Based on this entry it appears that Carter was having some issues as stated there and I supposedly conferenced in Innovation to try to get those ironed out, I guess.
Q And the problems you mean are with DallasWhite, the contractor that was assigned?
A According to this entry that's what it appears.
Q It also appears that there was some additional damages due to water leaks since Dallas never tarped some areas; is that correct?
…
THE WITNESS: I can't say if it's correct or not. I can say that is what it shows there.
…
Q It was your note; right?
A It says on the author so yeah, I'm -- yeah, I'm just saying four years ago I can't say what was or wasn't four years ago.
…
Q We are going to go to page 2217. There's two entries from you. Can you read those, please? Those are both apparently on November 3rd, 2016.
A Okay.
Q Can you tell me what those notes say?

---

28 Id at Page 63:1-25, 64:1-6
29 Id at Page 73:18-25, 74:1-16, 74:19-25, 75:1-5

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

A Based on those notes it appears Carter was having issues with DallasWhite.

Q And you conferenced in DallasWhite, Marques?

A Let me reread. I don't think I saw I conferenced -- oh, from that note it appears that, yeah, from that note, yeah.

And finally, Ms. Chambers notes clearly show she was involved in the removal of DallasWhite and the appointment of Belfor, even though once again, she has no independent recollection of anything in this case:[30]

Q Okay. Can you tell me what this says?

A Based on that entry once again it appears the insured is still unhappy with DallasWhite or Mr. and Mrs. Carter, I should say, still unhappy with DallasWhite and that a conference call was completed with Mr. and Mrs. Carter to go over their concerns with Innovation, and Innovation stated they would attempt to review and rectify Mr. and Mrs. Carter's concerns.

Q And, in fact, at the end it says that both PHs stated they were relieved and feel they will be able to move forward with Innovative newly assigned contractor; correct?

A That is what it says.

Q So the conference call that you had with all the people ended in DallasWhite being dismissed and the new contractor being assigned through Innovative; correct?

A Well, I can't attest to whether they were dismissed or not, and especially at that point I don't know because I don't have anything to do with Innovation and the way that they assign or unassign contractors.

…

Q So it's fair to say that sometime between May 19th, 2017 and July 13th, 2017 DallasWhite was removed and the new contractor was Belfor; correct?

…

THE WITNESS: I can't attest to when, you know, Dallas was removed or when Belfor -- I can't attest to that because I'm not privy or a party to that process.

Q Except you were, because May 19th there was a communication here where you were -- that's exactly what you were involved with, attempting to take care of the DallasWhite issues and have Innovative assign a new contractor; correct?

A And I'm sorry I thought --

…

THE WITNESS: -- your prior question was asking me whether or not I could confirm that DallasWhite was actually removed, I'm sorry, and Belfor assigned. I thought that was the question, I apologize.

Q Right, but you said you weren't involved in that. My question is you were involved with that?

….

THE WITNESS: May I clarify?

Q Sure.

A What I'm saying I'm not involved in is the actual cancelling of a contractor or removing them from a project and adding another one because that is strictly Innovation's process. That's what I was saying, yes.

…

---

[30] Id at Page 82:2-25, 83:1-25, 84:1-25, 85:1-23

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

Q You do not have any independent recollection of this phone call?

A No, I mean based on that entry it shows me putting that entry there. You know, I can't say three plus years later that I remember that exact conversation, no.

Q So you don't remember any details of that conversation or even having that conversation?

A No.

Q Is that correct?

A That is correct, I don't recall.

And multiple entries wherein the Plaintiffs are contacting Liberty because of the issues with the contractor and Innovation:[31]

Q So the entry at 3:50 p.m. there, can you tell me what that is?

A There's a lot of names. David – David and it appears Belfor, Innovation -- so it looks like David was unhappy about the repairs again with Innovation and Belfor, that is basically what that is saying.

Q And the policyholder was stating that the roof is uncovered, rats are getting in. You apologized for the delays. The policyholder stated he had a hard time getting repairs done with IPN DallasWhite, and what is again IPN, that's Innovative; right?

A Innovation.

Q Okay. And DallasWhite and now has Belfor, who has subbed roofer and other repairs but needs approval. Do you see that?

…

A So you said that it's reading I apologized for delays, but I can't attest that that was for delays, so that's the first thing. What was your question again, I'm sorry?

Q This indicates that you were apologizing for the delay that he was stating --

A Oh, down at the bottom. I didn't see that, I'm sorry, the next part. I apologize.

Q So then he stated he had a hard time getting the repairs done with DallasWhite, now with Belfor who has subbed roofer and other repairs, but needs approval. Then you put the open items are accepted; correct? Do you see that, open items are accepted?

A I see that.

…

Q Can you tell me what you were – what this states?

A Okay, one moment. It appears again Innovation and the policyholder are still having some issues with getting things moved along, that's what it looks like, and another call was made to Innovation in order to assist to try to, you know, get them on the same page.

…

Q And in this particular case can you tell me what those say, please?

A According to the bottom --

…

According to the bottom entry it looks like Innovation, Belfor, it seemed like there was a contact or attempted contact with Belfor once again or Innovation or and/or Innovation trying to settle the items with the policyholder.

….

Q And this is basically a conversation that you had with the policyholder with

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

---

[31] Id at Page 86:14-25, Page 87:1-23, Page 88:12-23, Page 90:11-21, Page 94:8-21

regard to his frustration of the timing of getting these things fixed; is that correct?

A From the note there it appears that David, the policyholder, called in to state that he was still having some issues with Innovation and getting things settled. There were still some delays.

Q And he was unhappy because more damage was being done to the house; correct?

…

THE WITNESS: That's noted there based on what was given, it appears.

A multitude of examples exist wherein the Plaintiffs relied upon Liberty and believed Liberty and Innovation Group to be working as one in providing the contractors to repair their home, as they continually went to Liberty with the issues they were having with the contractors appointed by Liberty through Innovation Group.  Clearly, Innovation Group was the conduit for the contractors and was contracted by Liberty to do so.  Innovative Group was an agent and worked in conjunction with Liberty such that the Plaintiffs believe they had to go through Innovation Group, or that they were some part of Liberty.

Innovation Group, DallasWhite, Belfor and Liberty are inextricably intertwined and Liberty cannot step back and simply wash their hands of their relationships. Further, Liberty has no expert to claim or opine otherwise.  The relationship between Liberty, Innovation Group and the contractors, Dallas White and Belfor, is a material issue of fact.

**B.       Facts As To Claims and Timing**

Undisputed is that the Plaintiffs filed a claim with Liberty May 4, 2016, after a date of loss of April 30, 2016, that resulted from high winds and bad weather.[32]

The original contractor and construction coordinator that Liberty required the Plaintiffs to go through, was DallasWhite, and the Plaintiffs did not have a choice in the matter.[33] DallasWhite was completely incompetent and failed to obtain any permits or licenses to perform the work, and what work they did complete was so poor that it had to be completely torn apart and redone by Belfor who was appointed by Liberty.[34]

For two and a half years, the Plaintiffs were extremely patient through all of Liberty's

---

[32] See deposition of David Bianco, Exhibit "7", Page 26:10-14
[33] Id at Page 79:1-15
[34] Id at Page 112:15-20, deposition of Darlene Carter, Exhibit "8". Page 83:20-25, 84:1-25, 85:1-2

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

1   missteps and inadequacies through the entire claim.  During that period of time, the Plaintiffs

2   relied upon Liberty to provide them guidance on the reconstruction and repairs.  When the

3   Plaintiffs had issues, they went to Liberty, who then went to Innovation Group and ultimately

4   directed Innovation Group.

5        The Plaintiffs have been forced to live in a home that is unrepaired and unsafe, since April

6   30, 2016, due to the ineptitude of Liberty's preferred contactors and the unprofessionalism and

7   rudeness of the claim's adjuster. Eventually, after the Plaintiffs' substantially complained to

8   Liberty, a conference call between Liberty and the Plaintiffs was held, after which Liberty,

9   through Innovation Group, appointed Belfor.35

10       Because of the ineptitude of the prior contractor, the Plaintiffs' home was further damaged

11  as a result of the failure to repair the initial claim, by subsequent winds rain and hail.  A "new"

12  claim beginning in March of 2017 was made to Liberty as a result of more damage to the

13  unrepaired home, and only occurred because of the failure of Liberty's contractors to complete

14  the prior work.  The Plaintiffs believed that the new damages to the home in the second event

15  should have been part and parcel to the original claim and not denied, *as does the Plaintiffs'*

16  *expert in her report*.36

17       BELFOR began working on the property, but then walked off the job, leaving the property

18  unprotected and in complete disarray,37 because Liberty has failed and refused to pay additional

19  monies for BELFOR.  The last payment made by Liberty was made on or about May 18, 2018,

20  over a year prior to filing this complaint.  The Plaintiffs had little or no support from Liberty as to

21  Belfor, even though Liberty was responsible for having Belfor conduct the work.38

22  ///

23  ///

24  ///

25

26  [35] Id at Page 112:22-25, 113:1-9 and also see, Exhibit "13" email between Matt Degelormo and Mr. Bianco and innovative notes

27  [36] See Expert Report Joanna Moore, Exhibit "2", Page __, see also deposition of David Bianco, Exhibit "7" Page 109:20-25, 110:1-11

28  [37] See deposition of Darlene Carter, Exhibit "8", Page 77:22-25, 78:1-4
    [38] Id at Page 78:7-11

2502261.1

The Plaintiffs contacted the Nevada State Contractor's Board to review the work completed thus far because even after Belfor conducted the work, it was improper.39  Because they were unable to determine which contractor was responsible for the poor workmanship, they were unable to determine liability.  However, the investigator termed the situation a "911" situation.40

Plaintiffs' property remains, nearly four years later, in a condition that continued to degrade and detrimental to the Plaintiffs as well as the structure itself.  The Plaintiffs have made repairs as they have been able to afford to do so.  The roof of the home, which is the first place that the contractors should have started at, has now been replaced and the Plaintiffs have installed new windows, and has just started to receive bids to repair the inside of the home, which was damaged from the events, including substantial mold infestation.41

Mr. Nardoni also denied the second wind event claim, in the face of a multitude of evidence from the neighbors and even the contractors on the job stating that the winds caused the additional damage.42  Mr. Nardoni was extremely rude to the Plaintiffs and denied pretty much everything he was to look at and stated that he would have denied the entire claim to begin with.43  The Plaintiffs expert, as previously addressed found Liberty to have denied this second wind claim in bad faith.

Further, the Plaintiffs have never been paid for their personal items that were destroyed, and according to Ms. Chamber's notes, Mr. Nardoni was asked by Ms. Chambers to meet with the Plaintiffs to settle any open items,44 which Mr. Nardoni never did.45

> Q And can you tell me what this is stating, please?
> A Based on that entry it appears that the field adjustor is to work with the policyholder and the policyholder is to provide any information needed to help settle any open item.

39 See deposition of David Bianco, Exhibit "7", Page 140:5-19, and expert Lane Swainston's report, Exhibit "3" generally
40 See deposition of Darlene Carter, Exhibit "8" Page 86:2-25, 87:1-17
41 Id at Page 147:2-25, 148:1-11
42 See, Exhibit "14" attached hereto, which consists of Mr. Nardoni's denial letter, and the notes of Belfor and Liberty
43 See, deposition of Darlene Carter, Exhibit "8", 74:2-25, 75:1-25, 76:1-12, 77:1-6
44 Id at 93:2-18, 74:2-18
45 Id at 68:7-25, 69:1-17

Q And they contacted you by e-mail requesting the status of the personal items damages; correct?

A According to this entry, yes.

Q And you told August to review the open items with the insured; is that correct?

A According to this entry, yes.

Q Apparently you knew August at one time. At the very beginning it says August, how are you. Do you see that?

A My entry does say that to August, yes.

**C.        Facts As To Additional Money On Hand**

Because Liberty brings this up in their Motion, it is addressed here, although it is more of a red herring because that money could have been applied to the roof or windows or both.  In fact, in her deposition, Ms. Carter's did not dispute that she was holding money, however, she did so because work had not been completed and was waiting for direction from Liberty:[46]

·Q.· · And is there a reason you have not spent that money for repairs for the home?

·A.· · The reason why I have not spent that money is because I wanted to make sure that all of you knew that I still had the money, the funds, that was paid to me for repairs to pay someone to repair my home.

·Q.· · It sounds like that's something you thought Liberty Mutual might think was important; is that right?

·A.· · Yes.

…

·Q.· · What do you intend to do with that money at this point?

·A.· · I need to have stuff repaired.· And at this point I expect Liberty Mutual to repair my home with another contractor, of course, that's liable.

·Q.· · When you say another contractor that's liable, do you mean another contractor who will do the job appropriately?

·A.· · Yes.

When Belfor walked off the job, they were claiming to have been owed over $20,000.00, even though the work they had done did not justify the amount claimed.[47]   The Plaintiffs contacted Liberty and worked through a solution to make a payment of $3000.00 to Belfor for them to come back and continue work.  However, after receiving the $3000.00 Belfor still did not return to the Plaintiffs' home, and has never been back.

Every step of the way, the Plaintiffs contacted and relied upon Liberty to manage the contractors, any issues that arose and the money disbursed.

///

[46] Id. Vol II, Page 70:14-25, Page 71:1-17

[47] See, deposition of David Bianco, Exhibit "7", Page 138:1-7

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

Without question the Plaintiffs relied and were led to believe intentionally, or negligently on behalf of Liberty, that Liberty was responsible for the contractors and repair of their home.[48]

Liberty, once paying out $27,059.90, stopped paying any further amounts and stopped managing the Plaintiffs claims.  Even though Liberty's contractor, DallasWhite, who received a portion of the money, was totally incompetent, failed to pull permits, and their work had to be completely redone, and even to the extent that Liberty's second contractor, Belfor, had to have an architect redesign their work on the patio cover and obtain proper permits.  Somehow, Liberty believes that the Plaintiffs are and should be responsible for the money that went to DallasWhite.  And Liberty believes such amounts paid to DallasWhite should be credited towards the total payout.

## IV.   POINTS AND AUTHORITIES

### A.   Relevant Law

Summary judgment is only proper when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[49] A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which is believes demonstrate the absence of a genuine issue of material fact.[50] An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law.[51] "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[52]

///

---

[48] See deposition of Darlene Carter, Exhibit "8", Page 110:22-25, 111:1-20
[49] Fed.R.Civ.P. 56(c).
[50] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)
[51] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505 (1986)
[52] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.2008)

2502261.1

A court "generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."53 "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."54 Plaintiffs are also entitled to reasonable inferences concerning probable expert testimony at trial, even if not presently in evidence. Where it is an "eminently reasonable, if not inescapable, inference" that an expert would testify a certain way, denial of summary judgment is "entirely in keeping with the Supreme Court's admonition that 'all justifiable inferences are to be drawn in ... favor [of non-movant].'"55

In this case, the material facts involve the relationship between Liberty and Innovative, as well as the contractors.  Not only does the question of the exact relationship between Liberty and the others, but also what Liberty led the Plaintiffs to believe the relationship was, and the Plaintiffs reliance and trust of Liberty as their fiduciary.

### B. **Argument**

The Nevada Supreme Court has stated unequivocally that, "the nature of the relationship [between an insurer and the insured] requires that the insurer adequately protect the insured's interests." *Allstate Ins. Co. v. Miller*, 125 Nev. 300, 311, 212 P.3d 318, 26 (2009) (cites omitted). "Thus, at a minimum, an insurer must equally consider the insured's interests and its own." *Miller*, 212 P.3d at 326 (cite omitted).

An insurance company can defend against bad faith claims and Breach of the Covenant of Good Faith and Fair Dealing by showing that it had a reasonable basis for acting as it did. What Liberty fails to recognize, however, is that the reasonableness on one's actions (or inactions) is a question of fact, not a question of law. Seeking summary judgment on a question of reasonableness is a waste of this court's time and judicial resources.

Finally, and as all insurance companies eventually do, Liberty attempts to paint this case as nothing more than a value dispute and invoking the genuine dispute doctrine in an attempt to

---

53 *Agosto v. INS*, 436 U.S. 748, 98 S.Ct. 2081 (1978)
54 *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505
55 *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 n.11 (D.C. Cir. 1987)(quoting *Anderson*, 477 U.S. at 255)

22

2502261.1

excuse its claims handling failures. This case is about Liberty's improper attempts to delegate the responsibility for the management of the claim to its insured, meanwhile ignoring all of the information in support of the Plaintiffs claim, further trying to justify the denial of the second wind event, and instead choosing to spin a web to support its unreasonable denial. This case is about Liberty's continued breach of the contract – failure to act in good faith – and failure to manage the claims through their appointed agents, Innovation Group and the contractors appointed by them.

### C.   Breach of Contract

The portion of the policy that Defendant attempts to claim as relating to contractors appointed by Liberty is faulty and misleading, when in fact, the portion that refers to *original claims* that are made as a result of faulty or defective design, specifications, workmanship, repair, construction, renovation, grading, compaction.[56]

In fact, that paragraph referenced by Liberty does not apply, or is so ambiguous as to not to apply in this situation, since the *original claims* associated with this case are not as a result of faulty contractors, repairs of the like, but rather from natural disaster (wind events) which were covered and accepted by Liberty to begin with (although Liberty failed to accept the second wind event, which is also an issue for the Jury as to the issue of good faith).  The problems associated with the contractors in this case were as a result of Liberty's appointed, and incompetent contractors, whose attempts at repairing the damage from the wind events was nothing but a failure.

Liberty is trying to bootstrap provisions that have nothing to do with the wind event claims.  In other words, Liberty is attempting to have their faulty contractor's repairs related back to the original claim, rather than as a result of their choices for the contractors to repair the claims. Pursuant to the policy, Liberty was to cover damages to the Dwelling and accepted responsibility for the same in the first event:[57]

---

[56] See Defendant's Motion, Page 6:3-14

[57] See, Certified copy of Policy, attached as Exhibit "15", Page 1, Section 1, wherein the exclusions are exclusions for claims against the policy, not work being done to repair the property.

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

The exclusions they reference is an attempt to mislead this court into believing that the exclusion applies to the contractors, when it only applies to *original claims*.58  The exclusions do not apply to Liberty's failure to comply with the contract or the failure to adequately perform under the contract. "Clauses providing coverage are to be interpreted broadly so as to afford the greatest possible coverage to the insured, while clauses excluding coverage are interpreted narrowly against the insurer."59

The original claim in this case was already approved, and a dispute exists as to whether the second wind event damage was as a result of Liberty's contractors failing to repair the property correctly, or even if a separate event, as to whether it should have been approved. Liberty has breached this agreement by failing to complete the repairs and ceasing to pay for the repairs and adequately perform their obligations under the contract.

They cannot try and use the exclusions clause for original claims, against the insured in an attempt to circumvent their responsibilities under the contract and failures under the contract.

**D.    Breach of the Covenant of Good Faith and Fair Dealing (Bad Faith)**

As reference herein above, multiple cases and jury instructions exist with regard to breaching the covenant of good faith and fair dealing in an insurance contract.

Pursuant to the jury instruction, 11FD.5 (in pertinent part):

> In every insurance contract there is an implied obligation of good faith and fair dealing that neither insurer nor the insured will do anything to injure the rights of the other party to receive the benefits of the agreement. *The relationship of an insured to an insurer is one of special confidence and akin to that of a fiduciary.*
> …
> This special relationship exists in part because, *as insurers are well aware, consumers contract for insurance to gain protection, peace of mind and security against calamity.* To fulfill its implied obligation of good faith and fair dealing, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct. (emphasis added)

In this case, the Plaintiffs relied completely on Liberty, not only with regard to the claim itself, but also relied upon Liberty to manage the issues they were having from the contractors that

---

58 Id. Section 2(c), Page 8.
59 See CONTRACTS INSTRUCTION 13CN.19, Exhibit "1".

were appointed by Liberty.  Plenty of notes, emails and testimony exist as referenced herein above, that proves that the Plaintiffs relied upon Liberty, not only for the requirement for use of Innovation Group as their agents, but in the management of the contractors.

Pursuant to the Plaintiffs testimony, and the evidence and experts' opinions, Liberty intentionally or without care of the negligence of their conduct, conducted themselves in such a manner, as a fiduciary, such that the Plaintiffs relied upon Liberty for the appointment of the contractors, believing they had no choice to do so, and wherein Liberty was involved in doing such and managing such, either directly or through its agent, Innovation Group.

Further, Liberty, in their motion, is attempting to point fingers at their agent Innovation and the contractors appointed to the Plaintiffs.  However, pursuant to Jury Instruction 11FD.6:

> The insurance company's duty of good faith and fair dealing cannot be delegated to anyone.

As a result, Liberty cannot attempt sluff off their responsibilities to their agents and partners.   Specifically, the Plaintiffs' expert has found that Liberty's denial of coverage on the second wind event claim of March 2017 and the failure to handle the first and second claims properly violated the Covenant of Good Faith and Fair Dealing Liberty owed to the Plaintiffs. That the damage associated with the second wind event was due to shoddy workmanship from the original contractor appointed by Liberty as confirmed and stated by Plaintiff's expert Lane Swainston.

In Nevada, no breach of an agreement even has to exist for a breach of the covenant of good faith and fair dealing.  If the defendant performed in a manner that was in violation of or unfaithful to the spirit of the contract (the terms of the contract are complied with in a literal sense, but the spirit of the contract is breached), then a jury can find that Liberty breached their duty of good faith and fair dealing to Plaintiffs.60

///

---

[60] See, generally, NRS 104.1203; NRS 104.1304; NRS 104.1201(t); *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152 (D. Nev. 2009); *George v. Morton*, No. 2:06-CV-112-PMP-GWF, 2007 WL 680788, at *8 (D. Nev. 2007); *Nelson v. Heer*, 123 Nev. 217, 163 P.3d 420 (2007)

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

Ms. Moore also opined that "Liberty Mutual relied in the services of a third-party partner to ensure proper claim handling of the policyholders' damages but then abandoned the policyholders when the recommended contractors which Liberty referred failed to complete the work properly."[61]

Ms. Moore specifically found that Liberty Mutual failed:[62]

(1) to conduct a reasonable, thorough and timely investigation of the claims
(2) to properly vet their recommended contractors
(3) to hire emergency services company to review the initial damages
(4) as to the contractors, as agents of Liberty, which failed to obtain proper permits
(5) as to the contractors, as agents of Liberty, which failed to conduct work properly
(6) to coordinate completion of repairs
(7) to ensure home repairs were paid for and completed to the homeowner's satisfaction
(8) to assist the policyholders in determining the amount of personal property damage and settle that portion of the claim
(9) to adequately compensate Belfor, resulting in a lien being filed against the Plaintiffs home
(10) to ensure timely, regular status updates and failed to inform the Policyholders of the status of the claims and repairs
(11) to oversee and manage the home repairs of their agent Innovation Group and their contractors
(12) to generally to support the Plaintiffs
(13) to provide on-site assistance
(14) to respond to written inquiries in a timely manner

Although not exhaustive, all of these, in the opinion of the Plaintiffs' expert, breach the covenant of good faith and fair dealing that Liberty owed to the Plaintiffs.  Many, if not all of these factors also apply to violations of the Nevada unfair Claims Practices Act, a separate and/or alternative claim for relief.

The Defendants have failed to obtain an expert to opine on the conduct and treatment of the Plaintiffs, the claim handling or any other purpose related to the conduct of Liberty as to the Plaintiffs and the relationship of Innovative, the contractors and Liberty.

### E.     Violation of the Unfair Claims Practices Act

In addition to the claims for breach of the covenant of good faith and fair dealing, Nevada has statutorily addressed fair claims in NRS 686A.310, et seq., the Nevada Unfair Claims

---

[61] See, Joanna Moore's Expert Opinion, Exhibit "2", Page 5
[62] Id, generally.

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

Practices Act. The Defendant violated their fiduciary duties to the Plaintiffs by seeking and interpreting Plaintiffs' property condition in a manner best calculated to deny and undervalue the benefits due to Plaintiffs.

Pursuant to the Plaintiffs' expert, Joanna Moore,[63] the Defendants violated the statutes by failing to ensure timely, regular status updates and failed to inform them as to the status of the claim and repairs.  Further. That Liberty failed to settle the claims properly, failed to act promptly on communications and failed to effectuate a prompt, fair and equitable settlement as a result of numerous and inconsistent claim handlers and allowing and relying upon Innovation Group to oversee and manage the home repairs.  Liberty, wrongfully and to the Plaintiffs detriment, took a "hands-off" approach to assisting the Plaintiffs.

The Defendants have failed to obtain an expert to opine on the conduct and treatment of the Plaintiffs, the claim handling, violations of statutes or any other purpose related to the conduct of Liberty as to the Plaintiffs and the relationship of Innovative, the contractors and Liberty.

### F.    Negligence of Agency

Negligence of Agency is a valid cause of action in Nevada, contrary to Defendant's representations.  As stated above, the elements are as follows:[64]

1) The existence of an agency relationship;
2) The agent was negligent in fulfilling the agent's duties; and
3) Causation and damages.

The only argument that Defendant has to this cause of action, is that such a claim does not exist, which is clearly inaccurate.  In this case Liberty, in its capacity as fiduciary and having Innovation appoint contractors, acted as an agent of the Plaintiffs and did so negligently, to the detriment of the Plaintiffs, causing them damages as supported by expert Lane Swainston's report and causation as supported by expert Joanna Moore.

///

///

[63] See Expert Report of Joanna Moore, Exhibit "2" generally and Page 6, specifically.
[64] *Scialabba v. Brandise Constr. Co.*, 112 Nev. 965, 968; 921 P.2d 928, 930 (1996); *Hunter Mining Laboratories, Inc. v. Mgt. Assistance, Inc.*, 104 Nev. 568, 570-71; 763 P.2d 350, 352 (1988).

27

2502261.1

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

### G. <u>Name of Defendant</u>

The name of the Defendant in error, is another red herring.  The caption reads as follows:

LIBERTY MUTUAL INSURANCE, a foreign entity, LIBERTY INSURANCE

CORPORATION, a foreign corporation, DOES I-X, ROE CORPORATION I-X inclusive.

Liberty errantly claim that the Plaintiffs sued LIBERY MUTUAL INSURANCE

CORPORATION.  The caption and Parties section of the complaint clearly state LIBERTY

INSURANCE CORPORATION, which defendant admits is the correct party.  Even if the

Plaintiffs errantly filed suit against the wrong party, the defendant never made a motion to dismiss

against that entity and now only brings such a motion within the summary judgment motion.

In any event, Liberty Insurance Corporation is properly named.

Further, as to Liberty Mutual, it is quite clear that the employees worked for LIBERTY

MUTUAL.[65]  As a result, Liberty mutual is also the correctly named Defendant.

### V. <u>CONCLUSION</u>

For the reasons stated above, the entire case rests upon admissible, relevant and material

issues of fact.  Testimony and documentation as well as the believability of the witnesses and

their behavior and treatment of the Plaintiffs.  the Plaintiffs respectfully request that Liberty's

Motion for Summary Judgment be denied in total.


DATED:  March 11, 2021             GIBBS GIDEN LOCHER TURNER
                                   SENET & WITTBRODT LLP


                            By:_____
                                   Steven Mack, Esq.
                                   Nevada State Bar # 4000
                                   1140 N. Town Center Drive, Suite 300
                                   Las Vegas, Nevada 89144
                                   Attorneys for Plaintiffs
                                   DARLENE CARTER and DAVID BLANCO

---

[65] See, for instance deposition of August Nardoni, Exhibit "10", Page 11:5-20, which is an example of the similar reference throughout the depositions.

2502261.1

**CERTIFICATE OF MAILING**

The undersigned, an employee of the law firm of GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP, hereby certifies that on March 11, 2021, she  served a copy of the foregoing **PLAINTIFFS DARLENE CARTER AND DAVID BIANCO'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** by email and by placing said copy in an envelope, postage fully prepaid, in the U.S. Mail at Las Vegas, Nevada, said envelope(s) addressed to:

Andrew C. Green, Esq.
Nathaniel T. Collins, Esq.
KOELLER, NEBEKER, CARLSON &
HALUCK
400 S. Fourth Street, Suite 600
Las Vegas, Nevada 89101

Attorneys for Defendants *LIBERTY MUTUAL INSURANCE*

Tel:    (702) 853-5500
Fax:    (702) 853-5599
Email:*nathaniel.collins@knchlaw.com*
Email:*andrew.green@knchlaw.com*

_____
An employee of
Gibbs Giden Locher Turner
Senet & Wittbrodt LLP

GIBBS GIDEN LOCHER TURNER SENET & WITTBRODT LLP

2502261.1

# EXHIBIT "1"

**(a) Implied Covenant of Good Faith and Fair Dealing**

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 11FD.5[1]

INSURANCE CONTRACTS

In every insurance contract there is an implied obligation of good faith and fair dealing that neither insurer nor the insured will do anything to injure the rights of the other party to receive the benefits of the agreement.

The relationship of an insured to an insurer is one of special confidence and akin to that of a fiduciary. A fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another. This special relationship exists in part because, as insurers are well aware, consumers contract for insurance to gain protection, peace of mind and security against calamity. To fulfill its implied obligation of good faith and fair dealing, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct.

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 11FD.6:[2]

INSURANCE COMPANY'S DUTY IS NON-DELEGABLE

The insurance company's duty of good faith and fair dealing cannot be delegated to anyone.

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 11FD.13:[3]

RELIANCE ON AN AMBIGUOUS CONTRACT

An insurer breaches the implied covenant of good faith and fair dealing where it

---

[1] SOURCE/AUTHORITY
CACI 2330; *Ainsworth v. Combined Ins. Co. of America*, 104 Nev. 587, 592, 763 P.2d 673 (1988); *Powers v United Services Auto. Ass'n*, 114 Nev. 690, 962 P.2d 596 (1998); *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 969 P.2d 949 (1998); *Guaranty Nat. Ins. Co. v. Potter*, 112 Nev. 199, 912 P.2d 267, (1996).
[2] SOURCE/AUTHORITY *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 969 P.2d 949 (1999).
[3] SOURCE/AUTHORITY *Alber H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 969 P.2d 949 (1998); *Ainsworth v. Combined Ins. Co. of America*, 104 Nev. 587, 763 P.2d 673 (1988).

relies upon its own ambiguous insurance contract as the sole basis for denying a claim.

## (b) Breach of Contract

In addition to the typical breach of contract provisions in a standard contract, the

additional instructions are specific for insurance contracts:

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 11FD.11:[4]

INTERPRETATION OF THE INSURANCE CONTRACT

The law recognizes certain principles with respect to the interpretation of an insurance policy. Those rules are: 1. An insurance policy is interpreted broadly affording the greatest possible coverage to the insured; and 2. The language in an insurance policy is viewed in its plain, ordinary, and popular meaning.

IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING INSTRUCTION 11FD.12:[5]

AMBIGUITY WITHIN AN INSURANCE CONTRACT

An insurance policy is a contract. If the language in the policy is clear and unambiguous, the language is enforced as written in order to accomplish the intent of the parties. However, as the insurer is in complete control of the language of an insurance policy, all doubt is construed against the insurer and in favor of the insured. An ambiguity exists when a policy term is subject to two reasonable interpretations. Any ambiguity in the terms of an insurance contract shall be resolved in favor of the insured and against the insurer.
CONTRACTS INSTRUCTION 13CN.19:[6]

INTERPRETATION OF AN INSURANCE POLICY

---

[4] SOURCE/AUTHORITY *Farmers Ins. Group v. Stonik By and Through Stonik*, 110 Nev. 64, 867 P.2d 389 (1994) (citing to *Harvey's Wagon Wheel, Inc. v. MacSween*, 96 Nev. 215, 219-20, 606 P.2d 1095, 1098 (1980)) (regarding subpart 1). *American Excess Ins. Co. v. MGM Grand Hotels, Inc.,* 102 Nev. 601, 604, 729 P.2d 1352 (1986) (citing to *National Union Fire Ins. Co. of State of Pa., Inc. v. Reno's Executive Air, Inc.* 100 Nev. 360, 682 P.2d 1380 (1984) (regarding subpart 2)

[5] SOURCE/AUTHORITY *Insurance Corp. of America v. Rubin*, 107 Nev. 610, 616, 818 P.2d 389, 392 (1991); *National Union Fire Ins. Co. of State of Pa., Inc. v. Reno's Executive Air,* 100 Nev. 360, 365, 682 P.2d 1380 (1984); *Farmers Ins. Exchange v. Young*, 108 Nev. 328, 330, 832 P.2d 376 (1992).

[6] SOURCE/AUTHORITY *McDaniel v. Sierra Health and Life Ins. Co.*, 118 Nev. 596, 598-99, 53 P.3d 904, 906 (2002); *State Farm Mut. Auto Ins. Co. v. Cramer*, 109 Nev. 704, 709-10, 857 P.2d 751, 755 (1993); *Farmers Ins. Exchange v. Young*, 108 Nev. 328, 832 P.2d 376 (1992); *Ellison v. California State Auto. Ass'n*, 106 Nev. 601, 603, 797 P.2d 975, 977 (1990); *Nat'l Union Fire Ins. 13.25 Co. v. Caesars Palace Hotel and Casino*, 106 Nev. 330, 792 P.2d 1129 (1990); *Nat'l Union Fire Ins. Co. of State of Pa,. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 682 P.2d 1380 (1984); *Sullivan v. Dairyland Ins. Co.*, 98 Nev. 364, 649 P.2d 1357 (1982).

An insurance policy is a contract and is to be enforced according to its terms in order to implement the parties' intent. The policy is to be interpreted from the perspective of a person not trained in law or in insurance, with the terms of the contract viewed in their plain, ordinary and popular sense. Clauses providing coverage are to be interpreted broadly so as to afford the greatest possible coverage to the insured, while clauses excluding coverage are interpreted narrowly against the insurer. Therefore, an insurer deciding to restrict coverage must do so clearly and explicitly, but unambiguous insurance policy provisions are not to be rewritten and a party's legal obligations are not to be increased where the parties have intentionally limited those obligations. An insurance policy provision must be read with reference to the entire policy considered as a whole, in order to give a reasonable and harmonious meaning to the entire policy and achieve the policy's purpose of providing indemnity for a loss to which the insurance relates. If the insurance policy is unambiguous, it must be construed from the written language of the policy and enforced as written, without giving the insured the benefit of the doubt or attempting to implement the reasonable expectations of the insured. However, any ambiguity in the terms of an insurance contract must be resolved in favor of the insured and against the insurer, considering not merely the language of the policy, but also the intent of parties, the subject matter of the policy, and the circumstances surrounding its issuance, in order to implement the reasonable expectations of the insured.

## (c) Bad Faith

CONTRACTS INSTRUCTION 13CN.45:[7]

INSURANCE BAD FAITH

An insurer violates the implied promise of good faith and fair dealing that is a part of every insurance policy if it acts unreasonably, with knowledge that there is no reasonable basis for its conduct. Thus, an insurer fails to act in good faith if it refuses, without proper cause, to compensate an insured for a loss covered by the policy, or if it fails to properly investigate the insured's claim, misleads the insured as to coverage and/or payment of the claim and delays or denies the claim without a reasonable, good faith basis for doing so.

CONTRACTUAL RELATIONSHIPS INSTRUCTION 14CR.15:[8]

---

[7] SOURCE/AUTHORITY *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 1258-60, 969 P.2d 949, 956-59 (1998); *Powers v. United Services Auto. Ass'n,* 114 Nev. 690, 962 P.2d 596 (1998); *Pulley v. Preferred Risk Mut. Ins. Co*., 111 Nev. 856, 859, 897 P.2d 1101, 1103 (1995); *Farmers Home Mut. Ins. Co. v. Fiscus,* 102 Nev. 371, 374, 725 P.2d 234, 235-36 (1986); *U.S. Fidelity & Guaranty Co. v. Peterson,* 91 Nev. 617, 620, 540 P.2d 1070, 1071 (1975).
[8] SOURCE/AUTHORITY *Powers v. United Service Auto. Ass'n*, 115 Nev. 38, 979 P.2d 1286 (1999).

FIDUCIARY RELATIONSHIP: INSURER'S DUTY TO POLICY HOLDER

An insurer's duty to its policyholder is fiduciary in nature. This special relationship exists in part because, as insurers are well aware, consumers contract for insurance to gain protection, peace of mind and security against calamity.

**(d) Agency**

COMMERCIAL TORTS INSTRUCTION 15CT.1:[9]

PRINCIPAL AND AGENT – RELATIONSHIP DEFINED

An agency relationship is formed when a principal hires an agent and retains a contractual right to control the agent's manner and means of performance. An agent is a person who, at a given time, under an express or implied agreement, is authorized to act for or in place of another person, called a principal. A principal is one who retains control or the right to control the agent's manner and means of performance.

**(e) Violation of the unfair claims Practices Act**

NRS 686A.310 et seq. contains the elements for the cause of actions, however the subsections relevant as outlined in the complaint include, but not limited to:

(b) (Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies),

(e) (Failing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear),

(f) (Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered),

(g) (Attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application), and

(l) (Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage).

---

[9] SOURCE/AUTHORITY *Grand Hotel Gift Shop v. Granite State Ins. Co*, 108 Nev. 811, 839 P.2d 599 (1992); 9TH CIR. CIVIL JURY INSTR. § 4.4 (2006).

# EXHIBIT "2"

## REPORT OF JOANNA MOORE

The following is my expert disclosure report discussing my findings and opinions pursuant to the matter of _Darlene Carter, an individual; and David Bianco, an individual vs. Liberty Mutual Insurance,_ Case No: A-19-794350-C, Eighth Judicial District Court, Clark County, Nevada

## I

## QUALIFICATIONS

Since retiring in 2014 having served as a Chief Claims Officer and Senior Vice-President of Claims, I have been formally retained as an insurance claim-handling expert or consultant on forty-four cases in the following states: California, Arizona, Nevada, Idaho, Michigan, and Alaska. I have also had the opportunity to consult on numerous national and global insurance-related matters through short-term assignments with firms such as Expert Network Group, Alpha-Sights Consulting and Emissary, all head-quartered in New York. My complete curriculum vitae is attached which reflects 33 years of property and casualty insurance claim handling, supervision, and top-level executive leadership for a national insurer.

## II

## PUBLICATIONS

None

**III**

**COMPENSATION**

Litigation Consultation and Review:     $275 per hour

Deposition and Trial Testimony:     $320 per hour

Non-Refundable Retainer Fee which is credited toward work produced:    $2,500

Actual Office, Travel, On-Call, and Mileage Expenses

**IV**

**<u>EXPERT WITNESS TESTIMONY WITHIN THE LAST FOUR YEARS</u>**

**DEPOSITIONS**

*12-21-16 Nichols v. Murphy*

Superior Court of the State of California-County of Merced

Elizabeth E. Waldow Esq., Borton Petrini, Attorney for Defendant

2

*01-23-17 Lopez v. IDS Property Casualty Insurance/Ameriprise*

Superior Court of the State of California-Los Angeles, Central District

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant


*02-27-17 Basargin v. State Farm Mutual*

United States District Court-District of Alaska

Kimberlee A. Colbo, Hughes et al, Attorney for Defendant


*06-06-17 Interinsurance Exchange of the Automobile Club v. Sears Roebuck Co & John Guest USA Inc.*

Superior Court of the State of California, County of Riverside

Gregory E. Eisner, Esq., Severson & Werson Attorney for Defendant


*09-27-17 Cooper v. Mid-Century Insurance*

Superior Court of the State of California, County of Los Angeles

Gregory B. Scher, Woolls, Peer, Dollinger & Scher, Attorney for Defendant


*11-20-17 R.J. Cline Corp. v. Pitner and related cross-action*

Superior Court of the State of California, County of Sacramento

H. Douglas Galt, Esq., Woolls, Peer Dollinger & Scher, Attorney for Cross-Defendant

*08-02-18 Sophia Brulee, Tools 'N' Thangs v. Midvale Indemnity*

United States District Court, Eastern District of California

Heather S. Cohen, Marderosian & Cohen, Attorney for Plaintiff


*09-12-18 Adair (f.k.a.Veytsman) v. State Farm Mutual*

United States District Court, District of Nevada

Benjamin J. Carman, Esq., Renalli, Zaniel, Fowler, & Moran, LLC, Attorney for Defendant


*11-13-18 Douglas Price, as Trustee of the Vivian Price Family Trust v. AMCO Insurance Company, et al*

Superior Court of the State of California, County of Tulare

Brian Pelanda, Esq., Hines Hampton LLP, Attorney for Defendant


*02-26-19 Michael J. Gustavel and Amy K. Gustavel v. Oregon Mutual Insurance Company*

District Court of the Fourth Judicial District for the State of Idaho

Martin C. Hendrickson, Givens Pursley LLP, Attorney for Plaintiffs


*03-14-19 Brenda Thompson v. Allstate Insurance Company*

United States District Court for the District of Nevada

Matthew L. Sharp, Esq. and Dennis M. Prince, Esq. Attorneys for Plaintiff

4

**TRIALS**

*Maslo v. IDS*

Superior Court of the State of California-NW District, Van Nuys, CA

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant

Lawrence P. Perle, Esq., Law Offices of Steven B. Simon, Attorney for Plaintiff

Edward M. Bialack, Law Offices of Edward M. Bialack, Attorney for Plaintiff


*Nichols v. Murphy*

Superior Court of the State of California-County of Merced

Elizabeth E. Waldow, Esq., Borton Petrini, LLP, Attorney for Defendant

Stanley K. Jacobs, Esq., Jacobs & Jacobs, LLP, Attorney for Plaintiff


*Lopez v. IDS/Ameriprise*

Superior Court of the State of California-County of Los Angeles, Central District

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant

Evangeline Fisher Grossman, Attorney for Plaintiff


*Nichols v. Murphy* (re-trial)

Superior Court of the State of California-County of Merced

Elizabeth E. Waldow, Esq., Borton Petrini, LLP, Attorney for Defendant

Stanley K. Jacobs, Esq., Jacobs & Jacobs, LLP, Attorney for Plaintiff

*Cooper v. Mid-Century*

Superior Court of the State of California-County of Los Angeles, Central District (Bench Trial)

Gregory B. Scher, Woolls, Peer, Dollinger & Scher, Attorney for Defendant

William P. Gemmill, Esq., Gemmill, Baldridge & Yguico, LLP, Attorney for Plaintiff

**V**

**DOCUMENTS REVIEWED**

1. Carter Disclosure Documents

2. Liberty Mutual Disclosure Documents

3. Complaint

4. Defendant's Answer to Complain

5. Plaintiff's First Set of Interrogatories

6. Plaintiff's First Set of Request for Production of Documents

7. Liberty Mutual Response to Plaintiff's First Set of Interrogatories

8. Liberty Mutual Response to Plaintiff's First Set of Request for Production of Documents

9. Available literature on Insurance Matters from Public Resources such as:

    a. propertycasualty360.com

    b. claimspages.com

    c. theinstitutes.org

    d. The National Alliance for Insurance Education and Research

6

e. claimsjournal.com

f. IRMI.com

g. NAIC.org

h. Justia.com


**VI**

**PRELIMINARY OPINIONS AND CONCLUSIONS**


**A. INTRODUCTION**

An insurance policy or contract is a binding legal agreement between two parties-the policyholder (or beneficiary of the contract terms) and the insurer. An insurance policy is written with specific terms, conditions, and promises which are agreed to by both the insurer and the insured. Because there are two parties to the insuring agreement, both are required to act in good faith toward the other. However, the Covenant of Good Faith and Fair Dealing requires insurance carriers to resolve any ambiguities in the written contract in favor of the policyholder since the carrier unilaterally created the written terms and conditions. A carrier must give at least the same consideration to the policyholder's interest as they do to their own interests.

Carriers are also charged with the duty to promptly investigate claims, fairly and objectively gather the facts and details of the loss, and equitably evaluate and resolve covered claims in which legal liability has become reasonably clear.

Some of the elements of quality good-faith claims practices can include:

- Timely, thorough and objective investigation of the facts of loss
- Complete, detailed, and accurate documentation
- Fair and reasonable settlement evaluations
- Negotiating in good faith to resolve a covered claim
- Regular claim investigation status updates

7

- Prompt coverage analysis and coverage determination
- Prompt payment upon settlement of a covered claim

In addition to the insurance contract benefits, exclusions, conditions, and endorsements, it should be noted that property-casualty insurance is very heavily regulated at the individual state level. Regulators and State Commissioners have broad oversight for individual state licensing, agent licensing, market conduct examinations, auditing, insurance rating, contract language, overall financial solvency and consumer protection. Regulators are charged with assuring that rates are adequate to cover anticipated losses, and that insurers maintain adequate capital to pay expected covered claims.

The Nevada Revised Statutes Chapter 686.A310 lists activities deemed as unfair practices in settling claims in the state of Nevada.

## B. INVESTIGATION

Ms. Carter and Mr. Bianco filed a homeowner's insurance claim with Liberty Mutual on May 4, 2016 as a result of homeowner damage to 9108 Driftwood Cove Ct., Las Vegas, Nevada. The damage resulted from high winds and inclement weather which occurred on April 30, 2016. Skylights were leaking and leaks were coming through the light fixture in the ceiling from intense wind and wind driven rain. Damages were also noted to roof tiles dislodged and broken by the wind which then led to leaks in the master bath. Additionally, wind driven rain caused leaks in the windows (LIC001705).  Liberty Mutual accepted the claim and referred the policyholders to Innovations Property Referral Network and Dallas White - Liberty Mutual's direct repair partners approved by Liberty Mutual to handle the construction repairs.  To the detriment of the policyholders, Dallas White employees failed to obtain building permits or licenses to perform the repairs properly. The construction work performed by the Dallas White team fell below acceptable standards and, as a result, had to be demolished and re-constructed. An email from Liberty Mutual dated December 12, 2016 to their recommended agent, Dallas White's estimator, Marques Brown, says, in part, "Hopefully you and Jason can settle the differences as the insured has been

8

waiting for way too long." (LIC001025).   Liberty Mutual eventually recommended Belfor Contractors to assist the policyholders and finish the job left incomplete by the former contractor. In addition, the policyholders suffered additional damage to their home from a storm in March, 2017. The subsequent damage to the home was caused as a result of the failure of the former contractor to perform the work they were approved and authorized by Liberty Mutual to complete. The second contractor recommended by Liberty Mutual, Belfor, began repairs but subsequently abandoned the job, leaving the homeowners property unprotected and in complete disarray. After contacting the Nevada State Contractor's Board to review a portion of the repairs which had been completed, the Board was unable to determine which of the two Liberty Mutual recommended contractors had been responsible for the defective workmanship but considered the homeowners in a "911" emergency situation.   At the time that the civil complaint was filed, the policyholders' property continued to be in disrepair and the allegations detailed in the complaint indicate that Liberty Mutual had two and one-half years to assist and guide the policyholders to a satisfactory conclusion of their claim but failed to do so. The policyholders' have also been subjected to harassment by Belfor for the balance of the agreed contract price and Liberty Mutual has not stepped up to find a reasonable and acceptable resolution to the claim which has been ongoing since 2016. The insureds also expressed significant hardship in communicating with the Liberty Mutual adjuster, August Nardoni, whom they experienced as rude, incompetent, and unprofessional. The policyholders' also made claims for personal property damages which, as of August 30, 2018, they had not received payment according to a handwritten note by Ms. Carter.

Unfortunately, the mistakes and missteps by Liberty Mutual in handling this claim forced the policyholders' to seek legal advice and ultimately file a Complaint on May 7, 2019. They had been forced by their own insurance company to live in an unrepaired and unsafe home. It is clear from the claim file log notes that by May 2, 2018 the policyholders' had become very frustrated and upset over the lack of proper attention by Liberty Mutual to try to resolve their ongoing issues (LIC002184). Liberty Mutual made the last claim payment on or about May 18, 2018, well over one year prior to the civil complaint filing. In addition, Liberty Mutual ceased communicating with the policyholders and refused to respond to further inquiries for more than ninety days prior to the filing of the complaint.

This lack of timely response to correspondence or inquiries is one of the many Liberty Mutual violations of the Nevada Fair Claims Practices Act.

**C. PRELIMINARY OPINIONS AND CONCLUSION**

The claim handling standards for Nevada are outlined in NRS686A.310. In my review of this matter, it is my opinion that the Liberty Mutual claim professionals failed to fully understand and make every effort necessary to comply with these standards. By the time the civil complaint was filed, the policyholders' had been suffering ongoing problems with their claim for nearly three years. In my opinion, Liberty Mutual failed to act promptly and reasonably to assist Ms. Carter and Mr. Bianco in the overall resolution of their claim. The behavior and actions of the Liberty Mutual claims professionals displayed a willful disregard for the services and benefits to which their policyholders were entitled.  In my review of the documents provided, I saw no effort on the part of Liberty Mutual to bring all stakeholders to a joint meeting (the policyholders, contractors, mortgage company, claims professionals, attorneys, etc.) in order to try to resolve the ongoing disputes and conclude their customer's claim fairly. Even proposing a mediation at Liberty Mutual's expense would have been a simple gesture of good will. Instead, they abandoned and ignored the insureds which led them to endure ongoing difficulties, financial losses, and emotional hardships.

The record is not complete for a final opinion and will be supplemented when additional discovery and documents are provided for my review.

Respectfully submitted,

JoAnna Y. Moore

# Supplemental Expert Report on Carter v. Liberty Mutual

JoAnna Moore

1/19/21

# REPORT OF JOANNA MOORE

The following is my supplemental expert disclosure report discussing my findings and opinions pursuant to the matter of *Darlene Carter, an individual; and David Bianco, an individual vs. Liberty Mutual Insurance,* Case No: A-19-794350-C, Eighth Judicial District Court, Clark County, Nevada

## I

## ADDITIONAL DOCUMENTS REVIEWED

1. Liberty Mutual Insurance Website

2. Deposition of Matt Degelormo

3. Deposition of Wanda Chambers

4. Deposition of August Nardoni

5. Deposition of Courtney Watts

6. Deposition of Stephanie Farmer

7. Deposition of David Bianco

8. Deposition of Lane Swainston

9. Deposition of Darlene Carter

10. Swainston Consulting Report

11. Innovation Group Website

# II

## UPDATED EXPERT TESTIMONY WITHIN THE LAST FOUR YEARS

**DEPOSITIONS**

*01-23-17 Lopez v. IDS Property Casualty Insurance/Ameriprise*

Superior Court of the State of California-Los Angeles, Central District

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant

*02-27-17 Basargin v. State Farm Mutual*

United States District Court-District of Alaska

Kimberlee A. Colbo, Hughes et al, Attorney for Defendant

*06-06-17 Interinsurance Exchange of the Automobile Club v. Sears Roebuck Co & John Guest USA Inc.*

Superior Court of the State of California, County of Riverside

Gregory E. Eisner, Esq., Severson & Werson Attorney for Defendant

*09-27-17 Cooper v. Mid-Century Insurance*

Superior Court of the State of California, County of Los Angeles

Gregory B. Scher, Woolls, Peer, Dollinger & Scher, Attorney for Defendant

*11-20-17 R.J. Cline Corp. v. Pitner and related cross-action*

Superior Court of the State of California, County of Sacramento

H. Douglas Galt, Esq., Woolls, Peer Dollinger & Scher, Attorney for Cross-Defendant

2

*08-02-18 Sophia Brulee, Tools 'N' Thangs v. Midvale Indemnity*

United States District Court, Eastern District of California

Heather S. Cohen, Marderosian & Cohen, Attorney for Plaintiff


*09-12-18 Adair (f.k.a.Veytsman) v. State Farm Mutual*

United States District Court, District of Nevada

Benjamin J. Carman, Esq., Renalli, Zaniel, Fowler, & Moran, LLC, Attorney for Defendant


*11-13-18 Douglas Price, as Trustee of the Vivian Price Family Trust v. AMCO Insurance Company, et al*

Superior Court of the State of California, County of Tulare

Brian Pelanda, Esq., Hines Hampton LLP, Attorney for Defendant


*02-26-19 Michael J. Gustavel and Amy K. Gustavel v. Oregon Mutual Insurance Company*

District Court of the Fourth Judicial District for the State of Idaho

Martin C. Hendrickson, Givens Pursley LLP, Attorney for Plaintiffs


*03-14-19 Brenda Thompson v. Allstate Insurance Company*

United States District Court for the District of Nevada

Matthew L. Sharp, Esq. and Dennis M. Prince, Esq. Attorneys for Plaintiff


*12-13-19 Layne Olson vs. Mid-Century/Farmers, Travis Strode Ins. Agency*

District Court, Clark County, Nevada

David Feldman, The Feldman Firm, Attorney for Defendant


3

*01-06-21 Douglas Ansell vs. Farmers Insurance Exchange*

District Court, Clark County, Nevada

David Feldman, The Feldman Firm, Attorney for Defendant


**TRIALS**

*Maslo v. IDS*

Superior Court of the State of California-NW District, Van Nuys, CA

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant

Lawrence P. Perle, Esq., Law Offices of Steven B. Simon, Attorney for Plaintiff

Edward M. Bialack, Law Offices of Edward M. Bialack, Attorney for Plaintiff


*Nichols v. Murphy*

Superior Court of the State of California-County of Merced

Elizabeth E. Waldow, Esq., Borton Petrini, LLP, Attorney for Defendant

Stanley K. Jacobs, Esq., Jacobs & Jacobs, LLP, Attorney for Plaintiff


*Lopez v. IDS/Ameriprise*

Superior Court of the State of California-County of Los Angeles, Central District

H. Douglas Galt, Esq., Woolls & Peer, Attorney for Defendant

Evangeline Fisher Grossman, Attorney for Plaintiff


*Nichols v. Murphy* (re-trial)

Superior Court of the State of California-County of Merced

Elizabeth E. Waldow, Esq., Borton Petrini, LLP, Attorney for Defendant

Stanley K. Jacobs, Esq., Jacobs & Jacobs, LLP, Attorney for Plaintiff

*Cooper v. Mid-Century*

Superior Court of the State of California-County of Los Angeles, Central District (Bench Trial)

Gregory B. Scher, Woolls, Peer, Dollinger & Scher, Attorney for Defendant

William P. Gemmill, Esq., Gemmill, Baldridge & Yguico, LLP, Attorney for Plaintiff

# III

## SUPPLEMENTAL OPINIONS AND CONCLUSIONS

The opinions expressed in my previous report have remained unchanged. Liberty Mutual denied coverage on the 2nd wind loss claim of March 2017 and failed to handle the 1st and 2nd claims in accordance with the Covenant of Good Faith and Fair Dealing. Liberty Mutual advised the policyholder to report the additional damage to their home as a 2nd claim even though the insureds alleged the damage was a result of not only additional wind/water intrusion but resulted primarily from improper and/or incomplete repairs from the 1st storm claim of April 30, 2016.

Mr. August Nardoni denied the 2nd claim stating the damages to the roof did not appear consistent with wind damage even though they had already been advised the additional damage was primarily the result of shoddy workmanship on the part of Dallas White. Belfor also later advised the damage to the roof was caused by a major wind event. Even though Liberty Mutual had competing theories about the additional damages without other substantiating evidence, they sided only with their expert Rimkus. The defense expert, Mr. Swainston, repeatedly testified that the ongoing water intrusion and resulting damages over the last several years arose from the improper original repairs as well as the subsequent storm damages.

The policyholder, David Bianco, describes the first interaction with August Nardoni of Liberty Mutual as very upsetting; he was labeled as so rude to the insureds that the policyholder wanted to "kick him out of his house." (See Bianco deposition page 159)

Liberty Mutual also hired an investigative service to canvass the neighbors regarding the additional March 2017 roof damage; the neighbor advised it was wind damage but Liberty Mutual simply denied their 2nd claim anyway putting their own interests above that of their policyholders.

Liberty Mutual relied on the services of a third party partner to ensure proper claim handling of the policyholders' damages but then abandoned the policyholders when the recommended contractors which Liberty Mutual referred failed to complete the work properly.

Liberty Mutual also failed to conduct a reasonable, thorough, and timely investigation of the claims and failed to properly vet their recommended contractor. Liberty Mutual failed to hire an emergency services company to review the initial damages to the patio cover and to the home interior and do whatever was necessary to prevent further ongoing damage (example, properly tarping or repairing the roof immediately). In addition, Dallas White, an agent acting on behalf of Liberty Mutual, failed to obtain the required building permits to perform the needed work and ultimately their work need to be demolished and redone. Liberty Mutual also failed to coordinate completion of repairs by Dallas White and Belfor to ensure home repairs were paid for and completed to the satisfaction of the homeowners. Dallas White also told the policyholders they were committed to other jobs and so could not begin repairs right away. Repairs did not begin until approximately September, 2016 and even then there was no supervising foreman on the job site.

Liberty Mutual failed to assist the policyholders in determining the amount of personal property damage and settle that portion of the claim.

Liberty Mutual has not paid amounts due to Belfor to fully complete repairs; Belfor filed a lien against the home and proceeded to small claims court which was ultimately dismissed but there still remains a lien against the property.

Liberty Mutual failed to ensure timely, regular status updates were provided to the policyholders and failed to inform them as to the status of claim/repairs as required by Nevada Code Title 57 Insurance Chapter 686A.310. It looks as if Liberty Mutual had numerous and inconsistent claim handlers involved in the course of this claim but relied on Innovation Group as their agent to oversee and manage the home repairs and Liberty Mutual took a "hands off" approach to assisting the insureds in their time of need. Unfortunately, it appears that the Liberty Mutual staff did not provide regular on-site assistance to their customers nor did they support these insureds who were caught in the middle between Liberty Mutual and their recommended contractors which ultimately ended in this particular claim "falling through the cracks." Failure to respond to the homeowners' written inquiries prompted the filing of the civil complaint.

Mr. Swainston has testified that many interior repairs remain uncompleted and a lack of early intervention has caused more interior damage, including the likelihood of mold growth. The homeowners have paid to have the roof replaced as well as numerous windows in the home. Much of the needed repairs remain incomplete to the home and to the patio area.

The record may not be complete for a final opinion and will be supplemented when additional information is provided for my review.

Respectfully submitted,

JoAnna Y. Moore

JoAnna Y. Moore

January 19, 2021

6

# EXHIBIT "3"



1541 Little Dove Court, Henderson, NV 89014
Telephone: (702) 434-9576 • Fax: (702) 435-1888
Web: www.swainston.com
License #0048156

13 September 2019

Steven Mack, Esq.
Black and LoBello
10777 West Twain Avenue, Suite 300
Las Vegas, NV 89117

**Subject:     Darlene Carter and David Bianco v Liberty Mutual Insurance**

Mr. Mack:

This report was prepared after Swainston Consulting Group (SCG) visited the Carter residence located at 9108 Driftwood Cove Las Vegas, NV 89117 on 12 September 2019 to observe conditions at the roof, exterior envelope, and the interior finishes.   We reserve the right to supplement our findings and conclusions, as necessary or as additional information becomes available. The following documents were reviewed in the preparation of this report:

- Complaint dated 7 May 2019;
- SCG Site Visit Photographs dated 12 September 2019;
- SCG Site Visit Videos dated 12 September 2019.

The residence that is the subject of this report is located at 9108 Driftwood Cove in the City of Las Vegas.  The house was built in 1987 under the requirements of the 1985 Uniform Building Code (UBC) as adopter and administered by the City of Las Vegas Department of Building and Safety.  The original construction consisted of a stucco-clad wood framed structure with a slab on grade and a concrete tile roof system.  The concrete tiles are a flat style with red colorant.

On 30 April 2016, the roof was damaged in a wind storm with tiles blowing off and some damage done to at least two windows from debris.  The damage was reported to the homeowner's insurance carrier but repairs have still not been completed.  Additional damage has happened since the initial wind damage due to incomplete or improper repairs.   Two different water damage repair

Steven Mack, Esq.                                    Carter and Bianco v Liberty Mutual Insurance
13 Sept 2019
Page 2 of 3

contractors have been involved doing repairs and the homeowner has attempted to mitigate damages by covering the damaged portion of the roof repeatedly and removing some of the contents of the house to avoid further damage from leaks.

Some of the repairs attempted by the contractors were improper, incomplete, or were in violation of applicable codes and ordinances. During our site visit, SCG personnel observed work done by the contractors that makes no sense and in no way begins to match the portions of the structure that were supposedly being repaired or replaced by their work. Many adjacent finishes were damaged by work done by the contractors.

In order to match color and provide for proper weather protection, the entire roof will need to be removed and replaced. Some areas along the drip edge of the patio and at the underside of the patio will have to be removed and replaced to meet code requirements related to electrical components, drip edge metal, and to replace the support columns to match original. The stucco work at the patio area is a mess. Some of the fascia board and associated framing elements have been water damaged and will need to be replaced. The delay in repairs has caused a great deal of damage both inside and out on the house.

Water intrusion from the roof has damaged insulation, drywall finishes, cabinetry, furniture, wooden blinds, doors and door frames, floor coverings, and popcorn ceiling finishes. Given the level of damage and repairs that need to be made it is probable that the homeowner will need to be relocated during repair work since the house will not be habitable. Contents will also need to be removed, stored, and moved back in after repairs are completed.

Much of the drywall will need to be removed at exterior walls to allow for the water damaged insulation to be removed and replaced along with some of the wiring and electrical devices. The interior will need to be repainted to match existing as well as the exterior.

The repair work will include the need for mold remediation and clearance testing, as well as asbestos testing and clearance for the ceiling finishes.

The total cost for the minimum necessary repair work will be well in excess of $190,000.00. This does not include costs for removal, storage, and replacement of contents or the expenses associated with the temporary relocation of the homeowners and their pets during demolition and construction.

Total costs including permits, drawings, and incidentals could easily exceed $225,000.00

Steven Mack, Esq.                                    Carter and Bianco v Liberty Mutual Insurance
13 Sept 2019
Page 3 of 3


This report, including any opinions contained herein, is based on our investigation of the information provided. Accordingly, this report represents our preliminary opinions in this matter. Should new details or information be provided, we reserve the right to supplement our opinions as we may see fit.

Thank you for this opportunity to be of assistance. Please call us if you have any questions, regarding this report or our opinions.

Sincerely,

**SWAINSTON CONSULTING GROUP**

Lane Swainston CBO, CXLT
Principal Consultant

    


Enc. photographs and videos (via Dropbox link)

https://www.dropbox.com/sh/91qqpdfegw56uhu/AADmeBvDCdN9ZLvX15KcK27Ba?dl=0



1541 Little Dove Court, Henderson, NV 89014
Telephone: (702) 434-9576 • Fax: (702) 435-1888
Web: www.swainston.com
License #0048156

30 July 2020

Steven Mack, Esq.
Black and LoBello
10777 West Twain Avenue, Suite 300
Las Vegas, NV 89117

**Subject:       Darlene Carter and David Bianco v Liberty Mutual Insurance
                 Rebuttal Report**

Mr. Mack:

This report was prepared after Swainston Consulting Group (SCG) received the
report from William Trigwell of Madsen, Kneppers & Associates, Inc. (Defense
Expert) dated 8 July 2020.  We reserve the right to supplement our findings and
conclusions, as necessary or as additional information becomes available. The
following documents were reviewed in the preparation of this report:

- Report written by William Trigwell of Madsen, Kneppers & Associates,
  Inc. dated 8 July 2020;
- Photographs taken by Anita Terry dated 16 May 2016 (LIC001102-1166);
- Photographs taken by Eagleview dated 20 June 2018 and taken by August
  Nardoni dated 6 July 2018 (LIC004782-4799);
- Photographs taken by Liberty Expert (LIC000738-773);

The Defense Expert report asserts that the condition of the roof after the storm
was primarily due to "…long-term water intrusion".  Information obtained by
SCG from discussions with the homeowners, review of file photographs, and
observations onsite, indicate otherwise.  The Defense Expert further alleges that
*"It is apparent, from the condition of the felt underlayment and oriented strand board
(OSB) roof sheathing, that water has leaked around, under, or behind waterproofing
elements of the roofing system for a long period of time.  Improper workmanship, lack of
maintenance, and typical wear and tear are considered the primary causes.  It was also
evident that repairs have been made to these and similar areas in the past."*  The system
is not intended or described by the applicable Building Codes as "waterproof".
The system is intended to be part of a "…weather resistant envelope".  In most

Steven Mack, Esq.                                    Carter and Bianco v Liberty Insurance
30 July 2020
Page 2 of 7

cases, the roofing and framing components referred to here by the Defense
Expert, were either left exposed after the storm damage or had nothing to do
with the resultant damage that is being claimed. The Defense Expert did not
visit the site until over four years after the storm event. An example of
inaccuracy is a label on one of the adjuster photographs that refers to skylight
caulking as having *"visible signs of deterioration to sealant"*. The sealant seen in the
photograph was in place and functional. No sealant deterioration was observed
by SCG personnel that would cause a system failure and the sealant was not the
cause of water intrusion during the storm event. Most of the deteriorated
materials that SCG personnel observed were the result of the roof system being
opened by the contractors and then left exposed to the weather for an extended
period of time.

The storm event that caused the roof, window, tile, and interior damage was on
30 April 2016 rather than *30 May 2016*, as identified in the Defense Expert report.
Very high winds and flying debris did the damage to the roof, windows, and
tiles on the date of loss, resulting in the water intrusion that is the subject of this
claim. Incidental historic staining of roofing components or roof sheathing did
not cause the water damage at the interior of the house or show any indication
that such damage occurred prior to the claimed storm event. The damage from
the storm and subsequent failed repair attempts by contractors, as referred by
Liberty Insurance, are the cause of the resultant damage here. A prompt, honest,
and competent assessment of the storm damage, along with proper subsequent
repairs, done in a timely manner, by a properly qualified contractor would have
been an easy solution, once the claim was brought to the attention of Liberty
Insurance by the homeowners.

The initial repair attempt by Dallas White was started illegally without a permit
and the City of Las Vegas (City) cited them for working without a permit on 27
April 2017 (See Figure 1). Dallas White then applied for a building permit with
the City on 19 April 2017 (See Figure 2). Subsequently, Dallas White abandoned
the job and a new building permit with the City was applied for on 11 October
2017 by "Belfor Property" (Belfor) (See Figure 3).

Steven Mack, Esq.                                    Carter and Bianco v Liberty Insurance
30 July 2020
Page 3 of 7

R17-03018

AP #                            CITY OF LAS VEGAS                    MAP # 2616-61
                        DEPARTMENT OF BUILDING AND SAFETY                    10:00
                       333 North Rancho Drive, Las Vegas Nevada 89106
              INVESTIGATION
               ~~DISASTER~~ ASSESSMENT INSPECTION REPORT

DATE: 4-27-17        ☐ FEE PAID IN OFFICE        INSPECTOR #: 08
                     ☑ COLLECT $ 344 FEE W/PERMIT   BLDG. DEPT. PHONE 229-6251
                                                 BLDG POSTED: _____

ADDRESS:  9108   DRIFTWOOD  COVE

NAME OF BUSINESS:  DALLAS   WHITE

OWNER/REPRESENTATIVE:  BOB            PHONE # 702 460-3256

USE OF BUILDING: ☐ APT/CONDO  ☐ COMMERCIAL  ☑ SFD  ☐ MOBILE HOME  ☐ HOTEL/MOTEL

DESCRIBE SPECIFIC AREAS POSTED: _____

**INSTRUCTIONS:** Review structure for the conditions listed below. Provide information on the extent and
location of observable damage.

**BUILDING:**
1. ☐ Replace Drywall; Ceiling Panels:_____
2. ☐ Replace Roof/Sheathing: PER ENGINEER REVIEW - ADDRESS # of SHINERS
3. ☐ Replace Framing: PER ENGINEER REVIEW
4. ☐ Replace Windows; Doors: _____
5. ☐ Slab Damage: _____
6. ☐ Replace Rafters or Trusses: PER ENGINEER REVIEW          RECEIVED
7. ☑ Replace or Repair Stucco: AS NEEDED                   OCT 11 17 R17
8. ☐ Other: _____              03818
                                                        CITY OF LAS V...

**PLUMBING/MECHANICAL**
1. ☐ Replace Gas Pipe: _____
2. ☐ Rephumb Rooms: _____
3. ☐ Replace Fixtures: _____
4. ☐ Replace AC Unit(s): _____
5. ☐ Replace Ducts: _____
6. ☐ Replace Hood: _____
7. ☐ Other: _____

**ELECTRICAL**
1. ☐ Replace Service: _____
2. ☐ Rewire Rooms: ELECTRICAL  CONTRACTOR  to REVIEW & MAKE CORRECTIONS
3. ☐ Other: _____

COMMENTS & RECOMMENDATIONS: WORK W/O PERMITS  ENGINEER to REVIEW
AS BUILT  PATIO COVER - NEED to ADDRESS LEDGER, HANGERS &
ATTACHMENT, BORED & NOTCHED RAFTERS, BEAM SIZE, POST SIZE &
FOOTINGS.   NEED FRAMING PLAN to MATCH AS BUILT.  NEED
BUILDING & ELECTRICAL PERMITS.  INSPECTIONS to INCLUDE 101,
ESTIMATED DAMAGE TO STRUCTURE: 107, 120, 129, 220, 240, & 190.
☑ 10% or Less    ☐ 11 - 25%    ☐ 26 - 50%    ☐ 51 - 75%
              PERMITS ARE REQUIRED FOR REPAIRS OF BUILDING,
              ELECTRICAL, PLUMBING AND MECHANICAL DAMAGE
FOR FURTHER INFORMATION, CALL THE CITY OF LAS VEGAS BUILDING DEPARTMENT AT 229-6251.
                                                        FM-0273-10-13

**Figure 1**

Steven Mack, Esq.                                    Carter and Bianco v Liberty Insurance
30 July 2020
Page 4 of 7



**DEPARTMENT OF BUILDING & SAFETY**

## PERMIT APPLICATION

333 North Rancho Drive, Las Vegas NV 89106-3703
Phone: (702) 229-6251    Fax: (702) 382-1240

CLV

Project # _34037B--KM_    (CLV USE ONLY)    Parent (Original) Project # _____

FOR:  ☐ Commercial & Public Structures    ☒ Residential    VALUATION: $ _10,933.54_

WORK DESCRIPTION: _Minor Structural Framing @ existing patio_    PROJECT/TENANT NAME: _Carter_

PROJECT ADDRESS: _910B Driftwood Cove Ct    LV  NV_    ZIP: _89117_

PARCEL NO.: _163-08-310-036_    LOT/BLOCK: _____

ZONE _____    LAND USE/ENTITLEMENTS: _____

| ☒ CONTRACTOR INFORMATION | ☐ OWNER/BUILDER INFORMATION |
|---|---|
| Company Name: _Dallaswhite Corporation_ | Owner Name: _David Bianco & Darlene Carter_ |
| Company Representative _Bob Butler_ | Owner's Representative _____ |
| Phone: _702 760 3256_ Fax: _____ | Owner's Phone: _____ |
| E-mail: _Bobby b @ dallaswhite.US_ | Owner's Fax: _____ |
| State Contractor License: _007 5668_ | Owner's E-mail: _____ |
| City of Las Vegas Business License: _____ | Additional Contact Phone: _____ |

**REQUIRED FOR SUBMITTAL:** (Please note that plan check fees are based on occupancy, use, construction type and square footage)
OCCUPANCY GROUP(S): _____    USE: _____    CONSTRUCTION TYPE: _____

TOTAL SQUARE FOOTAGE: _____    AFFECTED SQ' (TI's): _____    ☐ Is this a High-rise? More than 55'?

**IF THE BUILDING IS MIXED USE, PROVIDE CODE ANALYSIS PER FLOOR AS A SEPARATE ATTACHMENT**

SQUARE FT OF FLOOR AREAS:  1st _1609_    2nd _792_    3rd _____    4th _____

Garage _529_    Patio _____    Balcony _____    Number of Units _____    Number of Stories _____

SPECIAL CONDITIONS: _____

I state that the information I have supplied on this application is true and correct. By signing this application, I agree to comply with all conditions as noted on this permit.

_Bob Butler  RB_    _4-19-17_
Contractor or Agent / Owner  (Print & Sign)    Date    |    Planning Department    Date

Land Development/Flood Control Engr.    Date    |    Fire Department    Date

_CM_    _5.11.17_
Building Department    Date    |    TOTAL PERMIT FEE: $ _649.00_

| PRE-PAID: Plan Review $ _____ | **Permit Expires 180 Days After Abandonment of Work** |
| PRE-PAID: $ _____ | Permits expire when no inspection has been approved for any 180- |
| TOTAL  $ _____ | day. period after the permit has been issued. |

Use our Permit Fee Estimator, http://www.lasvegasnevada.gov/portal/faces/portal/faces/wcnav_externalId/bp-permit-fee-estimator, for your permit fee estimates. _Do not bring a pre-printed check_ as your final fees may be different from the estimate. A contact sheet must accompany this application.*

Revised:  052316                                                    yp: Permit Application

**Figure 2**

Steven Mack, Esq.                                    Carter and Bianco v Liberty Insurance
30 July 2020
Page 5 of 7

---

**DEPARTMENT OF BUILDING & SAFETY**

**PERMIT APPLICATION** OCT 11 '17

333 North Rancho Drive, Las Vegas NV 89106-3703
Phone: (702) 229-6251    Fax: (702) 382-1240

RECEIVED OCT 11 '17 R17 03818

CITY OF LAS VEGAS

CLV

NEVADA

Project # R17-03818          (CLV USE ONLY)     Parent (Original) Project # _____

FOR:   ☐ Commercial & Public Structures     ☑ Residential     VALUATION: $ 13,370

WORK DESCRIPTION: _____     PROJECT/TENANT NAME: _____

PROJECT ADDRESS: 9108 Driftwood Cove LV NV  ZIP: 89117

PARCEL NO.: _____     LOT/BLOCK: _____

ZONE _____     LAND USE/ENTITLEMENTS: _____

| CONTRACTOR INFORMATION | OWNER/BUILDER INFORMATION |
|---|---|
| Company Name: Belfor Property | Owner Name: Darlene Carter |
| Company Representative: Javier Esqueda | Owner's Representative: |
| Phone: 702-935-6866 Fax: 702-935-6869 | Owner's Phone: 702-578-2907 |
| E-mail: francisca.esqueda@us.belfor.com | Owner's Fax: |
| State Contractor License: 0067311 | Owner's E-mail: |
| City of Las Vegas Business License: 1005207453U | Additional Contact Phone: |

REQUIRED FOR SUBMITTAL: (Please note that plan check fees are based on occupancy, use, construction type and square footage)
OCCUPANCY GROUP(S): _____ USE: _____ CONSTRUCTION TYPE: _____

TOTAL SQUARE FOOTAGE: _____ AFFECTED SQ' (TI's): _____ ☐ Is this a High-rise? More than 55'?

**IF THE BUILDING IS MIXED USE, PROVIDE CODE ANALYSIS PER FLOOR AS A SEPARATE ATTACHMENT**

SQUARE FT OF FLOOR AREAS:   1st _____ 2nd _____ 3rd _____ 4th _____

Garage _____ Patio _____ Balcony _____ Number of Units _____ Number of Stories _____

SPECIAL CONDITIONS: _____

I state that the information I have supplied on this application is true and correct. By signing this application, I agree to comply with all conditions as noted on this permit.

DAVID MCKEE
Contractor or Agent / Owner (Print & Sign)     Date     |     Planning Department     Date

Land Development/Flood Control Engr.     Date 10.11.17     |     Fire Department     Date

Building Department     Date     |     TOTAL PERMIT FEE: $ 1049

| PRE-PAID: Plan Review $ _____ | **Permit Expires 180 Days After Abandonment of Work** |
| PRE-PAID: $ _____ | Permits expire when no inspection has been approved for any 180- |
| TOTAL $ _____ | day period after the permit has been issued. |

Use our Permit Fee Estimator, http://www.lasvegasnevada.gov/portal/faces/portal/faces/wcnav_externalId/bp-permit-fee-estimator, for your permit fee estimates.  Do not bring a pre-printed check as your final fees may be different from the estimate. A contact sheet must accompany this application.*

Revised: 052316                                         yp: Permit Application

**Figure 3**

Steven Mack, Esq.                                    Carter and Bianco v Liberty Insurance
30 July 2020
Page 6 of 7

The delays in the repair work of the damage resulting from the storm event is not defensible.  The failures by Dallas White and Belfor to properly accomplish the work in a timely fashion, in accordance with applicable codes, ordinances, and industry standards, is not defensible.  Leaving the exposed weather resistant envelope components without adequate protection is not defensible.  The unfinished work that was initially observed by SCG personnel at 9108 Driftwood Cove on 12 September 2019 was at best amateurish and incompetent.

The homeowners acted in good faith to secure a contract with the contractors that they were advised to use by Liberty Mutual.  The homeowners further attempted to mitigate damages by installing better protection for the uncovered work that was exposed by the contractors.

The amount shown in the Defense Expert estimate for repairs would not even cover the roof repairs, much less the significant number of resultant damage repairs that were caused by the storm at the interior.  The repair amount is also much larger due to the failures on the part of the contractors that were referred by Liberty Mutual.  The homeowner had repairs done to the roof by a properly licensed contractor and the final cost for the roof repairs was **$20,445.00**.  The overall repair amount offered by the Defense Expert does not even begin to cover the roof repairs alone.

The estimate done by the Defense Expert was done using "Xactimate" software. This software is typically used for insurance defense purposes and is notoriously inaccurate.  As described in a recent class on contracting practices, this software was said to be as much as 400% off from actual costs or reality-based estimating. Contractors do not typically use a rom by room estimating approach and instead prepare estimates based on overall material and labor costs.

Steven Mack, Esq.                                          Carter and Bianco v Liberty Insurance
30 July 2020
Page 7 of 7

This report, including any opinions contained herein, is based on our investigation of the information provided. Accordingly, this report represents our preliminary opinions in this matter.  Should new details or information be provided, we reserve the right to supplement our opinions as we may see fit.

Thank you for this opportunity to be of assistance.  Please call us if you have any questions, regarding this report or our opinions.

Sincerely,

**SWAINSTON CONSULTING GROUP**

Lane Swainston CBO, CXLT
Principal Consultant











# EXHIBIT "4"



**DALLASWHITE**
PROPERTY RESTORATION

**24/7 EMERGENCY SERVICES**
Office: (800) 821-8941
Fax:    (800) 723-4149
www.dallaswhite.us

## WORK AUTHORIZATION

Insured: CARTER, DARLENE / BIANCO, DAVID

Address of Loss (Property): 9108 DRIFTWOOD COVE CT; LAS VEGAS NV 89117

Contact Person and Phone #: DAVID BIANCO - 702 562 1753

Description of Loss and Work To Be Performed: WIND DAMAGE TO EXTERIOR AND RELATED
INTERIOR WATER DAMAGE PER AGREED SCOPE WITH INSURANCE

### STANDARD TERMS AND CONDITIONS OF WORK AUTHORIZATION

Insured agrees to the terms and conditions of this Work Authorization ("Agreement") and do hereby authorize and direct DALLASWHITE Corp. ("DW") to enter the property and perform work as needed to prevent further damage to/reduce the safety hazard created by a catastrophic event, to the extent reasonably possible to the property, which may include, but is not limited to removal of damaged or affected drywall, baseboards, insulation, carpet and pad for the purpose of drying and cleaning materials. It will likely be necessary to move furniture, appliances, and/or other contents in order to access the affected areas and materials. This agreement authorizes restoration personnel to manipulate items as necessary for this purpose. Further, this agreement will allow drying equipment, such as commercial fans and dehumidifiers, to be operated inside the property. A catastrophic event is defined as including, but not limited to; fire, flood, earth movement, wind, and rain. The Work of this agreement is limited to providing as needed consulting, moisture mapping, mitigation services, content manipulation & cleaning, abatement & remediation, restorations and/or replacements to the damaged Property ("Work"). Insured agrees to pay DW for all Work performed including, but not limited to, all labor, materials, and equipment utilized to mobilize, commence, and perform the Work in accordance with this Agreement. The Price for said Work is established by DW in accordance with insurance industry standards using software applications such as Xactimate or in accordance with the DW Time and Material Rate Schedule in effect at the time services are rendered ("Price"). Any additional services provided by DW not included in the description of work or outside the designated areas specified shall be subject to additional charges in accordance with the usual and customary rates and fees charged by DW.

DW will proceed with the Work and will cause all of the Work to be performed until completion, also furnish, or cause to be furnished, all the materials required to perform the Work. All materials used will be standard stock materials unless otherwise specified and will match existing materials to the extent possible with respect to the color, texture and design. All Work will be performed in a workmanlike manner and conform with customary industry practices using current techniques and materials reasonably calculated to approximate the finish and quality prior to the damage. The Work to be performed will be commenced as quickly as practicable and, when commenced, will be carried through expeditiously and continuously to completion as rapidly as the proper doing of the Work, the availability of crews of labor, the prompt placing of orders by DW, and the availability of materials, will permit. Insured agrees to provide immediate and continuous access to property so that DW can proceed with all Work in a continuous and uninterrupted manner. Interruptions or delays in Work caused by Insured, its representatives or insurance company resulting in additional costs incurred by DW will be billed to Insured.

Insured irrevocably directs insurance company to pay directly to DW (excluding Insured's name from the draft) any balance due for services rendered by DW. Insured authorizes DW to submit all invoices directly to the insurance company, its representative, or adjuster, where insurance coverage has been identified. Insured assigns to DW that portion of the proceeds from Insured's insurance policy covering the loss or any damage to Insured's property, in the amount equal to the charges for services rendered and/or to be rendered by DW for the Work. Insured shall remain primarily and fully responsible for payment of all sums owed to DW for any services provided and not paid by Insured's insurance company. Customer agrees to make payment in accordance with this Agreement if Insured's insurance company does not make timely payments as defined by the terms of this Agreement under the Payments section.

The undersigned has authority to execute this Agreement, and Insured agrees to the terms and conditions set forth on page 1 and page 2 of this Agreement, any scope of work covering the property, and any other document referenced in such documents, which are incorporated herein and made a part of this Agreement. The terms and conditions of this Agreement shall govern all labor, materials, rentals, and services furnished by DW to Insured under this Agreement and any subsequent services provided to Insured pertaining to the property, whether or not a subsequent Agreement, Scope or other Agreement is actually signed.

**I agree to the terms of this Agreement, including page 2, and do hereby Authorize DW to commence Work:**

SIGNATURE OF INSURED: _David Bian_            DATE: _07-06-2016_

Corporate Mailing Address: 6135 Harrison Drive Ste.1   NV: 0075668 B ($7.4M Limit) CA:960200B        WORK AUTHORIZATION (09/15)
Las Vegas, Nevada 89120                                                    Page 1 of 2



**BELFOR**

**PROPERTY RESTORATION**

## NEVADA WORK AUTHORIZATION CONTRACT

License Number: #0067311, Bid Limit: Unlimited
License Numbers: #0078990, #0078991, #0078992, Bid Limit: $1,000,000 each

**#13924**

BELFOR Representative: _DARRON PARTRIDGE_

Owner's Name: _DAVID CARTER_

Business/Tenant's Name: _____

Job Address: _9108 DRIFTWOOD COVE_

City: _LAS VEGAS_ State _NV_ Zip _89117_

Billing Address: _____

City: _____ State ____ Zip ____

Tel: _____ Alt. Tel: _____

E-mail: _____

Insurance Agent: _____

Insurance Carrier: _LIBERTY MUTUAL_

Policy #: _____

Claim #: _____

Owner either owns, leases, or controls the above property ("Property") and/or has the right to enter into this Work Authorization Contract ("Contract") with BELFOR USA Group, Inc. d/b/a BELFOR Property Restoration ("BELFOR"). Owner authorizes BELFOR to provide all labor, equipment, and materials to repair the Property.

**1. EMERGENCY SERVICES.** [☐Yes ☐No] Owner's Initials: _____.

(a) If Owner checks and initials the "Yes" above, BELFOR will provide Emergency Services to implement damage control measures after a property loss.

(b) Emergency Services may include securing the property, erecting safety barriers, initiating emergency structural repairs, conducting safety inspections, securing and sealing the property from the elements, providing temporary power, implementing water extraction, dehumidification, corrosion control, smoke removal, deodorization/cleaning/storage of personal property, clean-up and disposal, and demolition services.

**THERE ARE NO EXPRESSED OR IMPLIED WARRANTIES FOR EMERGENCY SERVICES.**

**2. RECONSTRUCTION SERVICES.** [☑Yes ☐No] Owner's Initials: _DJ3_

If Owner checks and initials the "Yes" above, BELFOR will manage the reconstruction process to rebuild and restore the Property following a property loss (e.g., including but not limited to full-scale carpentry, electrical, mechanical, and plumbing, roofing, interior build-out, construction defect reconstruction). See attached scope of work (if available). In some instances, the scope of work may not be available immediately. If so, BELFOR will provide a copy when it becomes available. Also, supplemental scopes of work may be necessary as the work progresses. If an approved scope of work is not available, BELFOR will provide the following reconstruction services as specified by Owner or Owner's insurance carrier:

_____
_____
_____
_____
_____

**3. CONTENT SERVICES.** [☐Yes ☐No] Owner's Initials: _____.

(a) If Owner checks and initials the "Yes" above, BELFOR will remove, store, and/or clean Owner's property.

(b) Owner and BELFOR will create, sign, and date an inventory list of all personal property that will be part of BELFOR's Content Services. BELFOR is further authorized to remove and dispose of those items determined by BELFOR to be non-salvageable and to restore those items determined by BELFOR to be salvageable.

(c) BELFOR is not responsible for missing or damaged property unless the personal property is listed on a BELFOR inventory list.

(d) Owner acknowledges that property damaged by smoke, water or other elements may be impossible to restore to its pre-loss condition. Thus, Owner's maximum damages from the inability and/or failure to restore property to Owner's satisfaction shall be determined by measuring the value of the property after the loss and the value of the property after BELFOR's effort to restore such property.

(e) Owner shall retrieve, or accept delivery, of all stored or removed (including non-salvageable items) property within the earlier of ninety (90) days of project completion or ninety (90) days of notice by BELFOR.

OWNER CONSENTS TO THE DISPOSAL OF ALL PROPERTY REMOVED OR STORED BY BELFOR WHICH IS NOT RETRIEVED OR ACCEPTED BY OWNER FOLLOWING THE EXPIRATION OF THE 90-DAY PERIOD. OWNER IS RESPONSIBLE FOR DISPOSAL COST.

**4. PRICING**

**(a)** Emergency Services Pricing

(1) The price of Emergency Services shall be based on BELFOR's National Rate and Material Schedule; or

(2) If required by Owner's insurance company, the cost of Emergency Services, materials, equipment, and supplies may be calculated by a scope of work generated by a computer software program (e.g., *Xactimate®*). BELFOR shall be paid the amount calculated by the computer software program and agreed upon by BELFOR and Owner's insurance company.

**(b)** Reconstruction and Contracting Services Pricing

(1) Price: _TBD_

(a) The price of Reconstruction and Contracting Services shall be based on BELFOR's National Rate and Material Schedule; or

(b) If required by Owner's insurance company, the cost of Reconstruction and Contracting Services, materials, equipment, and supplies may be calculated by a scope of work generated by a computer software program (e.g., *Xactimate®*). BELFOR shall be paid the amount calculated by the computer software program and agreed upon by BELFOR and Owner's insurance company.

(2) Price is determined by the scope of work approved by Owner's insurance company, and agreed to by BELFOR, plus any Uninsured Work, as defined section 5.

(3) BELFOR agrees to accept the insurance proceeds as payment for the approved and agreed upon scope of work; however, Owner remains responsible for any Uninsured Work as defined in section 5.

(4) Owner consents to any increase in the scope of work authorized by Owner's insurance carrier.

(5) Owner will pay BELFOR the amount of any insurance deductible before BELFOR starts the work.

**(c)** Content Services Pricing. Pricing for Content Services will be part of the overall pricing when BELFOR is providing either Emergency Services or Reconstruction Services.

**5. UNINSURED WORK.**

Owner is responsible for all work and materials not paid by Owner's insurance company (e.g., code-upgrade work, insurance depreciation value, remodeling, appliance upgrades, extra work, any change orders, supplements not covered by insurance, and increases in the scope of work authorized by Owner's carrier, etc.). Owner shall pay such costs within thirty (30) days of the date of the Invoice.

**6. BELFOR REPRESENTATIONS.** BELFOR will:

(a) maintain policies of insurance sufficient to cover the scope of work;

(b) provide all labor, equipment, and materials to repair the Property, unless noted otherwise in the scope of work;

(c) unless noted otherwise, perform the work in a workmanlike manner and comply with applicable local safety standards, building codes, building permits and zoning ordinances;

(d) provide Owner with a non-transferable, one-year limited warranty upon receipt of payment in full for the work performed. [Note: BELFOR agrees to increase the non-transferable, limited warranty if required by Owner's insurance carrier or third party administrator].

**7. START AND END DATES.**

(a) This Contract will start on or about _____ BELFOR estimates that it will substantially complete the work on or about _____. The start date may be delayed if the work requires BELFOR to obtain building permits.

(b) BELFOR shall not be liable for any failure or delay in the performance of its obligations under this Contract for the period that such failure or delay is beyond its control. Such delay shall not be included in calculating time frames for payment or performance obligations.

(c) Such delays include unavoidable casualty, delays in the delivery of materials, changes in the scope of work, delays in approval from Owner's insurance carrier, delays in selections by Owner, embargoes, government orders, acts of civil or military authorities, acts by common carriers, emergency conditions (including weather conditions) incompatible with safety or quality workmanship, or any similar unforeseen event that renders performance commercially impracticable.

**8. ASSIGNMENT AND AUTHORIZATION.**

(a) Owner assigns to BELFOR Owner's right, title, and interest to any insurance proceeds, checks, or drafts for work and materials furnished by BELFOR.

(b) Owner authorizes his insurance carrier to name BELFOR USA Group, Inc. as sole payee on all insurance checks or drafts for all insurance work and materials furnished by BELFOR.

(c) Owner shall endorse and tender to BELFOR all checks or drafts from the Owner's insurance carrier or mortgage company for BELFOR's work.

(d) Owner shall obtain the endorsement of Owner's insurance or mortgage company if either is named as a payee on any check or draft for any portion of BELFOR's work.

**BELFOR USA** 5870 La Costa Canyon Ct., Suite 200 • Las Vegas, NV 89139 • 866.899.0090 • ph: 702.933.6866 • fx: 702.933.6869
**BELFOR USA** 50 Artisan Means Way, Suite B, Reno, NV 89511-2901 • 866.938.2447 • ph: 775.424.3200 • fx: 775.356.0633
**BELFOR USA** Lake Tahoe Remit to: 50 Artisan Means Way, Suite B, Reno, NV 89511-2901 • ph: 775.588.4992 • fx : 775.356.0633
**HEADQUARTERS** 185 Oakland Ave., Suite 150, Birmingham, MI 48009-3433 • 888.421.4111 • ph: 248.594.1144 • fx: 248.594.1133
24/7 emergency hotline 800.856.3333 • **www.belforusa.com**

PAGE 1 OF 6                                                                 REV. 9/16-NV
White: BELFOR Copy          Yellow: Customer Copy



**BELFOR**
**PROPERTYRESTORATION**

## NEVADA WORK AUTHORIZATION CONTRACT
License Number: #0067311, Bid Limit: Unlimited
License Numbers: #0078990, #0078991, #0078992, Bid Limit: $1,000,000 each

**9. ATTORNEY-IN-FACT.** To protect BELFOR's right to collect the insurance proceeds, Owner irrevocably appoints BELFOR as its attorney-in-fact with full power and authority in the place and in the name of Owner and to endorse in Owner's name any checks, drafts, and any other instruments that may come into BELFOR's possession with respect to the work, insurance policy, or insurance proceeds. This power of attorney is coupled with an interest and is irrevocable until BELFOR is indefeasibly paid in full for all work and materials furnished.

**10. RELEASES.** Owner releases BELFOR from:

(a) work limitations or policy defenses imposed by Owner's insurer and for work not performed due to the refusal of Owner's insurance company to pay for it.

(b) claims caused by any environmental consultant for re-growth after "clearance" is obtained from an environmental consultant or due to un-remediated pre-existing conditions.

(c) performing mold remediation not specifically described and included in an approved scope of work.

**11. VALUABLE PERSONAL PROPERTY.**

Owner is responsible for removing and declaring, in writing, Owner's personal property from the Property (e.g., money, valuables, antiques, jewelry, firearms, pets, fine art) before BELFOR begins any work at the Property. Owner waives any content damage or theft claims against BELFOR for any property not removed by Owner.

**12. OWNERSHIP OF DOCUMENTS.**

BELFOR is the author and owner of all drawings, estimates, photos and other paperwork prepared by BELFOR relating to the work (the "Documents") and will retain all common law, statutory and other reserved rights, including copyrights. Owner acknowledges that the creation of Documents by BELFOR for conducting the agreed upon services does not bestow upon Owner any rights to those Documents, and any unauthorized distribution of the Documents is strictly prohibited. Upon termination of BELFOR's work, for any reason, Owner shall return all copies of Documents provided to it by BELFOR, or its agents.

**13. GENERAL CONDITIONS.**

(a) Notice is complete upon sending by email, facsimile, overnight delivery, or first class mail to the billing address, email address, or facsimile number provided by Owner.

(b) Owner authorizes BELFOR to obtain Owner's personal credit report.

(c) Owner will not enter into agreements with other contractors or subcontractors to perform BELFOR's work until BELFOR's work is complete and BELFOR's permit is closed.

(d) BELFOR may use subcontractors to assist BELFOR to perform its obligations under this Contract.

(e) Owner shall allow government and mortgage company inspections.

(f) Owner agrees to cooperate in obtaining any required third party signatures on insurance checks or drafts.

(g) BELFOR may suspend its performance under this Contract if it does not receive insurance proceeds within 30 days from the date of invoice.

(h) BELFOR may terminate this Contract if: (i) Owner materially breaches its obligations under this Contract or any mortgage or other security instrument against the Property; (ii) Owner fails to give reasonable assurance of payment upon BELFOR's request; (iii) Owner is in voluntary or involuntary bankruptcy; or (iv) foreclosure proceedings are instituted against the Property.

(i) Owner is personally liable for payment to BELFOR if: (1) Owner's insurer becomes insolvent; (2) Owner's insurer denies Owner's claim for any reason; (3) Owner's insurer fails or refuses to pay, in whole or in part, the cost of work performed and materials, equipment, and supplies furnished by BELFOR; or (4) Owner delays or prevents the payment of any insurance check or draft or uses any insurance check or draft for any other purpose other than to pay BELFOR.

(j) BELFOR is not responsible for any chemical sensitivities of Owner, tenant, occupant, or invitee.

(k) Owner agrees to defend, indemnify and hold harmless BELFOR against, all claims, damages, liabilities and costs (including reasonable attorney fees) in connection with the presence, discovery, or failure to discover, remove, remediate or clean-up environmental or biological hazards (e.g., mold, fungus, asbestos, and hazardous waste, substances or materials) unless covered by Owner's insurance policy and described in an approved scope of work.

(l) If for any reason the amount due under this Work Authorization is not paid, BELFOR shall be entitled to recover the costs and its expenses of collection (including actual attorney's fees incurred or 25% of the unpaid balance, whichever is higher) plus interest on the unpaid balance at the rate of 1.5% month, or the maximum amount allowed by law, whichever is greater.

(m) In the event Owner terminates the emergency services authorized by this Contract before they are complete, Owner expressly assumes the risk of, and accepts full responsibility for, the resulting condition of or damage to the property.

(n) Modifications to this Contract shall be in writing and signed by authorized representatives of both parties before the modifications take place. This includes modifications that change: (1) the cost of the work; (2) the scope or type of work to be performed; (3) the materials to be used; or (4) the estimated completion date.

(o) Notwithstanding the foregoing, if the Owner's insurance carrier agrees to an original revised, or supplemented scope of work, a written and signed modification of this Contract to effect that change in scope is not necessary.

**14. OWNER's ACKNOWLEDGEMENT.** Owner acknowledges that Owner has been provided a copy of this Contract.

**15. IN GENERAL.** (a) A party's failure to exercise or delay in exercising any right, power, or privilege under this Contract shall not operate as a waiver. (b) Any provision of this Contract that imposes an obligation after termination or expiration of the Contract shall survive termination or expiration of this Contract. (c) The invalidity or unenforceability of any provision of this Contract shall not affect the validity or enforceability of any other provision of the Agreement. (d) Except where expressly stated in this Contract, Owner may not assign the Contract or any right or obligation of this Contract without prior written consent of BELFOR. (e) This Contract, together with the documents referred to in this Contract, constitutes the entire agreement between the parties with respect to the subject matter and constitutes and supersedes all prior agreements, representations, and understandings of the parties, written or oral.

**OWNER HAS THE RIGHT TO CANCEL THIS TRANSACTION AT ANY TIME BEFORE MIDNIGHT OF THE THIRD (3rd) BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION. THE RIGHT OF CANCELLATION IS WAIVED IN EMERGENCY SITUATIONS IN ACCORDANCE WITH THE ATTACHED WAIVER OF RIGHT OF CANCELLATION. THIS RIGHT TO CANCEL APPLIES ONLY TO RESIDENTIAL TRANSACTIONS.**

Insured Owner or Authorized Representative _____ 6-20-2017
Date

Print Name: DAVID BIANTO

Insured Owner or Authorized Representative _____ /
Date

Print Name: _____

BELFOR Representative _____ 6/20/17
Date

Print Name: DARRON PARTRIDGE

**BELFORUSA** 5870 La Costa Canyon Ct., Suite 200 • Las Vegas, NV 89139 • 866.899.0090 • ph: 702.933.6866 • fx: 702.933.6869
**BELFORUSA** 50 Artisan Means Way, Suite B, Reno, NV 89511-2901 • 866.938.2447 • ph: 775.424.3200 • fx: 775.356.0633
**BELFORUSA** Lake Tahoe Remit to: 50 Artisan Means Way, Suite B, Reno, NV 89511-2901 • 877.587.2416 • ph: 775.588.4992 • f x : 775.356.0633
**HEADQUARTERS** 185 Oakland Ave., Suite 150, Birmingham, MI 48009-3433 • 888.421.4111 • ph: 248.594.1144 • fx: 248.594.1133
24/7 emergency hotline 800.856.3333 • www.belforusa.com

PAGE 2 OF 6
White: BELFOR Copy      Yellow: Customer Copy
REV. 9/16-NV

# EXHIBIT "5"



**$165**

**Liberty Mutual Insurance** Contractor Referral Network

**Liberty Mutual** INSURANCE

AUTO | HOME | LIFE

# Repair your home quickly and reliably.

When you suffer damage to your home, you want it fixed right and fixed quickly. At no additional cost to you, Liberty Mutual can help by providing a reliable network of highly trained local contractors who specialize in construction and restoration services.

PLT000773

$217

# When trouble comes your way, we have a way to fix it



Liberty Mutual has a trusted partnership with Innovation Property, a reliable network of professional home repair contractors. Together, we team up to get your home back in shape, as quickly and conveniently as possible.

## What can you expect from our contractor referral network?

- **Convenience:** Our call center is available 24/7, 365 days a year.

- **Speed:** We promise a prompt response to your call.

- **Peace of Mind:** All contractors are experienced in restoration, and have passed background checks. They are licensed, certified, insured, and bonded.

- **Quality:** We are committed to doing the job right. We're not happy until your home is back to its pre-loss condition.

- **Price:** There's no cost to you for using Innovation Property.

## Service Response Guidelines*

Here's what you can expect when you contact our network of recommended contractors:

- Innovation Property will provide you with contractor options for completing the repair to your home. (You are not required to use one of the contractors recommended.)

- The contractor will contact you within one hour.

- The contractor will inspect your home within 48 hours.

- Liberty Mutual will work with the contractor to reach an agreed upon cost of repair, and handle the final payment when the work is completed.

- Innovation Property will assist in monitoring the progress of the repair work.

## Warranties

We want you to have complete peace of mind during the repair or restoration process. That's why our partner Innovation Property provides the following warranties on labor and workmanship:

- Roofing: 5-year warranty on any replacement and 3-year warranty for roof repair work

- All other restoration, repair, or replacement work: 3-year warranty

## Repair Services

Innovation Property's certified contractors are experienced in a wide range of service areas, including carpentry, electrical, plumbing, heating and air conditioning, roofing, and many more. Not all services are available in all geographic locations.

### Schedule your service today!

Call Liberty Mutual Claims at 1-800-2CLAIMS (225-2467) or Innovation Property at 1-877-700-9009. You can also contact your Liberty Mutual adjuster.





AUTO | HOME | LIFE

*Exceptions may apply under certain conditions, such as a local catastrophic event or a severe storm situation.
Coverage provided and underwritten by Liberty Mutual Insurance Company and its affiliates, 175 Berkeley Street, MA 02116.
©2013 Liberty Mutual Insurance

PER 1548  2013/11

PLT000774

# EXHIBIT "6"

```
 1                 UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3
    DARLENE CARTER, an            )
 4  individual; and DAVID BIANCO, )
    an individual,                )
 5                                )
                 Plaintiffs,      )
 6                                )
                vs.               )  Case No.
 7                                )  2:19-cv-01779-APG-BNW
    LIBERTY MUTUAL INSURANCE, a   )
 8  foreign entity; LIBERTY       )
    INSURANCE CORPORATION, a      )
 9  foreign corporation; DOES I-X;)
    ROE CORPORATIONS I-X,         )
10  inclusive,                    )
                                  )
11               Defendants.      )
    _____)
12

13

14

15

16
               DEPOSITION OF JOANNA MOORE, VOLUME II
17
                    APPEARING REMOTELY FROM
18
                  ORANGE COUNTY, CALIFORNIA
19
                 On Thursday, January 21, 2021
20                      At 9:04 a.m.

21

22

23  Job No. 710892

24  Reported by:  Mickey Chan, CCR No. 928, RPR

25  APPEARING REMOTELY FROM CLARK COUNTY, NEVADA
```

JOANNA MOORE, VOLUME II - 01/21/2021

1    the terms of the policy are not relevant for the purpose of

2    your analysis in this matter?

3         A.   No.  I'm not saying that.  I'm just saying that

4    the policy, based on my recollection, was not something that

5    I included in the report because I must not have thought

6    that there was something there that was important for me to

7    include in the report.  I don't recall specifically, as I

8    sit here today.  I would have to go back and review, but

9    clearly I didn't reference anything in my report other than

10   what we've already talked about, which would have been the

11   disclosure documents.

12        Q.   And so from what we've talk about and from what's

13   in your report, certainly as of July 6, 2020, seems to be

14   that a summary of your opinions is that because the trades

15   that you believe or understand were recommended or referred

16   by, directly or indirectly, Liberty did not do a good job,

17   and that Liberty, then, did not adequately fix that failure

18   on that part, that that is what underlies these other areas

19   where you've determined that Liberty either did not satisfy

20   its duties or were -- was not reasonable.  Do you agree with

21   that?

22        A.   Well, I think it goes way beyond that.

23        Q.   Before we go beyond that, so you do not agree with

24   that?

25        A.   No.  I -- I agree that your statement that Liberty

Page 30

1   Mutual referred these repair trades through what I would

2   designate their third-party agent, Innovation Group, to

3   assist the insureds, and I think we talked about this the

4   last time that we met for my first deposition, that they

5   basically -- Liberty Mutual just turned this over to

6   Innovation Group, and the policyholders were stuck in the

7   middle, basically, in my view of what happened, and that

8   Liberty Mutual just abandoned them to try to figure it out

9   with Innovation Group.

10          There were -- there were times that I know that

11  there were some joint phone calls, but Liberty Mutual didn't

12  assist the policyholders, in my view, in their time of need,

13  and it continued to go from bad to worse, getting Mr. Bianco

14  and Ms. Carter more and more frustrated, more and more

15  upset, more and more desperate to try to have Liberty Mutual

16  help them, and that's what did not happen in this claim, and

17  here we are today because of it.

18     **Q.   And so your opinions that there were failures to**

19  **satisfy duties and failures to comply and unreasonableness**

20  **by Liberty Mutual, that's because of the failure of Liberty**

21  **Mutual to provide the help in these issues with the repair**

22  **trades; is that true?**

23     A.   That's definitely one part of it, because the

24  insureds relied on Liberty Mutual and Liberty Mutual's

25  assistance to get their home back in order and back to where

1  it was before the original storm, and that did not happen.

2       Q.   You say that's one part of it.  What are the other

3  parts?

4       A.   The other parts are just the normal day to day

5  customer service interaction with, you know, helping the

6  insureds, making sure that people, you know, if necessary,

7  go to the site.  I know that there's a reference to -- in

8  Mr. Bianco's deposition that he was treated -- in his mind,

9  he was treated very rudely by August Nardoni, and to the

10  point that when he first met him, he wanted to, quote, kick

11  him out of his house.

12          You know, that's not the kind of help that

13  customers need, especially when they are looking to their

14  insurance carrier for help and assistance.  That troubled

15  me.

16       Q.   So is that the other part then?

17       A.   That's one other part.  I think that another part

18  is that the primary adjuster -- I've forgotten her name

19  right now.  I think she may have gone on a leave of absence

20  or something, and there were a lot of what I would say

21  touches on the file that may have contributed to this claim

22  kind of falling through the cracks.

23          You know, I don't know the internal workings of

24  Liberty Mutual and I don't know why this happened the way it

25  happened with this particular claim.  There may be numerous

JOANNA MOORE, VOLUME II - 01/21/2021

1                    CERTIFICATE OF REPORTER

2    STATE OF NEVADA  ) SS:
     COUNTY OF CLARK  )

3              I, Mickey Chan, a duly commissioned and licensed

4    court reporter, Clark County, State of Nevada, do hereby

5    certify:  That I reported the taking of the remote

6    deposition of the witness, JOANNA MOORE, VOLUME II,

7    commencing on Thursday, January 21, 2021, at 9:04 a.m.

8              That prior to being examined, the witness was, by

9    me, duly sworn to testify to the truth.  That I thereafter

10   transcribed my said shorthand notes into typewriting and

11   that the typewritten transcript of said deposition is a

12   complete, true, and accurate transcription of said shorthand

13   notes.

14             I further certify that I am not a relative or

15   employee of an attorney or counsel or any of the parties,

16   nor a relative or employee of an attorney or counsel

17   involved in said action, nor a person financially interested

18   in the action; that a request [ ] has [X] has not been made

19   to review the transcript.

20             IN WITNESS THEREOF, I have hereunto set my hand in

21   my office in the County of Clark, State of Nevada, this 28th

22   day of January, 2021.

23

24        _____

25        Mickey Chan, CCR No. 928, RPR

# EXHIBIT "7"

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4 DARLENE CARTER, an individual;   )
   and DAVID BIANCO, an individual, )
 5                                   )
          Plaintiffs,               )
 6                                   )
       vs.                          )CASE NO.
 7                                   )2:19-CV-01779-APG-BNW
   LIBERTY MUTUAL INSURANCE, a      )
 8 foreign entity; LIBERTY INSURANCE)
   CORPORATION, a foreign           )
 9 corporation, DOES I-X; ROE       )
   CORPORATIONS I-X, inclusive,     )
10                                   )
          Defendants.               )
11 _____ )

12

13

14

15

16

17         DEPOSITION VIA ZOOM OF DAVID BIANCO

18

19                   LAS VEGAS, NEVADA

                  WEDNESDAY, OCTOBER 28, 2020
20

21

22

23

24 REPORTED BY:  DONNA E. MIZE, CCR NO. 675, CSR 11008

25                   JOB NO: 672556
```

DAVID BIANCO - 10/28/2020

Page 26

1 purchasing the home if any component of that was also

2 used to pay for fees related to the transaction?

3     A.   I believe so.

4     Q.   Do you know how much?

5     A.   I don't have the answer for that.  I can find

6 out.

7     Q.   You just have to go to the documents to look

8 that up?

9     A.   Correct.

10     Q.   You moved into the home at 9108 Driftwood

11 Cove in October 2015 and then the initial claim to

12 Liberty in this instance was about in May 2016; is that

13 your understanding?

14     A.   Correct, yes.

15     Q.   Do you have a specific date in mind about

16 when the claim was made to Liberty?

17     A.   Not the exact date.

18     Q.   Let's do some other background questions

19 here.  Did you review any documents to get ready for

20 today's deposition?

21     A.   Yes, I did.

22     Q.   What did you review, sir?

23     A.   I want to make sure I have my payments to the

24 best of my knowledge and, you know, the people that I

25 spoke to, my notes.

DAVID BIANCO - 10/28/2020

Page 79

1      Q.   You say you were referred to Dallaswhite, who

2 made that reference?

3      A.   Liberty Mutual.

4      Q.   Who at Liberty Mutual?

5      A.   It was one of the internal persons that was

6 assigned to the case.

7      Q.   What was that person's name?

8      A.   I don't recall the name.  I can go back to my

9 notes because my wife, like I said, was the one who

10 made the phone call.

11      Q.   It sounds like if there was a referral from

12 someone at Liberty Mutual to Dallaswhite that was not a

13 communication you had, correct?

14      A.   No, they were referred to me.  I didn't have

15 a choice on the matter.

16      Q.   And my question was not related to the

17 substance of it.  My question was did you have the

18 conversation wherein you understood someone from

19 Liberty Mutual referred Dallaswhite, was that you

20 personally who had that conversation?

21      A.   I don't think so.  I believe it was my wife.

22 I do not remember.

23      Q.   You do not remember having a conversation

24 with anyone like that from Liberty Mutual?

25      A.   I don't.  Maybe I had but I just don't

DAVID BIANCO - 10/28/2020

1 the next page in that first full paragraph on the

2 second page at the end of the eighth line there is a

3 statement that says that as a result of the ineptitude

4 that continues, my client's home has been further

5 damaged as a result of the failure to repair the

6 initial claim by wind, rain and hail.

7          Do you see that?

8     A.   I see it.

9     Q.   Do you agree with that statement?

10    A.   I do.

11    Q.   Then the next statement says that your new

12 claim beginning in March 2017 was more damage to the

13 unrepaired home and only occurred because of the

14 failure of your contractors to complete the proper

15 work.

16          Do you see that statement?

17    A.   Yes.

18    Q.   Do you agree with that statement?

19    A.   Yes.

20    Q.   There is a reference in there to a second

21 claim.  Is it your understanding there was a second

22 claim number that was assigned for damage to your home?

23    A.   They told me they were doing -- I was told

24 they were supposed to do a second claim.  I was told

25 that in order for me to fix the house again for the

DAVID BIANCO - 10/28/2020

Page 110

1 damage, I was told I have to do that.  I didn't want to

2 do that.

3         I was trying to explain, but I have different

4 people so I was trying to explain it because they have

5 never touched the initial work that was done.  They

6 didn't bother to start on my house, and I was trying to

7 explain if you don't fix something, something is going

8 to continue to deteriorate.  I was told I had to do it

9 in order for them to fix my house.

**10     Q.   Who did you have that discussion with?**

11     A.   With August Nardoni.

**12     Q.   Your recollection is that August is the one**

**13 that you remember told you you needed to have a second**

**14 claim started in order for there to be additional**

**15 repairs?**

16     A.   Yes.

**17     Q.   Do you remember when you had that**

**18 conversation?**

19     A.   I had the conversation after me trying to

20 explain to him a couple times, you know, what was going

21 on with the house.  He goes in order for us to fix the

22 house you have to do another claim.  He was trying to

23 explain to me if something happened, you know, like

24 right now if something happens later it is not going to

25 go under the same claim.  I go yes, I understand that,

DAVID BIANCO - 10/28/2020

1      Q.    What was the amount that Belfor charged for

2 the work that it did to the patio cover?

3      A.    The original amount they were asking was some

4 where around 26, $27,000 was the original amount they

5 were asking for.

6      Q.    That's the amount that Belfor was asking for?

7      A.    Correct.

8      Q.    Is that just for the patio cover?

9      A.    Yes.  I mentioned to you that they had a

10 subcontractor for the gas line, right?  I mentioned

11 that to you earlier.

12     Q.    That's some additional work that Belfor

13 ultimately did for the patio cover as well?

14     A.    Correct, yes.

15     Q.    And that was a similar kind of work of what

16 you described to me about how they brought in a

17 subcontractor to move the irrigation line for the

18 purpose of moving footings?

19     A.    Yes, sir.

20     Q.    At this point do you think we have spoken

21 about all of the work that Belfor did on the patio

22 cover?

23     A.    I believe so, yes.

24     Q.    Now, you have also told me that work that

25 Belfor did on the stucco is improper because the

1 BY MR. GREEN:

2     Q.    Mr. Mack has volunteered other than the
3 expert you hired.  Do you know who he is talking about?

4     A.    Yes, Swainston Company.

5     Q.    What do you understand that Swainston has
6 concluded?

7     A.    They concluded that they were here to say
8 that the work that the contractors supposedly did
9 correct was incorrect so they were doing estimates to
10 bring everything to supposedly fix right like a normal
11 patio without any leaks.

12     Q.    Is it your understanding that Swainston has
13 analyzed the patio cover and concluded that the work
14 done by Belfor was incorrect?

15     A.    Correct, yes.

16     Q.    Is it also your understanding that Swainston
17 has analyzed the patio cover and concluded that the
18 work done by Belfor needs to be replaced?

19     A.    Yes.

20     Q.    Do you have any understanding if Swainston
21 has calculated an amount of money necessary to do that
22 replacement work?

23     A.    I believe so, yes.

24     Q.    What's that amount?

25     A.    What is the amount that they calculated?

DAVID BIANCO - 10/28/2020

Page 167

1  STATE OF NEVADA  )
   COUNTY OF CLARK  )
2

3                CERTIFICATE OF REPORTER

4        I, Donna E. Mize, a licensed court reporter,

5  Clark County, State of Nevada, do hereby certify:

6        That I remotely reported the taking of the

7  deposition of David Bianco, commencing on Wednesday,

8  October 28, 2020, at the hour of 10:00 a.m.;

9        That the witness was, by me, remotely sworn to

10 testify to the truth and that I thereafter transcribed

11 my shorthand notes into typewriting, and that the

12 typewritten transcript of said deposition is a

13 complete, true, and accurate transcription of said

14 shorthand notes;

15       I further certify that I am not a relative or

16 employee of any of the parties involved in said action,

17 nor a person financially interested in said action;

18       That the reading and signing of the transcript

19 was requested.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21 in my office in the County of Clark, State of Nevada,

22 this 6th day of November 2020.

23

24       _____
          DONNA E. MIZE, CCR NO. 675
25

# EXHIBIT "8"

1                    UNITED STATES DISTRICT COURT

2                          DISTRICT OF NEVADA

3    DARLENE CARTER, an individual;
     and DAVID BIANCO, an individual,
4
                            Plaintiffs,
5
     vs.                              Case No. 2:19-cv-01799-APG-BNW
6
     LIBERTY MUTUAL INSURANCE, a
7    foreign entity, LIBERTY
     INSURANCE CORPORATION, a foreign
8    corporation, DOES I-X, ROE
     CORPORATIONS I-X, inclusive,
9
                            Defendants.
10   _____

11
            DEPOSITION BY VIDEOCONFERENCE OF DARLENE CARTER
12

13

14                       December 21, 2020
                             9:15 a.m.
15

16

17

18

19

20

21

22
     Reported by:
23   Joanne C. Williams, RPR, CR, NV CCR No. 899

24   Job No. 703132

25

DARLENE CARTER - 12/21/2020

1  it was quick or he will say I will check on that, but he

2  didn't.

3      Q.  And these are all things that you're telling me

4  to explain to me how you concluded he is rude; is that

5  right?

6      A.  Yes.  I find that rude.

7      Q.  Is there anything else that you would put in

8  your conclusion there?

9      A.  No.

10      Q.  Did you ever tell Mr. Nardoni --

11      A.  It just broke my heart to think that all said

12  and done, that I was given up on.  We felt we were -- no

13  one cared and we were given up on.  And just -- it just

14  tore us apart.  And that's when we hired Mr. Mack.

15      Q.  Did you ever tell Mr. Nardoni you thought he was

16  being rude?

17      A.  Oh, yes.

18      Q.  Did you tell him more than once?

19      A.  Yes.

20      Q.  Did you tell him several times as you recall?

21      A.  Not several, just a couple times.  I would just

22  let him know how I felt in my heart.  You're just not --

23  I can't even talk with you and I find you rude.  I'm

24  pretty outspoken but I'm kind to the point where --

25  eventually you can only -- it's almost like a -- it's

1  only when you feel deep in your heart they don't care

2  anymore.  I would be -- I am the kind of person to say

3  hey, this is how I feel.  You're not treating me

4  correctly and I feel like you don't care, and I find that

5  rude.

6      **Q.   Is there anything else that you remember**

7  **communicating with Mr. Nardoni about that we haven't**

8  **already spoken about?**

9      A.   No.

10     **Q.   I've also got a note that you had some**

11  **communications with Casey Ghobrial; is that right?**

12     A.   Yes, very brief, extremely brief.  They didn't

13  call back.  They didn't even call back.

14     **Q.   Did you ever --**

15     A.   I had to call -- I'm sorry.  I had to follow up.

16  I had to follow up all the time on everybody.  No one

17  would call.  And if I didn't call, I certainly wouldn't

18  hear from them.  I had to do the footwork to call.

19  What's going on?  When are we going to do this?  No one

20  would call.  And no one would communicate.  I felt like I

21  worked for Liberty Mutual.

22     **Q.   Do you remember about when you first had any**

23  **interaction with Casey Ghobrial?**

24     A.   I -- it had to be towards the end of 2000 and --

25  middle of '18.

DARLENE CARTER - 12/21/2020

Page 83

1 three-way call.  David and I were here at the home on

2 speaker phone and then Wanda and Stephanie Farmer because

3 we felt that Dallas White wasn't doing their job.  And

4 they were -- Liberty Mutual and Wanda, Stephanie and

5 David and I -- that's when they were terminated.

6     **Q.  Do you remember about when that was?  And I mean**

7 **that conversation.**

8     A.  Around 2017, towards the later part.

9     **Q.  Do you remember anything that Ms. Chambers said**

10 **during that call?**

11     A.  Well, they felt -- come to find out we felt they

12 weren't doing their job.  It was take -- one year, almost

13 one year and my roof has never been touched in one year.

14 The patio was demolished, not done whatsoever.  And there

15 was -- there was no one, no one on job site here.  There

16 was no -- nobody here.  Like I said when the gentlemen

17 would show up they would ask David well, what are we

18 supposed to be doing here today?

19        So there was no foreman taking care or no one

20 controlling what was going on.  So we found out that they

21 had never pulled any license for the job to begin with

22 until right to the last when we reported them.  Then they

23 started pulling license.  There was never any architect

24 here, no City inspector here, nothing.  This is -- we are

25 going on one year.  Remember this.  And --

DARLENE CARTER - 12/21/2020

Page 84

1    Q.   So it sound -- I didn't mean to interrupt.  Go
2  ahead.

3    A.   So they were -- there was no communication here
4  again, no follow-through on Liberty Mutual's part from
5  their field managers.  At that point I couldn't tell you
6  who the field manager was, but I have him written down.
7  But -- and the roof was never even touched.  Now, I live
8  here again underneath the roof and that's where the --
9  main damage was there and some of it in the patio area.
10  But when they came in, they just demolished everything.

11       They didn't even start with the roof.  So the
12  roof kept getting damaged more and more, but that's what
13  my main concern was.  So that's why I kept communicating.
14  So Dallas White had to go.  They just weren't doing their
15  job.  And long story short, they just never pulled
16  license, permits, nothing.  So they were fired.  That was
17  my last time that David, myself -- that was the only
18  communication that he and I had with Liberty, all of us
19  together.

20    Q.   And it sounds like those were things that you
21  and David raised during that call; is that right?

22    A.   Yes.

23    Q.   Okay.  What do you remember of anything that
24  Ms. Chambers said during that call?

25    A.   She said she would look into it.

DARLENE CARTER - 12/21/2020

Page 85

1    Q.    Anything else?

2    A.    No.

3    Q.    Was it decided during that call that Dallas

4    White would be terminated?

5    A.    At that time we all -- all of us felt that they

6    weren't doing their job.  And we weren't happy

7    whatsoever.  And she was actually -- she couldn't believe

8    that they hadn't finished.  So that was our last

9    conversation.  She said she would look into it and -- and

10   she did because she found out there was no license

11   pulled.

12   Q.    And I know that that has come up in a few

13   different ways in this litigation.  What is your

14   understanding in terms of how it was discovered that

15   Dallas White had not gotten any permits for the work it

16   was doing?

17   A.    I cannot recall.

18   Q.    At one point in one of your responses there a

19   moment ago I thought you said something to the effect

20   that you reported them.  What did you mean by that?

21   A.    When I -- because I called the contractors board

22   here.

23   Q.    When was that?

24   A.    I'm going to have to look at my emails on that.

25   Q.    And that was with regard to Dallas White?

DARLENE CARTER - 12/21/2020

Page 86

1      A.   Yes.

2      **Q.   Did you call them or write them a letter?  Do**

3  **you remember?**

4      A.   I actually called them and then just to get some

5  information how to report them.  And they sent me some

6  paperwork.  I filled that out and mailed it back.

7      **Q.   What response did you get from the contractors**

8  **board at that point?**

9      A.   They came out here.  And at that point in time

10 they said because Dallas White -- Belfor had already

11 started a job prior -- or after, I'm sorry, Dallas White,

12 they couldn't do anything because once the contractor --

13 and I didn't know this.  I had no idea.  I don't know the

14 steps to report someone or -- I was just upset because I

15 had to go back all through this again.  I had already

16 been through it once.

17         And when I found out that they hadn't pulled any

18 permits, that's when I reported them because I didn't

19 want what happened to me and my family to happen to

20 someone else.  That's why I reported them.  And the

21 contractors board told me after another contractor has

22 touched someone else's job, there is nothing they can do

23 regarding that.  So Belfor had came back in and started

24 after Dallas White.  So he couldn't do anything.

25         But he did inform me to let me know the next

DARLENE CARTER - 12/21/2020

Page 87

1  times if it ever happens.  And he said I hope it doesn't
2  but if it ever happens again, you can't have another
3  contract -- you have to call me first so I can see the
4  job and who it was before you hire someone else to come
5  in and touch it because they cannot hold them
6  accountable.  And I didn't -- I didn't know any of this.
7      Q.  Do you remember who you -- do you remember who
8  you spoke with from the contractors board?
9      A.  I have the gentleman's name written down, just
10  to let you know.  I could let you know, but I do have
11  paperwork on it.
12      Q.  It sounds like the contractors board took the
13  position that because Belfor had come in and interacted
14  or made any changes at all to Dallas White's work, then
15  the contractors board wouldn't then attempt to parse out
16  who did what?
17      A.  Correct.
18      Q.  Okay.  And then it sounds like Stephanie Farmer
19  was on that phone call with you and David and
20  Ms. Chambers; is that right?
21      A.  Yes.
22      Q.  Do you remember anything that she said during
23  that call?
24      A.  No, I do not actually.
25      Q.  Had you ever spoke or did you ever speak with

DARLENE CARTER - 12/21/2020

Page 91

1    A.    Lack of -- lack of my job being done perhaps.

2    Q.    **Do you remember anything that person said in**

3    **response?**

4    A.    No, because I can't even remember his name right

5    now, so no.

6    Q.    **The person who replaced Stephanie Farmer, was**

7    **that after Belfor started work?**

8    A.    Yes.

9    Q.    **Do you remember the last time you spoke with**

10   **anyone from Innovation?**

11   A.    No.  I can't remember, but I can look it up.

12   It's going to be in a email or, like I said, written

13   down, my last communication with them.  And it has to be,

14   well, let me tell you, 2018, give or take, June to

15   September of 2018.

16   Q.    **What was your understanding in terms of what**

17   **Innovation was supposed to do?**

18   A.    Liberty Mutual recommended and said go with --

19   go with Innovation Properties.  They teamed up together

20   and they said we have some contractors for you so we can

21   get this job done quickly.  So that's how we set that up.

22   Q.    **So it sounds like someone from Liberty**

23   **recommended Innovation is your recollection; is that**

24   **right?**

25   A.    Oh, yes, they did.

DARLENE CARTER - 12/21/2020

Page 92

1      Q.    Who was that?

2      A.    Billy Gold was my first contact with Liberty,

3   but then I believe it was Wanda Chambers because he said

4   he was going to forward the information on to her, so it

5   would be Wanda Chambers.  That's how I remember.

6      **Q.    So is it something where you remember Wanda**

7   **Chambers specifically recommended Innovation or is that**

8   **just what you probably think happened based upon what you**

9   **recall of the sequence?**

10     A.    Here again I'm sure I have some emails, but I do

11  remember Wanda Chambers and Stephanie Farmers and myself

12  and David always being involved at first.  So I

13  remember -- I believe it was Wanda Chambers that

14  recommended him or teamed up, said yeah, this is -- we go

15  with them and the job will get done quick.

16     **Q.    When was that?**

17     A.    2016.

18     **Q.    Was that in a phone call or in an email?**

19     A.    That was in a phone call at that time with

20  Liberty Mutual.  And then she said that she would forward

21  that on to Innovation Properties and somebody from

22  Innovation Properties would be calling me to -- with the

23  contractors.  And that's when Dallas White -- they

24  recommended Dallas White.

25     **Q.    So was the sequence as you remember it that**

DARLENE CARTER - 12/21/2020

1    Wanda Chambers made a recommendation for Innovation?

2        A.   Yes.

3        Q.   And then Innovation made a recommendation for

4    Dallas White?

5        A.   Yes.

6        Q.   Do you remember who you spoke with from

7    Innovation about the recommendation for Dallas White?

8        A.   From what I remember it was here again Stephanie

9    Farmers.  But Liberty recommended Innovation.  So Liberty

10   initiated it to Innovation Properties.  And Innovation

11   Properties chose -- said Dallas White.

12       Q.   So it sounds like Stephanie Farmer was the first

13   person to reach out to you from Innovation; is that

14   right?

15       A.   Yes, from what I remember.  It could have been

16   someone else briefly, like one phone call or one email.

17   But it was Stephanie Farmers, was my contact person.

18       Q.   I think I know the answer to this but I will ask

19   anyway.  Before this had you ever heard of Dallas White?

20       A.   No.

21       Q.   Before this you never worked with Dallas White

22   at all?

23       A.   No.

24       Q.   Before all of this had you ever heard of Belfor?

25       A.   No.

DARLENE CARTER - 12/21/2020

Page 110

1  paid for?

2     A.   Now, I'm going to -- I could not tell you to

3  that because looking at my patio and the job that was

4  finished or not finished, lack of, I don't know what --

5  why they would even ask for a dollar, to be honest with

6  ya.  So I would have to look up the documentation to what

7  they're asking for because they haven't done anything.

8  They have not completed a job.

9     **Q.   What is your understanding of what Belfor was**

10  **supposed to do at your home?**

11     A.   My understanding that Belfor was hired by

12  Liberty Mutual and Innovation Properties together to come

13  in and repair my roof, repair my patio and do exactly --

14  afterwards after the City inspector had came here, do

15  exactly through those plans that they signed off on that

16  he wanted.  That's what they should have been doing.

17     **Q.   It sounds like your understanding of what Belfor**

18  **was supposed to do was whatever was really directed by**

19  **the plans that the City stated needed to be prepared; is**

20  **that right?**

21     A.   Yes.

22     **Q.   And then you said it's your understanding that**

23  **Belfor was hired by Liberty Mutual and Innovation**

24  **together first.  Did I understand that correctly?**

25     A.   Yes.  Liberty Mutual -- yes.  My initial person

Page 111

1   was Liberty tied in with Innovation, yes.

2        Q.   And your understanding that Belfor was hired by

3   Liberty Mutual and Innovation, is that based upon the

4   same explanation you told me before that you considered

5   Liberty and Innovation to be one?

6        A.   I consider -- actually I -- my insurance carrier

7   is Liberty Mutual.  That's who I personally hold

8   accountable for all of this.  And then if they decide to

9   say hey, Innovation Properties is going to help us find

10  you a contractor, it still goes back to Liberty Mutual.

11       Q.   Is it correct to say that because you bought

12  insurance from Liberty and then the contractor that came

13  out to do the work did not do a good job, that

14  essentially it's that arrangement whereby you contend

15  Liberty should be responsible for the bad job by the

16  contractor?

17       A.   That's correct.

18       Q.   And that's the case for both Dallas White and

19  Belfor?

20       A.   Yes.

21       Q.   With regard to Innovation, do you have any

22  understanding if Innovation intended you to have any

23  warranty for work by either of Dallas White or Belfor?

24       A.   Innovation said that they would put a warranty.

25  And I can't remember for how many years.  I believe it

Page 147

1   were going to do my job.  So I wasn't going to come out

2   of pocket at that point in time because I felt that they

3   actually were going to do it.  And that didn't happen, so

4   that's when we had to do it.  I cannot let my home

5   crumble down.  I love my home.  I don't want this to fall

6   apart.  I live in this.

7        Q.   So it sounds like at some point because you

8   weren't getting Liberty Mutual to do repairs and Belfor

9   wasn't doing repairs, you decided that you had to do

10  repairs yourself; is that right?

11       A.   That is correct.

12       Q.   When was that?

13       A.   Well, we started this year.  Like I said Dave

14  and I both are in food and beverage.  Okay.  I live off

15  from tips.  So what money we save, that's what we were

16  doing.  But in the meantime David and I did spend money

17  on the tarp.  And he went up and repaired it the best he

18  could.

19       Q.   So it sounds like to me you determined that you

20  were going to need to save money in order to be able to

21  do these repairs.  And the timing of when you did the

22  repairs was dependent upon when you were able to save the

23  money?

24       A.   That is correct.

25       Q.   Did you do any investigation if there would be

DARLENE CARTER - 12/21/2020

Page 148

1   any alternative source for money for repairs, such as a

2   home equity loan or anything like that?

3       A.   No.  I'm not going to do a home equity, no.  I

4   absolutely did not do that whatsoever.

5       Q.   It sounds like that might have been something

6   that you considered but then rejected; is that true?

7            MR. MACK:  Form.

8            THE WITNESS:  I never considered it.

9   BY MR. GREEN:

10      Q.   It sounds like something that you wouldn't want

11   to do; is that right?

12      A.   I'm not going to go and reach beyond my means

13   and get some kind of financing when I only make X amount

14   a year.  So why would I go put myself into that

15   situation?  If I make X amount a year and then I have

16   mortgage payments and other payments, why would I extend

17   my say life of living to put a roof on my head?  I just

18   had to go with what I could do myself.

19      Q.   And I'm trying to think of how to phrase my

20   question.  It sounds to me like your preference would be

21   to never have to take out any sort of home equity loan

22   simply because you're concerned about having to pay that

23   back?

24      A.   That would be correct.

25      Q.   And we spoke a little bit earlier about the

DARLENE CARTER - 12/21/2020

Page 151

1                    CERTIFICATE OF REPORTER

2

3

4          I, Joanne C. Williams, CCR No. 899, certify as

5   follows:

6          That I reported the deposition of the witness,

7   DARLENE CARTER, at the date and time aforesaid.

8          That the witness appeared before me remotely.

9          That all counsel stipulated to swearing the

10  witness in remotely.

11         That prior to being examined, the witness was by

12  me duly sworn to testify to the truth, the whole truth

13  and nothing but the truth.

14         That I thereafter transcribed my stenographic

15  notes into typewriting and that the transcript of said

16  deposition is a complete, true and accurate transcript of

17  said stenographic notes.

18         That review of the transcript was not requested.

19         I further certify that I am not a relative or

20  employee of any party involved in said action nor a

21  person financially interested in the action.

22         Dated at Phoenix, Arizona, this 4th day

23  of January, 2021.

24         _____

25         Joanne C. Williams, RPR, CR, CCR No. 899

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3               ---oooOooo---
 4  DARLENE CARTER, an          )
    individual; and DAVID BIANCO, )
 5  an individual,              )
                                )
 6          Plaintiffs,         ) CASE NO.
                                ) 2:19-cv-01779-APG-BNW
 7              vs.             )
                                )
 8  LIBERTY MUTUAL INSURANCE, a )
    foreign entity, LIBERTY     )
 9  INSURANCE CORPORATION, a    )
    foreign corporation, DOES   )
10  I-X, ROE CORPORATIONS I-X,  )
    inclusive,                  )
11                              )
            Defendants.         )
12  _____)

13   **ALL PARTIES APPEARING VIA ZOOM VIDEOCONFERENCE**

14

15          The deposition of DARLENE CARTER,

16  Volume II, a witness in the above-entitled cause,

17  taken at the instance of the Defendants, on Monday,

18  January 11, 2021, at the hour of 9:03 a.m. to

19  11:25 a.m., before Robert D. Stanley, Certified

20  Shorthand Reporter, Registered Professional Reporter,

21  in and for the State of Utah and Nevada

22                  ---oooOooo---

23  Job No. 707318

24

25
```

DARLENE CARTER, VOL. II - 01/11/2021

Page 70

1   the photos that are in the binders of photos were all

2   taken at the same time; do you agree?

3        A.    I agree.

4        Q.    Okay.  When we spoke last time I

5   understood you to indicate that you still had

6   about -- about $10,000 that had been paid to you by

7   Liberty.  Is that -- first of all, did I understand

8   that correctly?

9        A.    Yes, you did.

10        Q.    And I know it's only been about 20 days

11   since we spoke last time, but you still have that

12   money?

13        A.    Yes, I do.

14        Q.    And is there a reason you have not spent

15   that money for repairs for the home?

16        A.    The reason why I have not spent that money

17   is because I wanted to make sure that all of you knew

18   that I still had the money, the funds, that was paid

19   to me for repairs to pay someone to repair my home.

20        Q.    It sounds like that's something you

21   thought Liberty Mutual might think was important; is

22   that right?

23        A.    Yes.

24        Q.    Did anyone from Liberty Mutual say to you

25   that they wanted you to keep and not spend that

DARLENE CARTER, VOL. II - 01/11/2021

Page 71

1  money?

2      A.    No, they did not.

3      Q.    Now, is that money that you planned to

4  spend for these other repairs that still need to be

5  done?

6      A.    No.

7      Q.    What do you intend to do with that money

8  at this point?

9      A.    I need to have stuff repaired.  And at

10  this point I expect Liberty Mutual to repair my home

11  with another contractor, of course, that's liable.

12      Q.    When you say another contractor that's

13  liable, do you mean another contractor who will do

14  the job appropriately?

15      A.    Yes.

16      Q.    Okay.  At this point are you -- are you

17  saving the money that Liberty Mutual previously paid

18  to you for the purpose of any future repairs that you

19  understand Liberty Mutual might agree to in the

20  future?

21      A.    Yes.

22      Q.    Are there any specific repairs that you

23  are saving that money for?

24      A.    No.

25      Q.    And I told you from my recollection that

DARLENE CARTER, VOL. II - 01/11/2021

Page 91

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF NEVADA          )
                              ) ss
 3   COUNTY OF CLARK          )

 4          I, Robert D. Stanley, a duly licensed

 5   Certified Court Reporter, Clark County, State of

 6   Nevada, do hereby certify:

 7          That I reported the taking of the

 8   deposition of the witness, DARLENE CARTER, commencing

 9   on Monday, January 11, 2021, at the hour of 9:03 a.m.

10   to 11:25 a.m.

11          That I thereafter transcribed my said

12   shorthand notes into typewriting and that the

13   typewritten transcript of said deposition is a

14   complete, true and accurate transcription of my said

15   shorthand notes taken down at said time.

16          I further certify that I am not a relative

17   or employee of any attorney or party involved in said

18   action, nor a person financially interested in the

19   action.

20          IN WITNESS WHEREOF, I have hereunto set my

21   hand in my office in the County of Clark, State of

22   Nevada, this date of January 18, 2021.

23

24

25                      Robert D. Stanley, RPR/CSR
```

# EXHIBIT "9"

1                    IN THE UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2
3     DARLENE CARTER, an individual;  )
      and DAVID BIANCO, an            )
4     individual,                     )
                                      )
5                     Plaintiffs,     )
                                      )
6          v.                         )   2:19-cv-01779-
                                      )   APG-BNW
7     LIBERTY MUTUAL INSURANCE, a     )
      foreign entity; DOES I-X; ROE   )
8     CORPORATIONS I-X, inclusive,    )
                                      )
9                     Defendants.     )
      _____)
10
11
12    The videotaped deposition of STEPHANIE FARMER,
13    taken via videoconference on behalf of the
14    plaintiffs in the above-entitled case before
15    Debra L. Kleszyk, a Certified Shorthand Reporter
16    within and for the State of Illinois, taken on
17    August 12, 2020, commencing at 2:03 p.m.,
18    pursuant to the Federal Rules of Civil Procedure.
19
20
21
22
23
24
25

                                            Page 1

1           MR. ISBELL:  Objection.  Form.

2  BY MR. MACK:

3       Q.    I'm sorry, one other thing I forgot to

4  tell you, there may be objections during the

5  deposition.  Unless your attorney specifically

6  tells you not to answer that question, you just

7  wait for the objections and then you can answer the

8  question.  Okay?

9       A.    Okay.

10       Q.    So -- so I guess my question was, is it

11  fair to say that the insurance companies contract

12  with Innovative to provide contractors to insureds?

13       A.    We work with them on a contractual

14  basis.

15       Q.    Okay.  The insurance companies.

16  Correct?

17       A.    Correct.

18       Q.    Okay.  And you represent -- or you did

19  represent Liberty Insurance.  Is that correct?

20           MR. GREEN:  Form.

21           MR. ISBELL:  Same objection.

22  BY MR. MACK:

23       Q.    You can answer.

24       A.    We -- we are contractually -- I wouldn't

25  say represent -- we have a contractual obligation

Page 13

1    to provide such service.

2         Q.    With Liberty?

3         A.    Correct.

4         Q.    Do you know if that exists still?

5         A.    If we have a contractual relationship

6    today?

7         Q.    Yes.

8         A.    I do not believe we do.

9         Q.    Do you know when that ended?

10        A.    I can -- I believe it ended in 2019.

11        Q.    Do you know why it ended?

12        A.    I do not.

13        Q.    Do you know who -- who would know?

14        A.    I do not.

15        Q.    Do you deal with contracting with the

16   insurance companies at all?

17        A.    I do not.

18        Q.    Do you know who does that?

19        A.    I do not.

20        Q.    Do you -- so why don't you explain what

21   your position is then specifically.

22        A.    As it relates to this particular claim?

23        Q.    As it -- general.  In general.

24        A.    Okay.  At Innovation Group today, I do

25   estimate compliance.

Veritext Legal Solutions
866 299-5127

```
 1                    CERTIFICATE

 2                        OF

 3          CERTIFIED SHORTHAND REPORTER

 4

 5          I, DEBRA L. KLESZYK, a Certified

 6   Shorthand Reporter of the State of Illinois,

 7   CSR License 084-002981, do hereby certify:

 8          That previous to the commencement of the

 9   examination of the aforesaid witness, the witness

10   was duly sworn by me to testify the whole truth

11   concerning the matters herein;

12          That the foregoing deposition transcript

13   was stenographically reported by me and was there-

14   after reduced to typewriting under my personal

15   direction and constitutes a true and accurate

16   record of the testimony given and the proceedings

17   had at the aforesaid deposition;

18          That the said deposition was taken before

19   me via videoconference at the time and place

20   specified;

21          That I am not a relative or employee or

22   attorney or counsel for any of the parties herein,

23   nor a relative or employee of such attorney or

24   counsel for any of the parties hereto, nor am I

25   interested directly or indirectly in the outcome
```

Page 65

1    of this action.

2              IN WITNESS WHEREOF, I do hereunto set my

3    hand at Elk Grove Village, Illinois, this 26th day

4    of August, 2020.

5

6

7

                 DEBRA L. KLESZYK

8            Certified Shorthand Reporter

               License No. 084-002981

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 66

# EXHIBIT "10"

```
 1                  UNITED STATES DISTRICT COURT
 2                     DISTRICT OF NEVADA
 3
 4    DARLENE CARTER, an individual,
      and DAVID BLANCO, an
 5    individual,
 6                    Plaintiffs,
                                         Case No.:
 7    vs.                                2:19-cv-01779-APG-BNW
 8    LIBERTY MUTUAL INSURANCE, a
      foreign entity; DOES I-X,
 9    ROE CORPORATIONS I-X,
      inclusive.
10
                      Defendants.
11    _____/
12
13
14
15               VIRTUAL ZOOM/TELEPHONIC
          RULE 30(b)(6) DEPOSITION OF THE PERSON MOST
16     KNOWLEDGEABLE OF LIBERTY MUTUAL INSURANCE AND AUGUST
                     NARDONI INDIVIDUALLY
17
                  Tuesday, October 27, 2020
18
                     Las Vegas, Nevada
19
20
21
22    Reported by:
      Michelle C. Johnson, RPR-CRR
23    NV CCR 771, CA CSR 5962
24    Job No. 4299767
25    Pages 1 - 108
```

                                                    Page 1

1          A.  Yes.

2          Q.  The same designation?

3          A.  Yeah, pretty much, field claims

4     representative.

5          Q.  And you work directly for Liberty Insurance;

6     is that correct?

7          A.  Liberty Mutual.

8          Q.  Liberty Mutual.  Are there different

9     Liberties?  I mean Liberty Insurance, Liberty Mutual

10    Insurance, or is it just Liberty Mutual?

11         A.  There are subsidiary underwriting companies

12    under the broad brand of Liberty Mutual.

13         Q.  Okay.  So when you act as an adjuster, you

14    act for all the subsidiary brands or just simply

15    Liberty Mutual?

16              MR. GREEN:  Form.

17              THE WITNESS:  Yes, so we are also part of

18    Safeco, or Safeco is part of Liberty Mutual now, so it

19    is -- I actually work and adjust claims for Safeco as

20    well.

21    BY MR. MACK:

22         Q.  And did there come a time where you were

23    involved with a claim that involves Ms. Darlene Carter

24    and Mr. David Blanco?

25         A.  Yes.

                                              Page 11

1    A.   The insurance company doesn't determine what

2    contractor will repair the home.

3    Q.   Okay.  Does the insurance company have

4    contracts -- well, at this time, did they have a

5    contract with a company called Innovations?

6    A.   Right now?

7    Q.   At the time.

8    A.   So, I believe Innovations, at the time, was a

9    program that was used to assist insureds in access to

10   a contractor, if they didn't have any contractors in

11   mind.

12   Q.   Okay.  Do you know how the contractors came

13   about in these claims?

14        MR. GREEN:  Form.

15        THE WITNESS:  I'm not sure, but it may have

16   been a referral for Innovations to provide a referral

17   to the homeowner regarding the contractor.

18   BY MR. MACK:

19   Q.   And Innovations was paid by Liberty, correct?

20        MR. GREEN:  Form.

21        THE WITNESS:  I don't believe Innovations is

22   paid by Liberty.

23   BY MR. MACK:

24   Q.   Do you know how Innovations gets their

25   income, then?

Page 18

1        A.  No, I don't.

2        Q.  Okay, so the answer I guess would be you

3   don't know if Innovations is paid by Liberty?

4        A.  No, I don't believe Innovations was paid by

5   Liberty.  I didn't see anything in the claim file for

6   payments that I noticed that were to Innovations

7   company.

8        Q.  Right.  But do you know if Liberty Mutual

9   generally had a contract with Innovations at the time?

10           MR. GREEN:  Form.

11           THE WITNESS:  No, not that I know of.

12  BY MR. MACK:

13       Q.  Okay.  Do you know how Innovations would have

14  been referred to my clients?

15       A.  I believe that Liberty Mutual claims adjuster

16  would have referred them to Innovations.

17       Q.  Okay.  And then Innovations' job is to obtain

18  a contractor for the insured?

19       A.  I believe that Innovations makes a referral

20  to the insured regarding contractors in the area.

21       Q.  Okay.  Do you how those contractors are

22  determined?

23           MR. GREEN:  Form.

24           THE WITNESS:  No, I don't.  Innovations is --

25  is not part of the company here, so I'm not sure of

Page 19

<pre>
 1                    REPORTER'S DECLARATION
 2    STATE OF NEVADA        )
                             )   s:
 3    COUNTY OF CLARK        )
 4              I, Michelle C. Johnson, CCR 771, declare as
 5    follows:
 6              That I reported virtually the taking of the
 7    deposition of the witness, AUGUST NARDONI, commencing
 8    on Tuesday, October 27, 2020 at 1:03 p.m.
 9              That prior to being examined, the witness was
10    by me virtually duly sworn to testify to the truth,
11    the whole truth, and nothing but the truth.
12              That I simultaneously transcribed my said
13    shorthand notes into typewriting via computer-aided
14    transcription, and that the typewritten transcript of
15    said deposition is a complete, true, and accurate
16    transcription of said shorthand notes taken down at
17    said time.  That prior to completion of the
18    proceedings, review of the transcript pursuant to
19    FRCP 30(e) was requested.
20              I further declare that I am not a relative or
21    employee of any party involved in said action, nor a
22    person financially interested in the action.
23              Dated:  November 19, 2020.
24
25              Michelle C. Johnson, RPR-CRR, CCR No. 771

                                               Page 108
</pre>

**EXHIBIT "11"**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                      DISTRICT OF NEVADA
 3              Case No. 2:19-cv-01779-APG-BNW
 4   DARLENE CARTER, an              )
     individual; and DAVID          )
 5   BLANCO, an individual,         )
             Plaintiffs,            )
 6                                  )
     vs.                            )
 7                                  )
     LIBERTY MUTUAL INSURANCE,      )
 8   a foreign entity; DOES         )
     I-X; ROE CORPORATIONS          )
 9   I-X,                           )
             Defendants.            )
10
11
12
13         VIRTUAL DEPOSITION OF MATT DEGELORMO
14             Monday, November 30, 2020
15                   11:03 a.m.
16
17
18
19
20
21
22
23   Reported by:  Jill E. Shepherd, RPR, NV CCR 948
24   Job No. 4329090
25
                                              Page 1
```

1    BY MR. MACK:

2        Q.    Okay.

3              Were you involved with the appointing of

4    BELFOR with the project?

5              MR. GREEN:  Form.

6        A.    I don't believe I was.  I think I came in

7    after they had already been brought in.

8    BY MR. MACK:

9        Q.    Okay.

10             Did you have any conversations with Wanda

11   Chambers regarding the case?

12       A.    I did not.

13       Q.    Was there -- did you have an understanding

14   that Dallas White was not performing the repairs and

15   they did not properly pull permits on this project

16   and that type of thing?  Did you hear about that?

17       A.    I remember hearing about that.  And I

18   remember that they, Mrs. Carter and Mr. Bianco, were

19   not happy with the work that they did.

20       Q.    Okay.

21             And did you hear about a telephone

22   conversation that they had with Wanda Chambers and

23   with Innovation when they were on the phone all

24   together to try and find out what they were going to

25   do with Dallas White, and then ultimately reassigned

Page 40

1    the case -- the repairs were reassigned to BELFOR?

2          MR. GREEN:  Form.

3      A.   I do not.  I don't know anything about

4    that.

5    BY MR. MACK:

6      Q.   Okay.

7          Were you involved when BELFOR was already

8    conducting work on the premises or when BELFOR had

9    to submit plans to be approved?  Do you remember

10   that?

11     A.   I was involved when they had to submit

12   plans for approval.  I don't know what work they had

13   already done up to that point, but I know they had

14   submitted a supplement for some additional work.

15     Q.   Okay.

16          Do you remember the date that several

17   months had to go by; and I mean went by while they

18   were trying to get the plans drawn and approved by

19   the City?

20     A.   I don't.

21     Q.   Okay.

22          But you do remember it becoming involved

23   before the plans were approved, correct?

24     A.   I think my earliest memory of this was that

25   they had a supplement and that we were working with

Page 41

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4   STATE OF NEVADA   )
                       ) ss
 5   COUNTY OF CLARK   )
 6           I, JILL E. SHEPHERD, NV-CSR 948, RPR, do
     hereby certify:
 7
                     That I reported the taking of the
 8   deposition of MATT DEGELORMO commencing on
     November 30, at the hour of 11:03 a.m.
 9
                     That prior to being examined, the
10   witness was by me duly sworn to testify to the
     truth, the whole truth, and nothing but the truth:
11
                     That I thereafter transcribed my
12   said shorthand notes into typewriting, and that the
     typewritten transcript of said deposition is a
13   complete, true, and accurate transcription of my
     said shorthand notes taken down at said time.
14
                     I further certify that (1) I am not
15   a relative, employee or independent contractor of
     counsel of any of the parties; nor a relative,
16   employee or independent contractor of the parties
     involved in said action; nor a person financially
17   interested in the action; nor do I have any other
     relationship with any of the parties or with counsel
18   of any of the parties involved in the action that
     may reasonably cause my impartiality to be
19   questioned; and (2) that a request has not been made
     to review the transcript.
20
                     IN WITNESS WHEREOF, I have hereunto
21   set my hand and affixed my official seal of office
     in the County of Clark, State of Nevada, this 16th
22   day of December, 2020.
23
24
25                   Jill E. Shepherd, NV-CSR 948
```

                                                    Page 98

# EXHIBIT "12"

```
 1                 UNITED STATES DISTRICT COURT
 2                     DISTRICT OF NEVADA
 3                         --oOo--
 4     DARLENE CARTER, an individual;   :
       and DAVID BLANCO, an             :
 5     individual,                      :   Case No.
                                        :   2:19-CV-01779-APG-
 6            Plaintiffs,               :   BNW
                                        :
 7           vs.                        :
                                        :
 8     LIBERTY MUTUAL INSURANCE, a      :
       foreign entity; DOES I-X; ROE    :
 9     CORPORATIONS I-X, inclusive,     :
                                        :
10            Defendants.               :
                                        :
11                                      :
12     ======================================================
13
14
15
16        VIDEOCONFERENCE DEPOSITION OF WANDA CHAMBERS
17              WEDNESDAY, NOVEMBER 11, 2020
18                     Reno, Nevada
19
20
21
22     REPORTED BY:          Janet Menges, CCR #206 (NV)
23                           CCR #5785 (CA)
24     JOB NO. 4315515
25     PAGES 1-99
```

Page 1

1          Q    That would have been July 13th, 2017, and
2     if we go back to July -- if we continue down to the
3     bottom of the page we have a July 11th that was from
4     Darren Partridge at Belfor, do you see that, to you?
5          A    I do see it.
6          Q    And attached is the proposal from the
7     architect to draw up plans for the as-built not to
8     code patio cover.  Do you see that?
9          A    I see that, yeah.
10         Q    Also attached is a proposal from the
11    roofer for roof replacement.  The roof suffered wind
12    damage from 80 mile an hour winds experienced in Las
13    Vegas this March.  So that would have been March of
14    2017, do you see that?
15         A    I see that information, yes.
16         Q    Does that help your memory as far as the
17    plans needing to be built for the patio cover and
18    also additional wind damage that was experienced in
19    2017?
20              MR. GREEN:  Form.
21    BY MR. MACK:
22         Q    Wanda?
23         A    It doesn't refresh me, no.
24         Q    Do you remember this at all?
25         A    I mean I'm looking at this information.

                                        Page 44

```
 1      I mean my name is there.  I mean I don't remember it,
 2      but if it's there, yeah.
 3             Q     You don't remember any of this discussion
 4      whatsoever?
 5             A     No.
 6             Q     Do you recall in this particular matter
 7      an issue where the contractor had failed to permit
 8      the reconstruction that they were performing on the
 9      property?
10             A     No, I don't recall.
11             Q     You don't remember Dallaswhite not
12      properly getting permits for the reconstruction?
13             A     I don't recall that.
14             Q     Do you recall that one of the reasons
15      that the Carters were unhappy with Dallaswhite was
16      because they failed to properly construct the
17      reconstruction?
18             A     I mean I don't recall it, no.  The
19      conversation, yeah, no.
20             Q     Can you tell me who Tyler Hollingsworth
21      is?
22             A     I don't know.  The name doesn't ring a
23      bell.
24             Q     I'm going to share with you page LIC796,
25      and do you see an e-mail that was sent from you to
```

Page 45

```
 1    STATE OF NEVADA        )

                             ) ss.

 2    COUNTY OF WASHOE       )

 3               I, JANET MENGES, a Certified Court

 4    Reporter for the State of Nevada, do hereby certify;

 5            That on Wednesday, the 11th day of November,

 6    2020, at the hour of 10:00 a.m. of said day, at Reno,

 7    Nevada, appeared via videoconference WANDA CHAMBERS,

 8    who was duly sworn by me, was thereupon deposed in

 9    the matter entitled herein, and that before the

10    proceedings completion the reading and signing of the

11    deposition has been requested by the deponent or party;

12            That the foregoing transcript, consisting of

13    pages 1 through 99, is a full, true, and correct

14    transcript of my stenotype notes of said deposition

15    to the best of my knowledge, skill, and ability.

16            I further certify that I am not an attorney

17    or counsel for any of the parties, nor a relative or

18    employee of any attorney or counsel connected with

19    the action, nor financially interested in the action.

20            DATED:  At Reno, Nevada, this 28th day of

21    November, 2020.

22

23

24            JANET MENGES, CCR #206 (NV)

25            CSR #5785 (CA)


                                             Page 99
```

# EXHIBIT "13"

**Nocera, Debbie 0897**

| | |
|---|---|
| **From:** | Degelormo, Matt <MATT.DEGELORMO@LibertyMutual.com> |
| **Sent:** | Friday, June 15, 2018 4:23 PM |
| **To:** | ClaimsCommunication |
| **Subject:** | Claim#:033687736-01 - Inbound: Communication from the insured regarding file |
| **Attachments:** | lmdownload-2.pdf; ATT00001.txt |

**From:** David Bianco <darlenecarter@me.com>
**Sent:** Friday, June 15, 2018 6:53:30 PM
**To:** Degelormo, Matt
**Subject:** lmdownload-2.pdf

Hello, Mr.Degelormo
I, have sent you a couple of e-mails,for a better understanding of what's going on, and I really do have a lot of dates and names that I can forward to you of people whom have just plain out forgot about us! Wanda Chambers @ Liberty Mutual & Stephanie Farmer( from innovation properties) were the one's handling this claim they know that Our first Contractor ( Dallas White)never never did The Job, Liberty Mutual Fired them and said we would start over! We had a three way call with ourselves and Wanda Chambers & Stephanie Farmer saying they took full responsibility and they would handle everything, so that being said They (Liberty Mutual & Innovation Properties) Hired (BELFOR ) Our new contractors, whom have been waiting FOREVER FOR LIBERTY MUTUAL to approve the roof ...ect... SO to be quite honest we were told by Casey that Liberty Mutual would send another Inspector here to Re-evaluate our home? No one as bothered to call us?
Matt, The bottom line is we have waited 2.5 years I'm asking you please what would you do? If this were your home, and you spent months on the phone and talking and begging to who knows how many people? we have contacted!! Just to have the  buck  Passed !! because no one wants to help!  or follow through with the job to see if it's been repaired and completed back up to code! Please Matt- can you help us? put our  home back together again! ( ps. we have never been paid for damages to our BBQ... ect... adjusters, took pictures of all items a long time  ago and Wanda Chambers said we would get paid, but like the rest this has never happened. STILL WAITING!!

Kind Regards: David,Darlene Carter

Home phone number: (702)562-1753

Claim number # 033687736

Property Address:
9108 Driftwood Cove Ct
Las Vegas, Nevada
89117

Innovation Properties number is:  # 1-413-231-1546 ( contact: person Byron Johnson , he took over for Stephanie Farmer, she still works there.

Our Contractor now is: Belfor  Property Restoration # 702-933-6866

 Belfor,contact person is (Darren Partridge his cell is  # 702-290-7753)

1

LIC000417

| 8/2/2017 | 3:20pm | Belfor | IG | From: Farmer, Stephanie<br>Sent: Wednesday, August 02, 2017 3:20 PM<br>To: 'darren.partridge@us.belfor.com'<br>Cc: Sven Bradley<br>Subject: Job 225755 Carter, Darlene<br><br>Darren,<br><br>Just got a 2 minute long nasty voice mail from Ms. Carter, complaining that no one has been to her house and it is a total mess. She mentioned there are rats in the attic and her puppies keep stepping on things.<br><br>What is the status of repairs?<br><br>Thank you,<br><br>Stephanie Farmer |
| 8/2/2017 | 3:31pm | IG | Belfor | Stephanie,<br><br>If I remember correctly, this is the one Dallas White was kicked off?<br><br>My super tells me that we were waiting for the supplement to be approved, something about engineer costs.  And other costs?  Roof and framing?   We need approval to proceed, even before we can pull permits.<br><br><br>**We've moved! Please note our new office address**<br><br>Sven Bradley,  AIC, WRT, HCC<br>BELFOR Property Restoration<br>2915 Coleman Street<br>N. Las Vegas Nevada 89032<br>Phone: 702.933.6866 | Mobile: 702.278.5936 |

Classification: General

Innovation 0163

| Date | Time | Belfor | IG | |
|---|---|---|---|---|
| 8/2/2017 | 3:41pm | Belfor | IG | Yep. This is the Dallas White job. I guess someone just needs to tell Ms. Carter what the hold up is. If we are waiting on LM to review and approve the supplement, then she needs to know that so can she call and leave them nasty grahams, not me. J<br><br>Thank you,<br><br>Stephanie Farmer |
| 8/3/2017 | 2:23pm | Belfor | IG | Guys, Got this email from Darlene just moments ago. Wanted to share with you. Doesn't sound like you have reached out to her yet. Let me know.Thank you,Stephanie FarmerProperty Compliance Specialiststephanie.farmer@innovation.groupT 413.231.1546 \| innovation.group<br><br>-----Original Message-----From: David Bianco [mailto:darlenecarter@me.com] Sent: Thursday, August 03, 2017 1:54 PMTo: Farmer, StephanieSubject: PLEASE HELP US!!<br><br>Hi Stephanie,I'm sending you some pictures of our Messy Home!We have rats coming in on the roof and holes they left open!! the mess that we have we were told someone would be cleaning up??? It's Very Hot here!! We would love to be using our patio fans, and BBQ! Our windows have been leaking inside! Yes it's a terrible eyesight. My big concern is there has not been any communication at all?? I need this job Done ASAP!! My Husband has been having chest pains because he is so upset! we cannot deal with this anymore! I want my BEUTIFUL HOME BACK!I look forward to hearing from you! did call you Wednesday but no call back, I will enclose my claim number & phone below.THANK-YOU!!Kind RegardsDarlene CarterClaim # 033687736Liberty Mutual InsuranceWanda Chambers1-866-542-2287. EXT: 74684Our Property Restoration Company is: BELFOR702-290-7753 cell: Darren Patridge  Also with Belfor: Francisco Esqueda cell # 702-241-2392 He's the one in charge NOTE:WE FEEL OUR HOME IS A SAFETY HAZARD!!! WE WANT IT REPAIRED!! (911)Thanks! Stephanie we sure need your help! |

Innovation 0164

| 8/2/2017 | 4:34pm | IG | Belfor | Stephanie, |
| --- | --- | --- | --- | --- |
| | | | | I believe we have advised Ms. Carter, I assume she is just frustrated that it is taking too long to get approved. I will have my program Coordinator reach out to her and explain again for reason for the delay and update Innovations.  We will also note the file. |
| | | | | Hopefully she won't leave me a nasty voice message!   You didnt give her my cell number did you??? |
| | | | | **We've moved! Please note our new office address** |
| | | | | Sven Bradley,  AIC, WRT, HCC<br>BELFOR Property Restoration<br>2915 Coleman Street<br>N. Las Vegas Nevada 89032<br>Phone: 702.933.6866 | Mobile: 702.278.5936 |

Innovation 0165

Classification: General

# EXHIBIT "14"



December 07, 2018

Black And Lobello
Attn: Steven Mack
10777 W. Twain Ave., Suite 300
Las Vegas, NV 89135

Claim Number:  037685867-01
Date of Loss:    03/30/17



CONTACT US

**By phone**
Tel: (800) 565-5505
(702) 429-3624
Fax: (800) 510-8005

**By E-mail**
august.nardoni@libertymutual.com

**Liberty Insurance Corporation**
Mailing Address:
P.O. Box 515097
Los Angeles, CA 90051-5097
Telephone: (800) 225-2467
Fax: (888) 268-8840

**Visit us online**
LibertyMutual.com

**About Claims Process**
Libertymutual.com/claims-
center/home-insurance-claims

Dear Mr. Mack,

We are in receipt of your letter dated 11/28/2018 and have reviewed the claim file.
The claim referenced under the above claim number relates to a claim filed for
wind damage to the property.  We completed our inspection of the property and
found that the damage to the roof was not due to wind, therefore the claim was
denied.  We are attaching a copy of the letter outlining the position of Liberty
Mutual as it relates to this claim.

Please feel free to call me to further discuss the enclosed letter.  At this time our
position on coverage will remain the same.

Sincerely,

August Nardoni
Your Liberty Mutual Claims Team

Enc. - Coverage Letter

LIC004664

**Nocera, Debbie 0897**

| | |
|---|---|
| **From:** | Degelormo, Matt <MATT.DEGELORMO@LibertyMutual.com> |
| **Sent:** | Friday, June 15, 2018 2:08 PM |
| **To:** | ClaimsCommunication |
| **Subject:** | Claim#:033687736-01 - Inbound: IPN CTR documents from the insured |
| **Attachments:** | carter architect-07112017163520.pdf; ATT00001.htm; carter roof-07112017164241.pdf; ATT00002.htm |

**From:** David Bianco <darlenecarter@me.com>
**Sent:** Friday, June 15, 2018 5:50:34 PM
**To:** Degelormo, Matt
**Subject:** Fwd: BELFOR SUPPLEMENT REQUEST INFORMATION Claim#:033687736


Sent from my iPad

Begin forwarded message:

> **From:** "Chambers, Wanda L" <WandaL.Chambers@LibertyMutual.com>
> **Date:** July 13, 2017 at 8:59:06 AM PDT
> **To:** "darren.partridge@us.belfor.com" <darren.partridge@us.belfor.com>
> **Cc:** "darlenecarter@me.com" <darlenecarter@me.com>
> **Subject: BELFOR SUPPLEMENT REQUEST INFORMATION Claim#:033687736**
>
>> Belfor,
>> Thank you for the information. You may want to provide additional information on the roof material if needed.
>> Your file is in line for review by one of our supplement assist adjusters. Once assigned and if needed the assist adjuster will work directly with the contractors to try and settled all items. This review normally takes 7 to 10 business days. We are working hard to try and settle all request as soon as possible. Any additional items are not approved until it is reviewed and added to our estimate. We will contact you to discuss settlement once the review is completed. We appreciate your patience. Thanks again,
>>
>> **From:** Darren Partridge [mailto:darren.partridge@us.belfor.com]
>> **Sent:** Tuesday, July 11, 2017 7:45 PM
>> **To:** Chambers, Wanda L <WandaL.Chambers@LibertyMutual.com>
>> **Subject:** Claim 033687736
>>
>> Wanda,
>>
>> Attached is the proposal from the architect to draw up the plans for the as-built  not to code patio cover.  Also attached is the proposal from the roofer for roof replacement.  The roof suffered wind damage from the 80 MPH winds experienced in Las Vegas this march.

1

LIC000411

Regards,

--

**\*\*We've moved! Please note our new office address\*\***

Darren Partridge
**BELFOR Property Restoration**
2915 Coleman Street
North Las Vegas, Nevada 89032
Office: 702.933.6866, Mobile: 702.290.7753

LIC000412

# David Mckee, ARCHITECT LC 4682
**5250 S. Rainbow Unit 2006**
**Las Vegas, NV 89118**
**cell:(702) 250-4070**
**email: mckeearchitect@juno.com**

28 April 2017

**Owners Address:**
   Carter Residence
   9108 Driftwood Cove Ct

   Contact:
      Francisco
      Belfor Construction
      Ana.willis@us.belfor.com

**Project Description:**
NOC patio cover at Carter residence to include structural and architectural design reveiw.

**Contract Proposal:**
   Architectural services which are provided as the following basic services.

**Construction Drawings:**
   Design review and construction document for building plan review.
      1) The architect shall prepare construction drawings to include site plan, floor plan, new building plans, sections and details.
      2) structural review to repair
      3) Include site investigate of structural components

**Consultant Services:**
   Provided by contractor subs.
      Mechanical, Plumbing, Electrical

**Schedule of Fees:**
   Fees for **Architectural** and **Structural** Design Services are based on lump sum fee for services as follows:
      Construction drawings for building permits
      Total fees including **$ 3,700**

LIC000413

**Ownership of Documents:**

    The design documents, construction drawings, and specifications remain property of the design professional per Nevada Revised Statute NRS 623.780. Copies of the drawings and specifications retained by the client may be utilized for the use of the specific project identified under the address as stated above. No other copies of the design shall be used on any project unless the owner obtains written permission from the design professional. The architect shall provide to the owner three stamped sets for permits.

**Limitation of Liability:**

    Existing and uncovered site and building conditions may vary from the prepared documents. The contractor or owner shall report to the designer any errors, omissions, or inconsistency that may be discovered. The architect shall assist the contractor and owner to resolve any discrepancies through appropriate drawings and details. Limitation of liability is not to exceed maximum contract price. All claims and disputes arising from this agreement between the owner and architect shall be subject to Arbitration. Through Arbitration all decisions shall follow in accordance to Construction Industry Arbitration Rules of the American Arbitration Association. Certificate of Insurance provided on request.

**Cancellation of Project:**

    The owner may request in writing to put on hold or terminate the project at any time prior to plan review submittal. Upon project termination the owner shall be invoiced at the percentage of construction document completion. The owner may request in writing for project restart. Upon written request the owner and architect shall have the right to reevaluate the project contract for fees and time frame.

Sincerely,

David McKee

**Owners Signature** _____ **Date** _____



**7-10-17**
**NV Contractor Lic # 57621**
**Bid Limit $950,000**

Belfor Property Restoration
Address:
**Las Vegas, Nevada**
Phone Number: **702**     Fax Number: **702-**

Email:

**TLC Roof Services is pleased to provide you with the following proposal of labor, material, and sales tax for your roofing project. This proposal includes the following:**

**Project: 9018 Driftwood**
**Scope of Work:  Tile roof**

Remove existing tile roofing system down to wood decking and dispose of.
Inspect existing wood decking for damage and replace as needed at an additional cost of $55.00 per sheet price includes labor and material.
Install one layer of tile roofing underlayment.
Install galv bird stop metal, drip edge metal, and valley metal flashing.
Install galv metal pipe flashings with gal secondary metal flashings as needed.
Install standard weight and color concrete roof tile per manf requirements.
Install weather blocking at all hip and ridge transitions as required.
Install standard weight and color trim roofing tiles.
Paint all galv flashings to match color of roofing.
Clean all related debris and haul away.

Price: $13,427.00
Patio roof: $1,800.00

Note: Existing roof tile no longer manufactured. Existing tile roofing has significant damage for full replacement.
Existing skylights may require replacement due to existing condition

3540 West Sahara Ave. #E6-116.........................................Las Vegas Nevada 89102
Office (702) 655-7663............................................................... Fax: (702) 566-0488
Contractor Licensee # 57621................................................. Bid Limit $950,000.00
Website: www.tlcroofservices.net



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**EXCLUSIONS:**

1. Any structural repairs needed to this project.
2. Carpentry of any kind, ie nailers, crickets, backing, framing metal or wood of any kind.
3. Painting of any kind.
4. General sheet metal other than mentioned in proposal

Thank you for the opportunity...

*Accepted by:*

Very Truly Yours,

**Todd Roberts**
**TLC Roof Services**
**(702) 688-0244 Direct Line**
**(702) 655-7663 Office**
**(702) 566-0488 Fax**
**e-mail: toddroberts@tlcroofservices.net**

3540 West Sahara Ave. #E6-116..........................................Las Vegas Nevada 89102
Office (702) 655-7663.............................................................. Fax: (702) 566-0488
Contractor Licensee # 57621............................................. Bid Limit $950,000.00
Website: www.tlcroofservices.net

LIC000416

Claim: 033687736

Pol: H372685537020240 | Pol St: NV | Clm: 033687736 | Ins: DARLENE CARTER | DoL: 04/30/2016 | Loss St: NV | Status: Open

| Claim Number | Date of Loss | Loss Category | Loss Type | Incident Only | Description |
|---|---|---|---|---|---|
| | | | | | filter tank is leaking and gas line leaking |
| 037685867 | 03/30/2017 | Wind | Property | No | High winds caused roof damage |

## ISO

**Status**

Status: Sent
Date sent to ISO: 06/03/2019 6:41 AM
Last response from ISO: 11/30/2016 2:24 PM

| Insurer | Insurer Phone | Claim/Exposure Number | Date of Loss | Policy Number | Reasons for match | Received |
|---|---|---|---|---|---|---|
| PROGRESSIVE GROUP OF INS COMPANIES-CT | 512-464-1089 | 0120125554403 | | 71219250003 | Phone number is identical | 11/30/2016 2:24 PM |

## Dwelling Incident

## Damage

Damage Description: Sky lights were leaking and leak coming through the light fixture in the ceiling.
Incident Only? No

| 7/3/2017 | 3:02pm | LM | Belfor | From: Darren Partridge [mailto:darren.partridge@us.belfor.com]<br>Sent: Tuesday, July 11, 2017 7:45 PM<br>To: Chambers, Wanda L <Wandal.Chambers@LibertyMutual.com><br>Subject: Claim 033687736<br><br>Wanda,<br><br>Attached is the proposal from the architect to draw up the plans for the as-built not to code patio cover. Also attached is the proposal from the roofer for roof replacement.   The roof suffered wind damage from the 80 MPH winds experienced in Las Vegas this march.<br><br>Regards,<br><br>--<br><br>**We've moved! Please note our new office address**<br>Darren Partridge<br>BELFOR Property Restoration<br>2915 Coleman Street<br>North Las Vegas, Nevada 89032<br>Office: 702.933.6866, Mobile: 702.290.7753 |
| 7/13/2017 | 9:59am | Belfor | LM | From: "Chambers, Wanda L" <Wandal.Chambers@LibertyMutual.com>Date: July 13, 2017 at 9:59:06 AM MDT<br>To: "darren.partridge@us.belfor.com" <darren.partridge@us.belfor.com>Cc: "darlenecarter@me.com" <darlenecarter@me.com>Subject: BELFOR SUPPLEMENT REQUEST INFORMATION Claim#:033687736<br><br>Belfor,Thank you for the information. You may want to provide additional information on the roof material if needed.Your file is in line for review by one of our supplement assist adjusters. Once assigned and if needed the assist adjuster will work directly with the contractors to try and settled all items. This review normally takes 7 to 10 business days. We are working hard to try and settle all request as soon as possible. Any additional items are not approved until it is reviewed and added to our estimate. We will contact you to discuss settlement once the review is completed. We appreciate your patience.Thanks again, |

Classification: General

Innovation 0162

# EXHIBIT "15"



**Liberty Mutual Insurance**

350 E. 96th Street
Indianapolis, IN 46240

June 4, 2019


Stacy Joseph-Jean
PO Box 515097
Los Angeles, CA 90051



Insured Name:          Darlene Carter
Policy Number:         H37-268-553702-40
Claim ID:              033687736
Date of Loss:          04/30/2016
Policy Effective:      10/20/2015


I hereby certify that the attached is a true and accurate copy of the documents requested for the policy listed above as maintained by the Liberty Mutual Insurance Group Inc. in the usual and customary course of its business.




Celest Bustard
Policy Copy Support


CB
Enclosures

# Policy Declarations



**Liberty Mutual INSURANCE**

## A summary of your homeowners insurance coverage

Welcome. Thank you for insuring with us. Here is your new homeowners policy summary, which is effective as of 10/20/2015.

 INSURANCE INFORMATION

| | |
|---|---|
| Named Insured<br>Darlene Carter | Policy Number<br>H37-268-553702-40 |
| Mailing Address<br>9108 Driftwood Cove Ct<br>Las Vegas NV 89117-2465 | Policy Period<br>10/20/2015-10/20/2016 12:01AM<br>standard time at the address of the<br>Named Insured at Insured Location. |
| Insured Location<br>Same as Mailing address above | |

---

**Premium Summary**

| | | |
|---|---|---|
| Standard Policy with HomeProtector Plus | $ | 876.00 |
| Additional Coverages | $ | 0.00 |
| | | |
| Total 12 Month Policy Premium | $ | 876.00 |

Your discounts and benefits have been applied to your total policy premium. Please refer to the Discounts and Benefits section for more details.

Through your affiliation with the National Association of Realtors your policy includes exclusive group savings on your home insurance.

THIS IS NOT YOUR HOME INSURANCE BILL.

## Coverage Information

**Standard Policy with HomeProtector Plus**

| Section I Coverages | | LIMITS | PREMIUM |
|---|---|---|---|
| A. Dwelling with Expanded Replacement Cost | $ | 300,000 | |
| B. Other Structures on Insured Location | $ | 30,000 | |
| C. Personal Property with Replacement Cost | $ | 225,000 | |
| D. Loss of Use of Insured Location | Actual Loss Sustained | | |

| Section II Coverages | | | |
|---|---|---|---|
| E. Personal Liability (each occurrence) | $ | 300,000 | |
| F. Medical Payments to Others (each person) | $ | 1,000 | |

Policy Deductibles

Losses covered under Section I are subject to a deductible of: $1,000

| Total Standard Policy with HomeProtector Plus | $ | 876 |
|---|---|---|

**Additional Coverages**

| | DEDUCTIBLE | | LIMITS | | PREMIUM |
|---|---|---|---|---|---|
| Credit Card, Fund Transfer Card,<br>Forgery | $ | | 1,000 | $ | 0 |

### QUESTIONS ABOUT YOUR POLICY?



By phone
1-702-256-0762
1-800-580-8094

Liberty Mutual Office
7125 Grand Montecito
Pkwy Ste 130
Las Vegas NV 89149

Sales Representative
Melody Doty

To report a claim
By phone
1-800-225-2467
Online
LibertyMutual.com/Claims

 INSURANCE GLOSSARY

For definitions of insurance terms, please visit LibertyMutual.com/insurance-glossary.

 Your policy includes HomeProtector Plus, which provides enhanced coverage in case of a loss. Please see your endorsement for details.

*Policy Declarations*

---



## Coverage Information (continued)

| Additional Coverages (continued) | | | |
| --- | --- | --- | --- |
| | DEDUCTIBLE | LIMITS | PREMIUM |
| Coverage E increased limit | | | INCL |
| Total Additional Coverages | | $ | 0 |

## Discounts and Benefits

Your discounts and benefits have been applied to your total policy premium.



**HOME DISCOUNTS**
For more information on discounts, please visit LibertyMutual.com/home-discounts.

- Inflation Protection Discount
- Early Shopper Discount
- Protective Device Discounts:
  Smoke/Heat Alarm-All Floors, Extinguishers and Dead Bolt Locks
  Complete Reporting Fire Alarm
  Complete Reporting Central Alarm

- Claims Free Discount
- Recent Home Buyer Discount

## Endorsements — Changes to Your Policy

Each endorsement listed has a form number (example: HO 00 00 00 00), which corresponds to the documents attached in the endorsement section of this package.

- LibertyGuard® Deluxe Homeowner Policy (HO 00 03 04 91)
- Credit Card, Fund Transfer Card, Forgery (HO 04 53 04 91)
- Special Provisions (FMHO 3435 0514)
- Amendmt Pol Definitions (FMHO-2934 7/04)
- Seepage Exclusion Endorsement (FMHO 3391 1112)
- Inflation Protection (FMHO-2835)
- Fuel Storage Exclusion (FMHO-1097 1/97)

- Home Protector Plus (FMHO-1183)
- Protective Devices (HO 04 16 04 91)
- Homeowner Amendatory Endorsement (FMHO 2493 0412)
- Amendatory Mold End (FMHO 3370 1112)
- No SecII/Limit I-Daycare (HO 04 96 04 91)
- Lead Poisoning Exclusion (FMHO-976 05/92)
- Amend. Cancel Provision (FMHO-2155)

## Mortgage Information

Mortgagee 1:

GUILD MORTGAGE COMPANY, ISAOA
LOAN NO. 515-2000658
PO Box 85304
San Diego, CA 92186-5304

## Important Messages

Flood Insurance: Your Homeowners policy does not provide coverage for damage caused by flood, even if the flood is caused by a storm surge. Liberty Mutual can help you obtain this coverage through the Federal Emergency Management Agency (FEMA) if your community participates in the National Flood Insurance Program. Please call your representative for more information.

LibertyGuard® Deluxe Homeowners Policy Declarations
Coverage provided and underwritten by Liberty Insurance Corporation, Boston MA.

This policy, including endorsements listed above, is countersigned by:

_Dexter R. Legg_
_____
Dexter R. Legg
Secretary

_David M. Long_
_____
David H. Long
President

_Gary Bishop_
_____
Gary Bishop
Authorized Representative



# LibertyGuard Deluxe Homeowners Policy

Please read your policy and each endorsement carefully.

**To serve you best...**

Liberty Mutual has over 350 service offices throughout the United States
and Canada.  Please contact your service office shown on your Declarations
Page to report losses, or for any changes or questions about your insurance.
Payments should be sent to the office indicated on your bill.

THIS POLICY IS NON ASSESSABLE


Liberty Mutual. INSURANCE

# LIBERTYGUARD DELUXE HOMEOWNERS POLICY
## HO 00 03 EDITION 04 91

**TABLE OF CONTENTS**      **Page**      **Page**

Agreement.............................................. 1
Definitions............................................. 1
**SECTION I - PROPERTY COVERAGES**
    Coverage A Dwelling............................ 1
    Coverage B Other Structures ............... 2
    Coverage C Personal Property.............. 2-3
    Coverage D Loss of Use...................... 3
    Additional Coverages.......................... 3
        Debris Removal............................... 3
        Reasonable Repairs.......................... 3-4
        Trees, Shrubs and Other Plants ......... 4
        Fire Department Service Charge.......... 4
        Property Removed ........................... 4
        Credit Card, Fund Transfer Card, Forgery
          and Counterfeit Money.................. 4
        Loss Assessment ............................ 4-5
        Collapse ....................................... 5
        Glass or Safety Glazing Material ........ 5
        Landlord's Furnishings ..................... 5-6
**SECTION I - PERILS INSURED AGAINST**
    Coverage A Dwelling and Coverage B
        Other Structures........................... 6
    Coverage C Personal Property.............. 6-7
**SECTION I - EXCLUSIONS**
    Ordinance or Law............................... 7
    Earth Movement ................................ 7-8
    Water Damage ................................. 8
    Power Failure ................................... 8
    Neglect .......................................... 8
    War ............................................... 8
    Nuclear Hazard................................. 8
    Intentional Loss ............................... 8
    Weather Conditions........................... 8
    Acts or Decisions.............................. 8
    Faulty, Inadequate or Defective............ 8
**SECTION I - CONDITIONS**
    Insurable Interest and Limit of Liability ... 8
    Your Duties After Loss ....................... 8-9
    Loss Settlement................................ 9-10
    Loss to a Pair or Set .......................... 10
    Glass Replacement ............................ 10
    Appraisal ........................................ 10

Other Insurance ................................. 10
Suit Against Us .................................. 10
Our Option ....................................... 10
Loss Payment.................................... 10
Abandonment of Property..................... 10
Mortgage Clause................................ 10
No Benefit To Bailee........................... 10
Nuclear Hazard Clause........................ 10-11
Recovered Property ............................ 11
Volcanic Eruption Period ...................... 11
**SECTION II - LIABILITY COVERAGES**
    Coverage E Personal Liability ............... 11
    Coverage F Medical Payments to Others. 11
**SECTION II - EXCLUSIONS**
    Coverage E Personal Liability and Coverage F
        Medical Payments to Others ............ 11-13
    Coverage E Personal Liability ............... 13
    Coverage F Medical Payments to Others. 13
**SECTION II - ADDITIONAL COVERAGES**
    Claim Expenses ................................ 13
    First Aid Expenses ............................ 14
    Damage to Property of Others ............. 14
    Loss Assessment............................... 14
**SECTION II - CONDITIONS**
    Limit of Liability................................ 14
    Severability of Insurance ..................... 14
    Duties After Loss .............................. 14-15
    Duties of an Injured Person ................. 15
    Payment of Claim ............................. 15
    Suit Against Us ................................. 15
    Bankruptcy of an Insured .................... 15
    Other Insurance ................................ 15
**SECTIONS I AND II - CONDITIONS**
    Policy Period .................................... 15
    Concealment or Fraud ........................ 15
    Liberalization Clause .......................... 15
    Waiver or Change of Policy Provisions ... 15
    Cancellation .................................... 15-16
    Non-Renewal ................................... 16
    Assignment ..................................... 16
    Subrogation ..................................... 16
    Death............................................. 16
**\*MUTUAL POLICY CONDITIONS** ............. 16

\*These conditions apply only if Liberty Mutual Fire Insurance Company is shown in the Declarations as the insurer.



| HOMEOWNERS 00 03 04 91 |
|---|

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

| DEFINITIONS |
|---|

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. "Business" includes trade, profession or occupation.

3. "Insured" means you and residents of your household who are:
   a. Your relatives; or
   b. Other persons under the age of 21 and in the care of any person named above.

   Under Section II, "insured" also means:
   c. With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3.a. or 3.b. above. A person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner is not an "insured";
   d. With respect to any vehicle to which this policy applies:
      (1) Persons while engaged in your employ or that of any person included in 3.a. or 3.b. above; or
      (2) Other persons using the vehicle on an "insured location" with your consent.

4. "Insured location" means:
   a. The "residence premises";
   b. The part of other premises, other structures and grounds used by you as a residence and:
      (1) Which is shown in the Declarations; or
      (2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises in 4.a. and 4.b. above;

d. Any part of a premises:
   (1) Not owned by an "insured"; and
   (2) Where an "insured" is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an "insured";

f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

g. Individual or family cemetery plots or burial vaults of an "insured"; or

h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
   a. "Bodily injury"; or
   b. "Property damage."

6. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

7. "Residence employee" means:
   a. An employee of an "insured" whose duties are related to the maintenance or use of the "residence premises," including household or domestic services; or
   b. One who performs similar duties elsewhere not related to the "business" of an "insured."

8. "Residence premises" means:
   a. The one family dwelling, other structures, and grounds; or
   b. That part of any other building;
   where you reside and which is shown as the "residence premises" in the Declarations.
   "Residence premises" also means a two family dwelling where you reside in at least one of the family units and which is shown as the "residence premises" in the Declarations.

| SECTION I - PROPERTY COVERAGES |
|---|

## COVERAGE A - Dwelling

We cover:

1. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

2. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises."

This coverage does not apply to land, including land on which the dwelling is located.

Page 1 of 16



**COVERAGE B - Other Structures**

We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. Used in whole or in part for "business"; or
2. Rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

**COVERAGE C - Personal Property**

We cover personal property owned or used by an "insured" while it is anywhere in the world. At your request, we will cover personal property owned by:

1. Others while the property is on the part of the "residence premises" occupied by an "insured";
2. A guest or a "residence employee," while the property is in any residence occupied by an "insured."

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises," is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.
2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.
   This limit includes the cost to research, replace or restore the information from the lost or damaged material.
3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard engines or motors.
4. $1000 on trailers not used with watercraft.
5. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.
6. $2000 for loss by theft of firearms.
7. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.
8. $2500 on property, on the "residence premises," used at any time or in any manner for any "business" purpose.
9. $250 on property, away from the "residence premises," used at any time or in any manner for any "business" purpose. However, this limit does not apply to loss to adaptable electronic apparatus as described in Special Limits 10. and 11. below.
10. $1000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:
    a. Accessories or antennas; or
    b. Tapes, wires, records, discs or other media; for use with any electronic apparatus.
11. $1000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:
    a. Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;
    b. Is away from the "residence premises"; and
    c. Is used at any time or in any manner for any "business" purpose.
    Electronic apparatus includes:
    a. Accessories or antennas; or
    b. Tapes, wires, records, discs or other media;
    for use with any electronic apparatus.

**Property Not Covered.** We do not cover:

1. Articles separately described and specifically insured in this or other insurance;
2. Animals, birds or fish;
3. Motor vehicles or all other motorized land conveyances.
   This includes:
   a. Their equipment and accessories; or
   b. Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:
      (1) Accessories or antennas; or



(2) Tapes, wires, records, discs or other media;

for use with any electronic apparatus. The exclusion of property described in 3.a. and 3.b. above applies only while the property is in or upon the vehicle or conveyance.

We do cover vehicles or conveyances not subject to motor vehicle registration which are:
a. Used to service an "insured's" residence; or
b. Designed for assisting the handicapped;

4. Aircraft and parts.  Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

6. Property in an apartment regularly rented or held for rental to others by an "insured," except as provided in Additional Coverages 10.;

7. Property rented or held for rental to others off the "residence premises";

8. "Business" data, including such data stored in:
a. Books of account, drawings or other paper records; or
b. Electronic data processing tapes, wires, records, discs or other software media;

However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market; or

9. Credit cards or fund transfer cards except as provided in Additional Coverages 6.

**COVERAGE D - Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following.  However, if the "residence premises" is not your principal place of residence, we will not provide the option under paragraph b. below.
a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or
b. **Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle

elsewhere.

2. If a loss covered under this Section makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the:
**Fair Rental Value,** meaning the fair rental value of that part of the "residence premises" rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense and Fair Rental Value loss as provided under 1. and 2. above for no more than two weeks.

The periods of time under 1., 2. and 3. above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

**ADDITIONAL COVERAGES**

1. **Debris Removal.**  We will pay your reasonable expense for the removal of:
a. Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or
b. Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property.  If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

We will also pay your reasonable expense, up to $500, for the removal from the "residence premises" of:
a. Your tree(s) felled by the peril of Windstorm or Hail;
b. Your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or
c. A neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.  The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees.

2. **Reasonable Repairs.**  In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage.



If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a. Does not increase the limit of liability that applies to the covered property;

b. Does not relieve you of your duties, in case of a loss to covered property, as set forth in SECTION I - CONDITION 2.d.

**3. Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the "residence premises," for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the "residence premises," Vandalism or malicious mischief or Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be available for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

**4. Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

**5. Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

**6. Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a. The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

b. Loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

c. Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

d. Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a. By a resident of your household;

b. By a person who has been entrusted with either type of card; or

c. If an "insured" has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of "business" use or dishonesty of an "insured."

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an "insured" for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under the Forgery coverage.

**7. Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under COVERAGE A - DWELLING, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises." We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.



Condition 1. Policy Period, under SECTIONS I AND II CONDITIONS, does not apply to this coverage.

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

   a. Perils Insured Against in COVERAGE C - PERSONAL PROPERTY. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

   b. Hidden decay;

   c. Hidden insect or vermin damage;

   d. Weight of contents, equipment, animals or people;

   e. Weight of rain which collects on a roof; or

   f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

   Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building.

   Collapse does not include settling, cracking, shrinking, bulging or expansion.

   This coverage does not increase the limit of liability applying to the damaged covered property.

9. **Glass or Safety Glazing Material.**

   We cover:

   a. The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window; and

   b. Damage to covered property by glass or safety glazing material which is part of a building, storm door or storm window.

   This coverage does not include loss on the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

   Loss for damage to glass will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

   This coverage does not increase the limit of liability that applies to the damaged property.

10. **Landlord's Furnishings.** We will pay up to $2500 for your appliances, carpeting and other household furnishings, in an apartment on the "residence premises" regularly rented or held for rental to others by an "insured," for loss caused only by the following Perils Insured Against:

    a. **Fire or lightning.**

    b. **Windstorm or hail.**

       This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

       This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

    c. **Explosion.**

    d. **Riot or civil commotion.**

    e. **Aircraft,** including self-propelled missiles and spacecraft.

    f. **Vehicles.**

    g. **Smoke,** meaning sudden and accidental damage from smoke.

       This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

    h. **Vandalism or malicious mischief.**

    i. **Falling objects.**

       This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

    j. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

    k. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

       This peril does not include loss:

       (1) To the system or appliance from which the water or steam escaped;

       (2) Caused by or resulting from freezing except as provided in the peril of freezing below; or

       (3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."

       In this peril, a plumbing system does not include a sump, sump pump or related equipment.

    l. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

       We do not cover loss caused by or resulting from freezing under this peril.



**m. Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain the system and appliances of water.

**n. Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

**o. Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

The $2500 limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

---

## SECTION I - PERILS INSURED AGAINST

### COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:

1. Involving collapse, other than as provided in Additional Coverage 8.;

2. Caused by:

   a. Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

      (1) Maintain heat in the building; or

      (2) Shut off the water supply and drain the system and appliances of water;

   b. Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

      (1) Fence, pavement, patio or swimming pool;

      (2) Foundation, retaining wall, or bulkhead; or

      (3) Pier, wharf or dock;

   c. Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

   d. Vandalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

   e. Any of the following:

      (1) Wear and tear, marring, deterioration;

      (2) Inherent vice, latent defect, mechanical breakdown;

      (3) Smog, rust or other corrosion, mold, wet or dry rot;

      (4) Smoke from agricultural smudging or industrial operations;

      (5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

      Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

      (6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

      (7) Birds, vermin, rodents, or insects; or

      (8) Animals owned or kept by an "insured."

      If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. Excluded under Section I - Exclusions.

Under items 1. and 2., any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

### COVERAGE C - PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I - EXCLUSIONS.

**1. Fire or lightning.**

**2. Windstorm or hail.**

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow,



sleet, sand or dust enters through this opening. This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

3. **Explosion.**
4. **Riot or civil commotion.**
5. **Aircraft,** including self-propelled missiles and spacecraft.
6. **Vehicles.**
7. **Smoke,** meaning sudden and accidental damage from smoke.
   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.
8. **Vandalism or malicious mischief.**
9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.
   This peril does not include loss caused by theft:
   a. Committed by an "insured";
   b. In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or
   c. From that part of a "residence premises" rented by an "insured" to other than an "insured."
      This peril does not include loss caused by theft that occurs off the "residence premises" of:
   a. Property while at any other residence owned by, rented to, or occupied by an "insured" except while an "insured" is temporarily living there.   Property of a student who is an "insured" is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;
   b. Watercraft, and their furnishings, equipment and outboard engines or motors; or
   c. Trailers and campers.
10. **Falling objects.**
    This peril does not include loss to property

contained in a building unless the roof or an outside wall of the building is first damaged by a falling object.  Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.
12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.
    This peril does not include loss:
    a. To the system or appliance from which the water or steam escaped;
    b. Caused by or resulting from freezing except as provided in the peril of freezing below; or
    c. On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises."
    In this peril, a plumbing system does not include a sump, sump pump or related equipment.
13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.
    We do not cover loss caused by or resulting from freezing under this peril.
14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.
    This peril does not include loss on the "residence premises" while the dwelling is unoccupied, unless you have used reasonable care to:
    a. Maintain heat in the building; or
    b. Shut off the water supply and drain the system and appliances of water.
15. **Sudden and accidental damage from artificially generated electrical current.**
    This peril does not include loss to a tube, transistor or similar electronic component.
16. **Volcanic eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I - EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

   b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mine subsidence; mudflow; earth sinking, rising or shifting; unless direct loss by:
      (1) Fire;
      (2) Explosion; or
      (3) Breakage of glass or safety glazing material which is part of a building, storm door or storm window;



ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

c. **Water Damage,** meaning:

(1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

(2) Water which backs up through sewers or drains or which overflows from a sump; or

(3) Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

d. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the "residence premises." But, if a Peril Insured Against ensues on the "residence premises," we will pay only for that ensuing loss.

e. **Neglect,** meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

f. **War,** including the following and any consequence of any of the following:

(1) Undeclared war, civil war, insurrection, rebellion or revolution;

(2) Warlike act by a military force or military personnel; or

(3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

g. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of SECTION I - CONDITIONS.

h. **Intentional Loss,** meaning any loss arising out of any act committed:

(1) By or at the direction of an "insured"; and

(2) With the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

a. **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

c. **Faulty, inadequate or defective:**

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property whether on or off the "residence premises."

| SECTION I - CONDITIONS |
|---|

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

a. To the "insured" for more than the amount of the "insured's" interest at the time of loss; or

b. For more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

a. Give prompt notice to us or our agent;

b. Notify the police in case of loss by theft;

c. Notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

d. Protect the property from further damage. If repairs to the property are required, you must:

(1) Make reasonable and necessary repairs to protect the property; and

(2) Keep an accurate record of repair expenses;

e. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

f. As often as we reasonably require:

(1) Show the damaged property;

(2) Provide us with records and documents we request and permit us to make copies; and

(3) Submit to examination under oath, while not in the presence of any other "insured," and sign the same;

g. Send to us, within 60 days after our request, your signed, sworn proof of loss



which sets forth, to the best of your knowledge and belief:

(1) The time and cause of loss;

(2) The interest of the "insured" and all others in the property involved and all liens on the property;

(3) Other insurance which may cover the loss;

(4) Changes in title or occupancy of the property during the term of the policy;

(5) Specifications of damaged buildings and detailed repair estimates;

(6) The inventory of damaged personal property described in 2.e. above;

(7) Receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) Evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

**3. Loss Settlement.** Covered property losses are settled as follows:

a. Property of the following types:

(1) Personal property;

(2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

(3) Structures that are not buildings;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

(a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) Those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) Underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

However, if the cost to repair or replace the damage is both:

(a) Less than 5% of the amount of insurance in this policy on the building; and

(b) Less than $2500;

we will settle the loss according to the provisions of b.(1) and b.(2) above whether or not actual repair or replacement is complete.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim



within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

4. **Loss to a Pair or Set.**  In case of loss to a pair or set we may elect to:
   a. Repair or replace any part to restore the pair or set to its value before the loss; or
   b. Pay the difference between actual cash value of the property before and after the loss.

5. **Glass Replacement.**  Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6. **Appraisal.**  If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss.  In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other.   The two appraisers will choose an umpire.  If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located.   The appraisers will separately set the amount of loss.   If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will set the amount of loss.

   Each party will:
   a. Pay its own appraiser; and
   b. Bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.**  If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.**  No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.**  If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.**  We will adjust all losses with you.  We will pay you unless some other person is named in the policy or is legally entitled to receive payment.  Loss will be payable 60 days after we receive your proof of loss and:

a. Reach an agreement with you;
b. There is an entry of a final judgement; or
c. There is a filing of an appraisal award with us.

11. **Abandonment of Property.**  We need not accept any property abandoned by an "insured."

12. **Mortgage Clause.**
    The word "mortgagee" includes trustee.
    If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear.  If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.
    If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:
    a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;
    b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and
    c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so.   Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.
    If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.
    If we pay the mortgagee for any loss and deny payment to you:
    a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or
    b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest.  In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.
    Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

13. **No Benefit to Bailee.**  We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**
    a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.



b.  Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

c.  This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**15. Recovered Property.**  If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery.  At your option, the property will be returned to or retained by you or it will become our property.  If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**16. Volcanic Eruption Period.**  One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

## SECTION II - LIABILITY COVERAGES

**COVERAGE E - Personal Liability**
If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1.  Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2.  Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to settle or defend ends when the amount we pay for damages resulting from the "occurrence" equals our limit of liability.

**COVERAGE F - Medical Payments To Others**
We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury."  Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees."  As to others, this coverage applies only:

1.  To a person on the "insured location" with the permission of an "insured"; or

2.  To a person off the "insured location," if the "bodily injury":

a.  Arises out of a condition on the "insured location" or the ways immediately adjoining;

b.  Is caused by the activities of an "insured";

c.  Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

d.  Is caused by an animal owned by or in the care of an "insured."

## SECTION II - EXCLUSIONS

1.  **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** do not apply to "bodily injury" or "property damage":

a.  Which is expected or intended by the "insured";

b.  Arising out of or in connection with a "business" engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business";

c.  Arising out of the rental or holding for rental of any part of any premises by an "insured."  This exclusion does not apply to the rental or holding for rental of an "insured location":

(1) On an occasional basis if used only as a residence;

(2) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(3) In part, as an office, school, studio or private garage;

d.  Arising out of the rendering of or failure to render professional services;

e.  Arising out of a premises:

(1) Owned by an "insured";

(2) Rented to an "insured"; or

(3) Rented to others by an "insured"; that is not an "insured location";

f.  Arising out of:

(1) The ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an "insured";



(2) The entrustment by an "insured" of a motor vehicle or any other motorized land conveyance to any person; or

(3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

This exclusion does not apply to:

(1) A trailer not towed by or carried on a motorized land conveyance.

(2) A motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

(a) Not owned by an "insured"; or

(b) Owned by an "insured" and on an "insured location";

(3) A motorized golf cart when used to play golf on a golf course;

(4) A vehicle or conveyance not subject to motor vehicle registration which is:

(a) Used to service an "insured's" residence;

(b) Designed for assisting the handicapped; or

(c) In dead storage on an "insured location";

g. Arising out of:

(1) The ownership, maintenance, use, loading or unloading of an excluded watercraft described below;

(2) The entrustment by an "insured" of an excluded watercraft described below to any person; or

(3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an excluded watercraft described below.

Excluded watercraft are those that are principally designed to be propelled by engine power or electric motor, or are sailing vessels, whether owned by or rented to an "insured." This exclusion does not apply to watercraft:

(1) That are not sailing vessels and are powered by:

(a) Inboard or inboard-outdrive engine or motor power of 50 horsepower or less not owned by an "insured";

(b) Inboard or inboard-outdrive engine or motor power of more than 50 horsepower not owned by or rented to an "insured";

(c) One or more outboard engines or motors with 25 total horsepower or less;

(d) One or more outboard engines or motors with more than 25 total horsepower if the outboard engine or motor is not owned by an "insured";

(e) Outboard engines or motors of more than 25 total horsepower owned by an "insured" if:

(i) You acquire them prior to the policy period; and

(a) You declare them at policy inception; or

(b) Your intention to insure is reported to us in writing within 45 days after you acquire the outboard engines or motors.

(ii) You acquire them during the policy period.

This coverage applies for the policy period.

(2) That are sailing vessels, with or without auxiliary power:

(a) Less than 26 feet in overall length;

(b) 26 feet or more in overall length, not owned by or rented to an "insured."

(3) That are stored;

h. Arising out of:

(1) The ownership, maintenance, use, loading or unloading of an aircraft;

(2) The entrustment by an "insured" of an aircraft to any person; or

(3) Vicarious liability, whether or not statutorily imposed, for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

i. Caused directly or indirectly by war, including the following and any consequence of any of the following:

(1) Undeclared war, civil war, insurrection, rebellion or revolution;

(2) Warlike act by a military force or military personnel; or

(3) Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

j. Which arises out of the transmission of a communicable disease by an "insured";

k. Arising out of sexual molestation, corporal punishment or physical or mental abuse; or

l. Arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as



defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions e., f., g., and h. do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employees" employment by an "insured."

2. **Coverage E - Personal Liability,** does not apply to:
   a. Liability:
      (1) For any loss assessment charged against you as a member of an association, corporation or community of property owners;
      (2) Under any contract or agreement. However, this exclusion does not apply to written contracts:
         (a) That directly relate to the ownership, maintenance or use of an "insured location"; or
         (b) Where the liability of others is assumed by the "insured" prior to an "occurrence";
         unless excluded in (1) above or elsewhere in this policy;
   b. "Property damage" to property owned by the "insured";
   c. "Property damage" to property rented to, occupied or used by or in the care of the "insured." This exclusion does not apply to "property damage" caused by fire, smoke or explosion;
   d. "Bodily injury" to any person eligible to receive any benefits:
      (1) Voluntarily provided; or
      (2) Required to be provided;
      by the "insured" under any:
      (1) Workers' compensation law;
      (2) Non-occupational disability law; or
      (3) Occupational disease law;

   e. "Bodily injury" or "property damage" for which an "insured" under this policy:
      (1) Is also an insured under a nuclear energy liability policy; or
      (2) Would be an insured under that policy but for the exhaustion of its limit of liability.
      A nuclear energy liability policy is one issued by:
      (1) American Nuclear Insurers;
      (2) Mutual Atomic Energy Liability Under-writers;
      (3) Nuclear Insurance Association of Canada;
      or any of their successors; or
   f. "Bodily injury" to you or an "insured" within the meaning of part a. or b. of "insured" as defined.

3. **Coverage F - Medical Payments to Others,** does not apply to "bodily injury":
   a. To a "residence employee" if the "bodily injury":
      (1) Occurs off the "insured location"; and
      (2) Does not arise out of or in the course of the "residence employee's" employment by an "insured";
   b. To any person eligible to receive benefits:
      (1) Voluntarily provided; or
      (2) Required to be provided;
      under any:
      (1) Workers' compensation law;
      (2) Non-occupational disability law; or
      (3) Occupational disease law;
   c. From any:
      (1) Nuclear reaction;
      (2) Nuclear radiation; or
      (3) Radioactive contamination;
      all whether controlled or uncontrolled or however caused; or
      (4) Any consequence of any of these; or
   d. To any person, other than a "residence employee" of an "insured," regularly residing on any part of the "insured location."

---

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:
   a. Expenses we incur and costs taxed against an "insured" in any suit we defend;
   b. Premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

   c. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit; and
   d. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.



2. **First Aid Expenses.**  We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy.  We will not pay for first aid to you or any other "insured."

3. **Damage to Property of Others.**  We will pay, at replacement cost, up to $500 per "occurrence" for "property damage" to property of others caused by an "insured."
   We will not pay for "property damage":
   a. To the extent of any amount recoverable under Section I of this policy;
   b. Caused intentionally by an "insured" who is 13 years of age or older;
   c. To property owned by an "insured";
   d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or
   e. Arising out of:
   (1) A "business" engaged in by an "insured";
   (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured," other than the "insured location"; or
   (3) The ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.
   This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an "insured."

4. **Loss Assessment.**  We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

a. "Bodily injury" or "property damage" not excluded under Section II of this policy; or
b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:
   (1) The director, officer or trustee is elected by the members of a corporation or association of property owners; and
   (2) The director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the "residence premises."

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:

a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or
b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II - Coverage E - Personal Liability Exclusion 2.a.(1);
2. Condition 1. Policy Period, under SECTIONS I AND II - CONDITIONS.

## SECTION II - CONDITIONS

1. **Limit of Liability.**  Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the limit of liability for Coverage E as shown in the Declarations.  This limit is the same regardless of the number of "insureds," claims made or persons injured.  All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

   Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.**  This insurance applies separately to each "insured."  This

condition will not increase our limit of liability for any one "occurrence."

3. **Duties After Loss.**  In case of an accident or "occurrence," the "insured" will perform the following duties that apply.  You will help us by seeing that these duties are performed:
   a. Give written notice to us or our agent as soon as is practical, which sets forth:
      (1) The identity of the policy and "insured";
      (2) Reasonably available information on the time, place and circumstances of the accident or "occurrence"; and
      (3) Names and addresses of any claimants and witnesses;
   b. Promptly forward to us every notice, demand, summons or other process relating to the accident or "occurrence";



c.  At our request, help us:
   (1) To make settlement;
   (2) To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";
   (3) With the conduct of suits and attend hearings and trials; and
   (4) To secure and give evidence and obtain the attendance of witnesses;

d.  Under the coverage - Damage to Property of Others - submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the "insured's" control;

e.  The "insured" will not, except at the "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury."

**4. Duties of an Injured Person - Coverage F - Medical Payments to Others.**

The injured person or someone acting for the injured person will:

a.  Give us written proof of claim, under oath if required, as soon as is practical; and

b.  Authorize us to obtain copies of medical reports and records.

The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

**5. Payment of Claim - Coverage F - Medical Payments to Others.**  Payment under this coverage is not an admission of liability by an "insured" or us.

**6. Suit Against Us.**  No action can be brought against us unless there has been compliance with the policy provisions.

No one will have the right to join us as a party to any action against an "insured."  Also, no action with respect to Coverage E can be brought against us until the obligation of the "insured" has been determined by final judgment or agreement signed by us.

**7. Bankruptcy of an Insured.**  Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

**8. Other Insurance - Coverage E - Personal Liability.**  This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

---

## SECTIONS I AND II - CONDITIONS

**1. Policy Period.**  This policy applies only to loss in Section I or "bodily injury" or "property damage" in Section II, which occurs during the policy period.

**2. Concealment or Fraud.**  The entire policy will be void if, whether before or after a loss, an "insured" has:

a.  Intentionally concealed or misrepresented any material fact or circumstance;

b.  Engaged in fraudulent conduct; or

c.  Made false statements;

relating to this insurance.

**3. Liberalization Clause.**  If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

**4. Waiver or Change of Policy Provisions.**

A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any of our rights.

**5. Cancellation.**

a.  You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

b.  We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.  This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.  Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

     (a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or



(b) If the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

(4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. "Insured" includes:

(1) Any member of your household who is an "insured" at the time of your death, but only while a resident of the "residence premises"; and

(2) With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

---

### *MUTUAL POLICY CONDITIONS

You are a member of the Liberty Mutual Fire Insurance Company while this policy is in force. Membership entitles you to vote in person or by proxy at meetings of the company. The Annual Meeting is in Boston, Massachusetts, on the second Wednesday in April each year at 11 o'clock in the morning.

Also, as a member, you will receive any dividends declared on this policy by the Directors.

This policy is classified in Dividend Class II.

This policy has been signed by our President and Secretary at Boston, Massachusetts, and countersigned on the Declarations Page by an authorized representative.

*These conditions apply only if Liberty Mutual Fire Insurance Company is shown in the Declarations as the insurer.

**SECRETARY**

**PRESIDENT**



# HOMEPROTECTOR PLUS ENDORSEMENT

**A.  INCREASED SPECIAL LIMIT OF LIABILITY - JEWELRY, WATCHES, FURS, PRECIOUS AND SEMI-PRECIOUS STONES**

Section I, Coverage C - Personal Property.  Special Limits of Liability.  Paragraph 5 is replaced with:

5.  Jewelry, watches, furs, precious and semi-precious stones are insured for accidental direct physical loss or damage.  The following exclusions and limitations apply:

   a.  $2500 for loss by theft, subject to a maximum of $1000 for any one article.

   b.  The limit of liability stated in the declarations page for Coverage C, for loss caused by perils named under Coverage C of this policy, other than theft.

   c.  $2500 for loss caused by perils not named and not excluded in this policy, subject to a maximum of $1000 for any article.

   d.  We do not cover loss or damage caused by mechanical breakdown, wear and tear, gradual deterioration, insects, vermin or inherent vice.

**B.  REPLACEMENT COST PROVISION - DWELLING AND PERSONAL PROPERTY**

You must meet the following additional Section I Condition for this provision to apply:

17. Additions or Changes to Dwelling - Notice to Company.  You must inform us within 90 days of the start of any additions, alterations or improvements to the dwelling that will increase the replacement cost of the dwelling by $5,000 or more.

If you meet Condition 17, then Section I, Condition 3. Loss Settlement, is deleted and replaced by the following:

3.  Loss Settlement.  Covered property losses are settled as follows:

   a.  The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

     (1) We will pay the cost of repair or replacement, but not exceeding:

       (a) The replacement cost of that part of the building damaged using like construction on the same premises and intended for the same occupancy and use;

       (b) With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declaration, as modified by the Inflation Protection Provision of the policy;

       (c) With respect to Coverage B, the limit of liability stated in the declaration, as modified by the Inflation Protection Provision of the policy;

       (d) The amount actually and necessarily spent to repair or replace the damage.

     (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.  Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.

     However, if the cost to repair or replace the damage is both:

       (a) Less than 5% of the amount of insurance in this policy on the building;

        and

       (b) Less than $2500;

     We will settle the loss according to the provisions of a.(1) above whether or not actual repair or replacement is complete.

   b.  Awnings, outdoor antennas and outdoor equipment, whether or not attached to buildings, and structures that are not buildings; at actual cash value at the time of loss but not exceeding the amount needed to repair or replace.



c. Personal property, carpeting and household appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

(1) Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

(a) Replacement cost with a similar item of like kind and quality at the time of loss;

(b) The full cost of repair;

(c) Any special limit of liability described in the policy or stated in this endorsement; or

(d) The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection of the policy.

(2) This endorsement shall not apply to:

(a) Fine arts and items which, by their nature cannot be replaced with new items;

(b) Articles whose age or history contribute substantially to their value including souvenirs or collector's items.

(c) Property that is unusable for the purpose for which it was originally intended due to age or historic condition.

(3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

## C. INCREASED LIMIT - COVERAGE D

We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D - Loss of Use.

## D. ADDITIONAL COVERAGES

REFRIGERATORS AND FREEZERS CONTENTS COVERAGE

We cover the contents of deep freeze or refrigerated units on the residence premises from the perils of:

1. Fluctuation or total interruption of electric power, either on or off premises, resulting from conditions beyond the control of the "insured".

2. Mechanical breakdown of any refrigeration equipment on premises including the blowing of fuses or circuit breakers.

We do not cover loss caused by the following additional exclusions:

1. Disconnection or termination of power due to turning off any switch.

2. Inability of power source to provide sufficient power due to government order, lack of fuel or lack of generating capacity to meet demand.

SPECIAL LIMIT - We will not pay more than $500 of your loss of refrigerator or freezer contents resulting from the above perils.

All other provisions of this policy apply.

LOCK REPLACEMENT COVERAGE

We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen.  The theft of the keys must be reported to the police for this coverage to apply.

This coverage is additional insurance.  No deductible applies to this coverage.

**HOMEOWNERS**
**HO 04 53 04 91**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CREDIT CARD, FUND TRANSFER CARD, FORGERY AND COUNTERFEIT MONEY COVERAGE
### Increased Limit

For an additional premium, the limit of liability for Additional Coverage **6.**, Credit Card, Fund Transfer Card, Forgery and Counterfeit Money, is increased to $ _____*.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

**HO 04 53 04 91**          Copyright, Insurance Services Office, Inc.,  1990          **Page 1 of 1**



## PREMISES ALARM OR
## FIRE PROTECTION SYSTEM

HO 04 16 04 91

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the "residence premises."  You agree to maintain this system in working order and to let us know promptly of any change made to the system or if it is removed.

 Copyright, Insurance Services Office, Inc., 1990



# SPECIAL PROVISIONS – NEVADA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**SECTION I - PROPERTY COVERAGES**

### COVERAGE C - Personal Property
**Special Limits of Liability**

Items **10.** and **11.** are deleted and replaced by the following:

**10.** $1,000 for loss to electronic apparatus, while in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power. Electronic apparatus includes:

   **a.** Accessories and antennas; or

   **b.** Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this item **10.**

**11.** $1,000 for loss to electronic apparatus, while not in or upon a motor vehicle or other motorized land conveyance, if the electronic apparatus:

   **a.** Is equipped to be operated by power from the electrical system of the vehicle or conveyance while retaining its capability of being operated by other sources of power;

   **b.** Is away from the "residence premises"; and

   **c.** Is used at any time or in any manner for any "business" purpose.

   Electronic apparatus includes:

   **a.** Accessories and antennas; or

   **b.** Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this item **11.**

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverages contained in Special Limits of Liability 10 and 11 are deleted and do not apply.

**Property Not Covered**

Item **3.b.** is deleted and replaced by the following:

**3.** Motor vehicles or all other motorized land conveyances. This includes:

   **b.** Electronic apparatus that is designed to be operated solely by use of the power from the electrical system of motor vehicles or all other motorized land conveyances. Electronic apparatus includes:

   **(1)** Accessories or antennas; or

   **(2)** Tapes, wires, records, discs or other media;

   for use with any electronic apparatus described in this item **3.b.**

   The exclusion of property described in **3.a.** and **3.b.** above applies only while the property is in or upon the vehicle or conveyance.

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   **a.** Used to service an "insured's" residence; or

   **b.** Designed for assisting the handicapped;

### COVERAGE D - Loss of Use

Item **1.** is deleted and replaced by the following:

**1.** If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover the Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

   Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverages contained in Coverage D - Loss of Use is deleted and does not apply.

### ADDITIONAL COVERAGES

**9. Glass or Safety Glazing Material** is deleted and replaced by the following:

**9. Glass or Safety Glazing Material**

   **a.** We cover:



**(1)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

**(2)** The breakage, caused directly by Earth Movement, of glass or safety glazing material which is part of a covered building, storm door or storm window; and

**(3)** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**b.** This coverage does not include loss:

**(1)** To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

**(2)** On the "residence premises" if the dwelling has been vacant for more than 30 consecutive days immediately before the loss, except when the breakage results directly from Earth Movement as provided for in **a.(2)** above. A dwelling being constructed is not considered vacant.

Loss to glass covered under this ADDITIONAL COVERAGE **9.** will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

For forms **HO 00 01** and **HO 00 08**, we will pay up to $100 for loss under this coverage.

This coverage does not increase the limit of liability that applies to the damaged property.

(This is Additional Coverage **8.** in forms **HO 00 01** and **HO 00 08**.)

The following ADDITIONAL COVERAGE is added to all forms except **HO 00 08**. With respect to form **HO 00 04**, the words 'covered building' used below, refer to property covered under ADDITIONAL COVERAGE **10.** Building Additions and Alterations.

**12. Ordinance or Law**

**a.** You may use up to 10% of the limit of liability that applies to COVERAGE A (or for form **HO 00 04**, you may use up to 10% of the limit of liability that applies to Building Additions and Alterations) for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

**(1)** The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a PERIL INSURED AGAINST;

**(2)** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a PERIL INSURED AGAINST to another part of that covered building or other structure; or

**(3)** The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a PERIL INSURED AGAINST.

**b.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

**c.** We do not cover:

**(1)** The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

**(2)** The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

(This is ADDITIONAL COVERAGE **11.** in forms **HO 00 01** and **HO 00 06**.)

Under **Form HO 00 03**, the following Additional Coverage is added:

**13. Damage to Siding and/or Roofing.** In case of damage to siding and/or roofing of the



covered dwelling and other structures at the insured location, we will reimburse you for the cost you incur, up to a maximum of $15,000 in aggregate to replace any undamaged siding, soffit, fascia, and/or roofing material of like kind and quality to match those materials that were used to repair or replace the damaged property.

This coverage applies only if reasonably similar siding and/or roofing materials are no longer available to repair or replace the damaged portion of the damaged covered dwelling and other structures at the insured location due to a covered peril.

This coverage does not apply to:

**a.** Mismatches caused by weathering, fading, oxidizing, wear and tear, deterioration, or product defect;

**b.** Damage to siding material other than vinyl or metal siding;

**c.** Roofing material other than architectural (laminated) asphalt shingle or 3-tab asphalt shingle.

However, we will not pay to:

**a.** Replace siding and/or roofing material of any undamaged dwelling or other structure at the insured location in order to match newly repaired or replaced siding and/or roofing material of any damaged dwelling or other structure;

**b.** Repair or replace undamaged roofing and/or siding material due to mismatch between undamaged material and new material used to repair or replace damaged material because of:

**(1)** Texture, quality, dimensional differences color, fading;

**(2)** Oxidation, rust, corrosion, weathering differences;

**(3)** Wear and tear, marring, scratching, deterioration;

**(4)** Inherent vice, latent defect, mechanical breakdown;

**(5)** Obsolescence, discontinuation; or

**(6)** Material type variation.

## SECTION I - EXCLUSIONS

**1.** **Ordinance or Law** is deleted and replaced by the following:

**1.** **Ordinance or Law**, meaning any ordinance or law:

**a.** Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **1.a.** does not apply to the amount of coverage that may be provided for under ADDITIONAL COVERAGES, Glass

or Safety Glazing Material or Ordinance or Law;

**b.** The requirements of which result in a loss in value to property; or

**c.** Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion applies whether or not the property has been physically damaged.

(This is exclusion **1.a.** in form **HO 00 03**.)

**2.** **Earth Movement** is deleted and replaced by the following:

**2.** **Earth Movement,** meaning movement of the earth, whether combined with water or not, in any direction, including but not limited to:

**a.** Earthquake, including land shock waves or tremors before, during, or after a volcanic eruption;

**b.** Landslide, mud slide, or mud flow;

**c.** Subsidence or sinkhole; or

**d.** Any other earth movement, including earth sinking, rising, shifting, expanding, contracting, or eroding;

caused by or resulting from manmade, animal, or natural actions, events, or conditions.

If direct loss by fire or explosion ensues, we will pay only for the ensuing loss.

(This is Exclusion **1.b.** in Form **HO 00 03**.)

**4.** **Power Failure** is deleted and replaced by the following:

**4.** **Power Failure**, meaning the failure of power or other utility service if the failure takes place off the "residence premises." But if the failure of power or other utility service results in a loss, from a PERIL INSURED AGAINST on the "residence premises," we will pay for the loss or damage caused by that PERIL INSURED AGAINST.

(This is exclusion **1.d.** in form **HO 00 03**.)

For form **HO 00 03**, the following is added as item **2.d.**

**d.** **Cosmetic Loss or Damage,** meaning any loss that alters only the physical appearance of the metal roof covering but:



**(1)** does not result in the penetration of water through the metal roof covering; or

**(2)** does not result in the failure of the metal roof covering to perform its intended function of keeping out the elements over an extended period of time.

Metal roof covering means the metal roofing material exposed to the weather; the underlayments applied for moisture protection; and all flashings required in the replacement of a metal roof covering.

We do cover loss or damage by hail to roof coverings that allow the penetration of water through the roof covering or that results in the failure of the roof covering to perform its intended function of keeping out the elements over an extended period of time.

## SECTION I – CONDITIONS

**2. Your Duties After Loss**

Paragraph **a.** is deleted and replaced by the following:

**a.** Give prompt notice to us or our agent. With respect to a loss caused by the peril of windstorm or hail, that notice must occur no later than 365 days after the date of loss.

**3. Loss Settlement.**

Under form **HO 00 06**, item **b.(2)** is deleted and replaced by the following:

**(2)** If the damage is not repaired or replaced within a reasonable time, at actual cash value but not more than the amount required to repair or replace.

The following paragraph is added and applies to this policy and to any Loss Settlement provision in any other endorsement applicable to this policy:

Loss Settlement does not include payment for any actual or perceived decrease in market or resale value resulting from loss to or repair of your covered property.

**8. Suit Against Us** is deleted and replaced by the following:

**8. Suit Against Us.** No action can be brought against us unless the policy provisions have been complied with.  Any action against us for denial of a claim, in whole or in part, must be commenced at any time up to, but not to exceed, one year from the date of the denial of the claim.

## SECTION II – EXCLUSIONS

Under **1.** COVERAGE E - Personal Liability and COVERAGE F - Medical Payments to Others; Item **a.** is deleted and replaced by the following:

**a.** Which is expected or intended by one or more "insureds";

## SECTIONS I AND II – CONDITIONS

**2. Concealment or Fraud** is deleted and replaced by the following:

**2. Concealment or Fraud**

**a.** Under SECTION **I** – PROPERTY COVERAGES, with respect to all "insureds" covered under this policy, we provide no coverage for loss under SECTION I - PROPERTY COVERAGES if, whether before or after a loss, one or more "insureds" have:

**(1)** Intentionally concealed or misrepresented any material fact or circumstance;

**(2)** Engaged in fraudulent conduct; or

**(3)** Made materially false statements;

relating to this insurance.

**b.** Under SECTION **II** – LIABILITY COVERAGES, we do not provide coverage to one or more "insureds" who, whether before or after a loss, have:

**(1)** Intentionally concealed or misrepresented any material fact or circumstance;

**(2)** Engaged in fraudulent conduct; or

**(3)** Made materially false statements;

relating to this insurance.

**5. Cancellation.** Paragraph **b.(3)** is deleted and replaced by the following:

**b. (3)** When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

**(a)** If you have made a material misrepresentation in the policy application which we have relied upon in affording coverage; or

**(b)** If the insured risk has substantially changed since the policy inception date and such change would warrant a



substantial difference in the premium charged.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

All other provisions of this policy apply



# AMENDATORY ENDORSEMENT

**THIS ENDORSEMENT CHANGES YOUR POLICY - PLEASE READ IT CAREFULLY**

*THIS ENDORSEMENT SUPERCEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

**SECTION 1 - PROPERTY COVERAGES**

**COVERAGE A - Dwelling**

Item 1. is amended as follows:

We cover:

1.  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling, and attached wall-to-wall carpeting;

**COVERAGE C - Personal Property**

The introductory paragraph of **Special Limits of Liability** is amended to read:

These do not increase the Coverage C limit of liability.  The special limit for each numbered category below is the total limit for each loss for all property in that category.  If personal property can reasonably be considered a part of two or more of the groups listed below, the lowest limit will apply.

The following limits are added:

12. $5000 on electronic data processing system equipment and the recording or storage media or accessories used with that equipment.

13. $5000 on any one article and $10000 in the aggregate for loss by theft of any rug, carpet (excluding attached wall-to-wall carpet), tapestry, wall-hanging or other similar article.

14. $2500 in the aggregate for loss of any of the following whether or not they are part of a collection: trading cards, comic books, figurines, stamps, advertising materials, stuffed animals, dolls, sports and entertainment memorabilia, toys, games, militaria, and books.

15. $1200 for any one electrical appliance for loss by sudden and accidental damage from artificially generated electrical currents. This special limit does not apply to electronic data processing equipment or storage media.

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in Special Limits of Liability introductory paragraph and Subparagraphs 12 through 15 are deleted.

**Property Not Covered** under **COVERAGE C - Personal Property**

The final two subparagraphs of Item 3 (a. and b.) are replaced by the following:

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

a.  Used solely to service an "insured's" residence; or

b.  Designed for assisting the handicapped;

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in the final two subparagraphs of Item 3 (a. and b.) is deleted.

Item 10. is added as personal property items not covered.

10.  Water or steam

**ADDITIONAL COVERAGES** is revised as follows:

Item 7. **Loss Assessment** is deleted in its entirety.

The following is added to Item 8. **Collapse**.

   With respect to this Additional Coverage:

   (1) Collapse means the sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.

   (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

   (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

   (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Item 10. **Landlord's Furnishings** is deleted in its entirety.



**SECTION I - PERILS INSURED AGAINST**

**COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES**

The following is added to item **2.b.**

    (4)   Footing(s)

The following are added to item **2.e.** Any of the following:

  (10)  Growth of trees, shrubs, plants or lawns whether or not such growth is above or below the surface of the ground;

  (11)  Matching of undamaged property. We will not pay to repair or replace undamaged property due to mismatch between undamaged material and new material used to repair or replace damaged material because of:

      (1)   texture, dimensional differences, color, fading;

      (2)   oxidation, rust, corrosion, weathering differences;

      (3)   wear and tear, marring, scratching, deterioration;

      (4)   inherent vice, latent defect, mechanical breakdown; or

      (5)   obsolescence or discontinuation

The following Additional Coverage is added to the policy:

In the case of damage to siding and/or roofing of the covered dwelling and other structures on the insured location, we will reimburse you for the cost you incur, up to a maximum of $15,000, to replace any undamaged siding, soffit, fascia, and/or roofing material of like kind and quality to match those materials that were damaged by the Perils of Windstorm or Hail.

This coverage applies only if a reasonably similar siding and/or roofing shingles are no longer available to repair or replace the damaged portion of the damaged covered dwelling and other structures on the insured premises.

This coverage will not apply to mismatches caused by weathering, fading, oxidizing, wear and tear, deterioration, or product defect.

The siding coverage does not apply to siding material other than vinyl or metal siding. The matching roofing coverage does not apply to roofing material other than architectural (laminated) asphalt shingle or 3-tab asphalt shingle.

We will not pay to replace siding and/or roofing material of any undamaged dwelling or other structure on the insured premises in order to match newly repaired or replaced siding and/or roofing material of any damaged dwelling or other structure.

The final paragraph of Item 2. is further revised as follows:

If any of these cause sudden and accidental water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

**SECTION II - EXCLUSIONS**

Item **1.a.** under **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** is amended as follows:

Which is expected or intended by the "insured", even if the resulting "bodily injury" or "property damage"

    1)  is of a different kind, quality, or degree than initially expected or intended; or

    2)  is sustained by a different person, entity, real or personal property, than initially expected or intended.

    However, this exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**SECTION II - ADDITIONAL COVERAGES**

Item **1.c.** under **Claims Expenses** is amended as follows:

Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit.

Item **4. Loss Assessment** is deleted in its entirety.

All other policy terms and conditions apply



## HOMEOWNER AMENDATORY ENDORSEMENT

**THIS ENDORSEMENT CHANGES YOUR POLICY - PLEASE READ IT CAREFULLY**

*THIS ENDORSEMENT SUPERSEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

**DEFINITIONS**

The introductory paragraph of **Definitions** is amended to read:

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and
   (1) the spouse of the "named insured" shown on the Declarations, if a resident of the same household; or
   (2) the partner in a civil union, registered domestic partnership, or similar union or partnership, with the "named insured" shown on the Declarations, if a resident of the same household.

Section (2), above, only applies if the civil union, registered domestic partnership or other similar union or partnership is validly entered into under the law of any state, territory or possession of the United States of America, any territory or province of Canada, or the equivalent of a state or province in any other country.

"We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

**SECTIONS I AND II - CONDITIONS**

The introductory paragraph of **9. Death.** is amended to read:

If any person named in the Declarations or the spouse, if a resident of the same household; or the partner in a civil union, registered domestic partnership or similar union or partnership, if a resident of the same household, dies:



# AMENDATORY MOLD, FUNGUS, WET ROT, DRY ROT, BACTERIA, OR VIRUS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**DEFINITIONS**

The following definition is added to the DEFINITIONS section:

9. **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** means any type or form of fungus, rot, virus or bacteria.  This includes mold, mildew and any mycotoxins  (meaning a toxin produced by a fungus), other microbes, spores, scents or byproducts  produced or released by mold, mildew, fungus, rot, bacteria, or viruses.

**SECTION I – PROPERTY COVERAGES**

**Additional Coverages**

The following Additional Coverage is added:

11. **Remediation of "Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus" Resulting Directly From Any Covered Loss**

   We will pay, up to the Additional Coverage – Mold Limit of Liability shown below, for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss.

   **"Remediation"** means the reasonable and necessary treatment, containment, decontamination, removal or disposal of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** as required to complete the repair or replacement of property, covered under Section I of the policy, that is damaged by any covered peril insured against, and also consists of the following:

   1. The reasonable costs or expense to remove, repair, restore, and replace that property including the costs to tear out and replace any part of the building as needed to gain access to the **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

   2. the reasonable costs or expense for the testing or investigation necessary to detect, evaluate or measure **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

   3. any loss of fair rental value, or reasonable increase in additional living expenses, that is necessary to maintain your normal standard of living, if **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss makes your residence premises uninhabitable.

We will pay no more than the Additional Coverage - Mold Limit of Liability shown below for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss during the policy period, regardless of the number of locations under the policy to which this endorsement is attached, the number of persons whose property is damaged, the number of "insureds," or the number of losses or claims made.

If there is a covered loss or damage to covered property, not caused, in whole or in part, by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** loss payment will not be limited by the terms of this Additional Coverage, except to the extent that **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.



## ADDITIONAL COVERAGE -- MOLD LIMIT OF LIABILITY

| Mold Limit of Liability: | SECTION I | Aggregate Limit | $5,000 |
|---|---|---|---|

This Additional Coverage does not increase the limits of liability under Section I of the policy as shown in the Declarations.

**SECTION I – EXCLUSIONS**

Exclusion **1.i.** is added:

i.  Except as provided by **Additional Coverage 11.**, loss consisting of or caused by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** is excluded, even if resulting from a peril insured against under Section I. We do not cover **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** even if resulting from a peril insured against under Section I, except as provided by **Additional Coverage 11.**

**SECTION II – EXCLUSIONS**

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others**
Exclusion **1.m.** is added:

m.  Arising out of or aggravated by, in whole or in part by, **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus."**

**This endorsement takes precedence over all other endorsements attached to your policy.**



# SEEPAGE EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**SECTION I – PERILS INSURED AGAINST**

    **Coverage A – Dwelling and Coverage B – Other Structures**

    **Paragraph 2.e.(9)** is added:

        **(9)** Seepage, meaning a gradual, continuous, or repeated seepage or leakage of water, steam or fuel over a period of 14 days or more, resulting in damage to the structure, whether hidden or not.

**This endorsement takes precedence over all other endorsements attached to your policy.**



## <u>NO</u> SECTION II - LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## <u>LIMITED</u> SECTION I - PROPERTY COVERAGES FOR HOME DAY CARE
## BUSINESS                                                    HO 04 96 04 91

If an "insured" regularly provides home day care services to a person or persons other than "insureds" and receives monetary or other compensation for such services, that enterprise is a "business." Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an "insured" to a relative of an "insured" is not considered a "business."

Therefore, with respect to a home day care enterprise which is considered to be a "business," this policy:

**1.** Does not provide Section II - Liability Coverages because a "business" of an "insured" is excluded under exclusion **1.b.** of Section II - Exclusions;

**2.** Does not provide Section I - Coverage B coverage where other structures are used in whole or in part for "business";

**3.** Limits coverage for property used on the "residence premises" for the home day care enterprise to $2,500, because Coverage C - Special Limits of Liability - item **8.** imposes that limit on "business" property on the "residence premises." (Item **8.** corresponds to item **5.** in Form **HO 00 08.**);

**4.** Limits coverage for property used away from the "residence premises" for the home day care enterprise to $250, because Coverage C - Special Limits of Liability - item **9.** imposes that limit on "business" property away from the "residence premises." Special Limit of Liability item **9.** does not apply to adaptable electronic apparatus as described in Special Limit of Liability items **10.** and **11.** (Items **9., 10.** and **11.** correspond to items **6., 7.** and **8.** respectively in Form **HO 00 08.**)

THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.



## INFLATION PROTECTION ENDORSEMENT

It is agreed that the limits of liability for:

Coverage A, Dwelling;

Coverage B, Structure;

Coverage C, Personal Property;

and Coverage D, Loss of Use,

shall be raised by the rate of increase in the latest available information on residential building cost inflation.

**METHOD**

To find the limits of liability on a given date, the Index Level the Company assigns to that date will be divided by the Index Level for the effective date of this Endorsement. This Factor is then multiplied by the limit for Coverages A, B, C and D separately.

If during this policy's term the Coverage A limit is changed at the insured's request, the effective date of this Endorsement is amended to the effective date of such change.

This Endorsement shall not reduce the limits of liability to less than the amount shown on:

a.  The policy; or

b.  The most recent Homeowners Policy Renewal Declaration.

This Endorsement must be attached to Change Endorsement when issued after the policy is written.



# LEAD POISONING EXCLUSION ENDORSEMENT

The following provisions are added to and made part of your Homeowners Policy:

Section I - Property Coverages do not apply to any costs or expenses incurred or loss arising out of:

1.  the removal, testing for, monitoring, clean-up, abatement, treatment, or neutralization of lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead, or;

2.  any governmental direction or other request that you test for, monitor, clean-up, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead.

Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to bodily injury or property damage:

1.  arising out of lead paint, plaster or putty containing lead; soil or earth containing lead or any other material or substance containing lead, or;

2   any costs or expenses incurred or loss arising out of any claim, governmental direction, or request that you test for, monitor, clean-up, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead.

This exclusion applies to any obligation to share damages, costs or expenses with someone else or to repay someone else who must pay damages, costs or expenses.

FMHO 976 (Ed. 5-92)            **LIBERTY MUTUAL GROUP**                        Page 1 of 1



## UNDERGROUND FUEL STORAGE TANK EXCLUSION

**The following provision is added to and made part of your Homeowners Policy:**

**Section II - Exclusions**

**The Paragraph below is added:**

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to "bodily injury" or "property damage":**

arising out of the release of fuel or fuel products from an "underground storage tank system."

"Underground storage tank system" means the underground tank, the fill pipe, the vent pipes, and all associated fixtures, including pipe and tubing which contains or conveys fuel or fuel products from the underground storage tank to the point of combustion.

All other provisions of this policy apply.

FMHO 1097 (Ed. 1-97)                    Liberty Mutual Group                    Page 1 of 1



## AMENDMENT TO CANCELLATION PROVISIONS

**SECTIONS I AND II - CONDITIONS**

5. **Cancellation.**

   Paragraph **a.** is deleted and replaced by the following:

   **a.** You may cancel this policy at any time by returning it to us or by letting us know verbally or in writing of the date the cancellation is to take effect.

FMHO 2155                                                                                                        Page 1 of 1