# Exhibit "2"

# Swainston Deposition Transcript Excerpt

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3

 4  DARLENE CARTER, an individual;    )
    and DAVID BIANCO, an individual,  )
 5                                    )
            Plaintiffs,               )
 6                                    )
          vs.                         ) CASE NO.
 7                                    ) 2:19-CV-01779-APG-BNW
    LIBERTY MUTUAL INSURANCE, a       )
 8  foreign entity; LIBERTY INSURANCE )
    CORPORATION, a foreign            )
 9  corporation, DOES I-X; ROE        )
    CORPORATIONS I-X, inclusive,      )
10                                    )
            Defendants.               )
11  _____)

12

13

14

15

16

17        DEPOSITION VIA ZOOM OF LANE SWAINSTON

18
                    LAS VEGAS, NEVADA
19
                TUESDAY, NOVEMBER 24, 2020
20

21

22

23

24  REPORTED BY:  DONNA E. MIZE, CCR NO. 675, CSR 11008

25                    JOB NO: 688908
```

Page 38

1 them to pay us. I assume it was the two insurance
2 carriers.
3   Q.   Who was the public adjuster?
4   A.   I don't recall. I would have to dig that
5 information out.
6   Q.   Do you remember the name of the company?
7   A.   No, I don't. It's been a few years ago.
8   Q.   Your recollection is by virtue of that
9 engagement you were given access to and read written
10 claim handling policies and procedures?
11  A.   I had PMKs come to the site from the
12 insurance carrier and that's when that discussion took
13 place. I don't recall necessarily that they had their
14 procedures written out to show me, but they were the
15 ones that had written the procedures and we discussed
16 at length different approaches to the work that would
17 reduce the friction that was developing.
18  Q.   It sounds like at least with regard to the
19 Black Bear Diner, I will call it dispute that you were
20 involved in, you don't recall reading written insurance
21 company claim handling policies and procedures; is that
22 true?
23  A.   I don't. I think they might have had one of
24 their manuals with them and might have referred to it,
25 but I don't know for sure.

Page 39

1   Q.   Have you ever do you believe reviewed written
2 insurance company claim handling policies and
3 procedures?
4   A.   Yes. For example, we used to offer a service
5 to firms, Maryland Casualty again comes to mind, where
6 we went to their office in Sacramento and met with
7 their underwriters, their adjusters and other teams
8 within their organization to give them feedback on some
9 of the procedures that they had. We talked to them
10 about claims resolution and how some of the
11 decision-making processes they were involved in either
12 helped or made things worse in a claim. Our purpose
13 was to assist them to make things easier for us when we
14 got hired on a matter.
15  Q.   When was that?
16  A.   That's been over a decade. That's some time
17 ago. That was one of our initial meetings like that.
18 From a marketing standpoint we decided we would offer
19 at no charge those kind of training sessions to
20 insurance carriers, to owners of properties, to general
21 contractors and developers, the subcontractors and so
22 we made a presentation that's tailored to those kind of
23 groups. We do presentations at no cost to law firms
24 where we talk about use of experts and technology and
25 different types of lawsuits. Often times we are

Page 40

1 involved in premises liability and we get involved in
2 helping law firms understand how to get the most out of
3 their experts.
4   Q.   It sounds like what you are referring to in
5 that response is you provide guidance about how to
6 utilize consultants for the purpose of discerning
7 information that could be useful for dispute resolution
8 or claim resolution; is that true?
9   A.   Yes, that often involves different
10 applications of technology. We sometimes have been
11 brought in on claims where our charge was to help put a
12 team together to answer the claim.
13  Q.   In those circumstances what you've been asked
14 to do is apply your expertise with regard to the
15 construction process and associated standards to
16 determine what information is impactful for the claim
17 and how to get it; is that true?
18  A.   Yes. Combined with analysis of failure to
19 assist in finding out what went wrong and special
20 measurement to preserve a scene. We will do infrared
21 laser scanning outdoors and we have a laser scanner
22 that has a range of 330 meters. Depending on how we
23 use that, we can get extremely specific and accurate
24 measurements of anything in that scene, especially if
25 that scene is going to be altered going forward.

Page 41

1   Q.   I'm worried we are getting a little far
2 afield so I'm going to discuss something slightly
3 different.
4        Have you seen the expert designations
5 prepared by the plaintiff for your consulting and
6 opinions for this matter?
7   A.   I believe so.
8   Q.   Did you contribute to those?
9   A.   I believe so, yes. I spoke to them about --
10 obviously, they told me what they wanted me to do and
11 then I spoke to them about what I was proposing to do
12 to accomplish that assignment.
13  Q.   For the initial expert --
14  A.   You are talking about the designation of me
15 as a plaintiff's expert; is that correct?
16  Q.   Yes, sir. Your recollection is you believe
17 you had seen that document and that its contents were
18 fine with you?
19  A.   I believe so.
20  Q.   The initial expert disclosure states as
21 follows under your name. Lane Swainston is a principal
22 consultant and expert as to construction, engineering,
23 standards and repair as well as the valuation thereof
24 and is expected to testify regarding those matters
25 stated in his report as well as any other related

LANE SWAINSTON - 11/24/2020

Page 42

1 matters as such information is discovered or provided
2 to. It says Ms. Swainston but I'm sure it's intended
3 to be Mr. Swainston and included in any additions,
4 updates or revisions to the report produced herein.
5         Is that an accurate description of your
6 description in your involvement and anticipated scope
7 of testimony in this matter?
8    A.   I think it generally is, yes.
9    Q.   You have referenced insurance a couple times
10 so I want to understand. Are you intended to provide
11 any sort of expert opinions with regard to any aspect
12 of insurance in this matter?
13   A.   Only to the extent I might offer some of my
14 experiential input with respect to how long things
15 should take to resolve an insurance claim.
16   Q.   When you say that I think what you mean is
17 you have had involvement with insurance companies
18 through your consulting and have through that developed
19 some impressions in terms of how long certain aspects
20 of claims should take; is that true?
21   A.   Yes. Sometimes we get brought in, for
22 example, when an insurance carrier draws things out
23 unnecessarily and we have to analyze the impacts of
24 that on the project or loss.
25   Q.   I think what you are saying is there have

Page 43

1 been times when delays related to conduct by insurance
2 companies has had an effect on construction and
3 conditions and repairs; is that right?
4    A.   I think it could be delays, it could be
5 intransigents with respect to coverage. In such cases
6 I have seen insurance carriers when we got access to
7 their records and their policy was to say no as many
8 times as possible that they could get away with it
9 instead of exploring a resolution. That's been
10 exceptional. I don't see that very often but some
11 carriers have tended to be intransigent.
12        I'm speaking from the standpoint of being
13 their expert as well as the standpoint of being the
14 expert for a plaintiff that was pursuing a claim
15 against the carrier.
16   Q.   What do you mean when you say intransigent?
17   A.   In the face of information that would
18 indicate that there should be a resolution to a problem
19 that was covered under the policy. When I see an
20 insurance carrier continue to say no with no reasonable
21 backup for that decision I call that intransigent.
22   Q.   When you use that term and context, which you
23 are meaning as an insurance company denying coverage
24 without a reasonable basis?
25        MR. MACK: Form.

Page 44

1         THE WITNESS: I think that's part of it.
2 BY MR. GREEN:
3    Q.   What are the other parts?
4    A.   I think some carriers simply have more of a
5 hard-nosed approach where they think if they say no
6 enough that people will die in a war of attrition and
7 just give up. Often times most people don't have the
8 kind of financing to fight an insurance carrier that
9 has a bevy of lawyers both in house and outside
10 counsel.
11        Again, I'm saying this as less of a frequency
12 but it happens. That is where things like bad faith
13 get thrown around by people and I think people start to
14 be disappointed in contractors that are involved and
15 disappointed in insurance representatives and sometimes
16 disappointed in lawyers.
17   Q.   For the purpose of our deposition I want to
18 make sure that I understand as best I can the scope of
19 the opinions that you are going to give in this matter.
20 I don't believe you have given any opinions in any of
21 your reports with regard to bad faith or status of
22 compliance with covenants or implied covenants.
23        Are you going to give any opinions with
24 regard to that?
25   A.   To the extent I'm going to tell the story of

Page 45

1 how this has been drawn out over time and how that
2 resulted in additional damage it may indirectly speak
3 to those issues.
4         My purpose would not be to give an exhaustive
5 analysis of what an insurance carrier should do. My
6 purpose will be to identify what happened here and that
7 is an extraordinary set of circumstances. That's not
8 typical for an insurance claim.
9    Q.   You are not going to give any opinion of bad
10 faith; is that true?
11   A.   Well, I'm not going to use the term bad
12 faith, but what I'm going to describe is going to look
13 like and sound like bad faith.
14   Q.   I think what you mean when you say that is
15 you're going to state opinions based upon what you
16 understand to be the chronology, but those opinions
17 relate to the impact on damage to the home and the
18 repairs that are required and the associated cost; is
19 that true?
20   A.   I think that's part of it. Another part of
21 it is the fact that people were making decisions when
22 they hadn't even been to the job site. They were
23 relying either on someone else's photographs or someone
24 else's description and making decisions that I felt
25 were uninformed. I found it to be extraordinary that

Page 46

one of the key experts in this matter has never been to the job site.

Q. Who is that?

A. I believe it was the gentleman that offered the report on behalf of Liberty Mutual, William Trigwell. He talks about how he didn't go to the site and made measurements using Google Earth. I found that to be outrageous. I didn't want to be too bias, but I contacted a colleague who is also a certified professional aerial photography like myself.

I'm a certified master photographer, and I explained to him that I was involved in a matter where somebody was doing quantity takeoffs using Google Earth and he burst out laughing. I think he thought I was kidding.

When it comes down to that type of thing we either like to go to the site and measure things. We went to the site here on two occasions, or we will use the imagery that's available through the county. The county has aerial photography shot once a year, and that is intended to be able to be used for measurement. The idea that an expert would use Google Earth for anything other than verifying, for example, that something was on a site but to use it for measurements and offer that as a professional approach I can't

Page 47

relate to that.

Q. You are not giving any opinions with regard to compliance with the Nevada Unfair Practices Act; is that true?

A. I hadn't planned on that, no.

Q. You haven't prepared any opinions like that either; is that true?

A. That's correct. My commentary will probably relate to those kind of issues, but I'm not coming in as an expert on those particular aspects of law.

Q. You are not giving any opinions with regard to the content of the policy and its terms; is that true?

A. I'm not sure. There might be some aspects of the policy where somebody might ask a question I can't anticipate right now.

Q. You have not prepared any opinions like that at this point; is that true?

A. No, I haven't.

Q. You will not give any opinions with regard to compliance with claim handling, standards or procedures; is that true?

A. Only to the extent that I've already explained. There may be some commentary where I answer, for example, should it take this long to

Page 48

resolve this type of damage on a house like this, and I can categorially say no, it shouldn't, that's outrageous; and I'm qualified to make that comment.

Q. You have not prepared any opinions with regard to compliance or noncompliance with any insurance standards of policies and procedures; is that true?

A. Correct. Anything that I have prepared would be used indirectly. I'm going to speak to timing, I'm going to speak to responsiveness, I'm going to speak to what happened on this particular project, and that could very easily then be fit up against the template of what the law requires.

Q. My point in those questions, and I think that you have gathered it, is to confirm you do not intend to provide any testimony with regard to insurance; is that true?

A. Yes, I'm not an insurance guy. I do work for them, I advise them but I'm not planning on giving some exhaustive review of the NRS when it comes to insurance requirements.

Q. What you are going to give testimony about is the construction related aspects of this matter and that will include discussion with regard to how long it should take to achieve certain components of

Page 49

investigation and construction.

Do I understand that correctly?

A. Yes. Included in that would be inspection of the residence to prevent further damage, for example, and/or timely resolution of roof leaks so the interior doesn't continue to be damaged.

Q. I think we have been going for an hour now that we have gotten reconnected. Why don't we take a five minute break.

(A recess was taken.)

BY MR. GREEN:

Q. Back on the record after a quick break. Mr. Swainston, I have report documents from you. I have two of them. One is dated September 13, 2019 and one of them is dated July 30, 2020.

Are those all the reports you prepared for this matter, excluding the supplemental report that is in process?

A. That's correct.

Q. Before we start talking about them are there any changes that you think need to be made to either of those documents?

A. No. There might be some clarification in my supplemental but no, I don't see any changes.

Q. The September 13, 2019 report, this is a